1   DOWNEY BRAND LLP
    WILLIAM R. WARNE (Bar No. 141280)
2   MICHAEL J. THOMAS (Bar No. 172326)
    MEGHAN M. BAKER (Bar No. 243765)
3   555 Capitol Mall, Tenth Floor
    Sacramento, CA 95814-4686
4   Telephone: (916) 444-1000
    Facsimile: (916) 444-2100
5   bwarne@downeybrand.com
    mthomas@downeybrand.com
6   mbaker@downeybrand.com

7   Attorneys for Defendants
    SUPERIOR FIREPLACE COMPANY; LENNOX
8   HEARTH PRODUCTS INC.; LENNOX
    INTERNATIONAL INC.

9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12

13   KIRK KEILHOLTZ and KOLLEEN            Case No. C 08-00836SI
     KEILHOLTZ for themselves and on behalf
14   of those similarly situated,           **INDEX OF TREATISES AND NON-
                                            CALIFORNIA AUTHORITIES CITED IN
15                  Plaintiffs,             DEFENDANT SUPERIOR FIREPLACE
                                            COMPANY'S MEMORANDUM OF
16          v.                              POINTS AND AUTHORITIES IN
                                            SUPPORT OF MOTION TO DISMISS
17   SUPERIOR FIREPLACE COMPANY;            UNDER FEDERAL RULES OF CIVIL
     LENNOX HEARTH PRODUCTS INC.;           PROCEDURE 9(b) AND 12(b)(6)**
18   LENNOX INTERNATIONAL INC. and
     DOES 1 through 25, Inclusive,
19                                          Date:        October 3, 2008
                    Defendants.             Time:        9:00 a.m.
20                                          Location:    Courtroom 10

21                                          Complaint Filed February 6, 2008

22

23

24          Please find attached a courtesy submission of Treatises and Non-California Authorities

25   Cited by Defendant Superior Fireplace Company in its Memorandum of Points and Authorities in

26   Support of Motion to Dismiss Under Federal Rules of Civil Procedure 9(b) and 12(b)(6).

27   ////

28   ////

939318.1                                  1

1    DATED: July 14, 2008                    DOWNEY BRAND LLP

2

3                                            By: /s/ William R. Warne

4                                                 WILLIAM R. WARNE
                                                  Attorney for Defendants
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INDEX OF NON-CALIFORNIA AUTHORITIES AND TREATISES CITED IN DEFENDANT SUPERIOR FIREPLACE COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE 9(b) AND 12(b)(6)**

## STATUTES

1. 8 Del. Code Ann. § 259.

2. 8 Del. Code Ann. § 261.

## TREATISES

1. 15 Fletcher Cyc. Corp. (2008) § 7082.

2. Friedman, Cal. Practice Guide: Corporations, Ch. 8-B § 8:161.

**STATUTE:  8 Del. Code Ann. § 259**

8 Del.C. § 259

West's Delaware Code Annotated Currentness
  Title 8. Corporations
    Chapter 1. General Corporation Law
      Subchapter IX. Merger, Consolidation or Conversion
      ➡**§ 259. Status, rights, liabilities, of constituent and surviving or resulting corporations following merger or consolidation**

(a) When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, as the case may be, possessing all the rights, privileges, powers and franchises as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated; and all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any of said constituent corporations on whatever account, as well for stock subscriptions as all other things in action or belonging to each of such corporations shall be vested in the corporation surviving or resulting from such merger or consolidation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations, and the title to any real estate vested by deed or otherwise, under the laws of this State, in any of such constituent corporations, shall not revert or be in any way impaired by reason of this chapter; but all rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

(b) In the case of a merger of banks or trust companies, without any order or action on the part of any court or otherwise, all appointments, designations, and nominations, and all other rights and interests as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, trustee of estates of persons mentally ill and in every other fiduciary capacity, shall be automatically vested in the corporation resulting from or surviving such merger; provided, however, that any party in interest shall have the right to apply to an appropriate court or tribunal for a determination as to whether the surviving corporation shall continue to serve in the same fiduciary capacity as the merged corporation, or whether a new and different fiduciary should be appointed.

56 Laws 1967, ch. 50; 56 Laws 1967, ch. 186, § 23.

**Codifications:** 8 Del.C. 1953, § 259

LIBRARY REFERENCES

    Banks and Banking ⬗67, 315.5.
    Corporations ⬗586 to 590.
    Westlaw Key Number Searches: 52k67; 52k315.5; 101k586 to 101k590.
    C.J.S. Banks and Banking §§ 158 to 161, 646.
    C.J.S. Corporations §§ 807 to 810.

RESEARCH REFERENCES

ALR Library

172 ALR 512, Ownership of Stock at Time Cause of Action Arose as Condition of Stockholder's Right to Maintain Nonderivative Action.

168 ALR 906, Right of Former Stockholder to Maintain Stockholder's Suit.

154 ALR 1295, Rights of Stockholder of One Corporation to Maintain Derivative Action in Right of Another Corporation Stock of Which is Owned by the Former Corporation "Double Derivative Suit".

149 ALR 787, Liability of Corporation for Debts of Predecessor.

Treatises and Practice Aids

BNA Corporate Practice Series No. 61 § IV, IV. Due Diligence Investigation and Successor Liability Issues.

BNA Corporate Practice Series No. 61-2 § IV, IV. Due Diligence Investigation and Successor Liability Issues.

Bromberg & Lowenfels on § Fraud & Commodities Fraud § 5:195, The Problem.

Bromberg & Lowenfels on § Fraud & Commodities Fraud § 5:197, The Equitable and Federal Law Approach.

Fletcher Cyclopedia Law of Private Corporations § 7086, on Consolidation or Merger in General.

Fletcher Cyclopedia Law of Private Corporations § 7089, Powers and Rights Acquired.

Fletcher Cyclopedia Law of Private Corporations § 7095, Exemptions and Immunities Passing to New Company.

Fletcher Cyclopedia Law of Private Corporations § 7109, Constitutional or Statutory Provisions Imposing or Regulating Liability.

Fletcher Cyclopedia Law of Private Corporations § 7121, in Case of Statutory Merger.

Fletcher Cyclopedia Law of Private Corporations § 7168, Right of Creditor to Enjoin Consolidation or Merger.

Law and Practice of Insurance Coverage Litigation § 46:9, Preliminary Considerations for Counsel-- Counsel for the Insured--Mergers and Successor Corporations.

Law of Corp. Offs. & Dirs.: Rts., Duties & Liabs. § 9:4, Requirements for Suits--Shareholder Status and Contemporaneous Ownership.

Law of Toxic Torts App 31M, California Court of Appeals Decision in Asbestos Insurance Coverage Cases.

Partnership Law for Securities Practitioners § 2:27, Relations of Partners to One Another-- Transferability of Interests in a Partnership.

Shareholder Derivative Actions: Law and Practice § 4:3, Rules of Civil Procedure and Statutory Provisions Governing Derivative Suits--Plaintiff's Ownership of Shares.

NOTES OF DECISIONS

In general 1
Actions between shareholders and officers or agents 3
Actions on judgments, liabilities for debts and acts of original corporations 12
Conclusiveness of adjudication 21
Contracts, liabilities for debts and acts of original corporations 8
Conveyances, liabilities for debts and acts of original corporations 11
Creditor remedies 20
Debts, liabilities for debts and acts of original corporations 13
Equitable estoppel 19
Foreign corporations 17
Joint adventures 15
Labor contracts, liabilities for debts and acts of original corporations 9
Labor dispute resolution, liabilities for debts and acts of original corporations 10
Liabilities for debts and acts of original corporations 7-14
    Liabilities for debts and acts of original corporations - In general 7
    Liabilities for debts and acts of original corporations - Actions on judgments 12
    Liabilities for debts and acts of original corporations - Contracts 8
    Liabilities for debts and acts of original corporations - Conveyances 11
    Liabilities for debts and acts of original corporations - Debts 13
    Liabilities for debts and acts of original corporations - Labor contracts 9
    Liabilities for debts and acts of original corporations - Labor dispute resolution 10
    Liabilities for debts and acts of original corporations - Torts 14
Patents 16
Persons entitled to sue or defend 2
Rights and remedies of dissenting stockholders 6
Sequestration 18
Status of original and consolidated corporations 4
Succession to rights of original corporations 5
Torts, liabilities for debts and acts of original corporations 14

1. In general

The substantial elements of merger and consolidation provisions of General Corporation Law are written into every corporate charter, and a shareholder has notice that corporation whose shares he has acquired may be merged with another corporation if required majority of shareholders agree, and is informed that merger agreement may prescribe the terms and conditions of merger and the mode of carrying it into effect and may "convert," which means to alter in form, substance, or quality, shares of the constituent corporation into shares of the resulting corporation. Rev.Code 1935, §§ 2091, 2092, 2093, and § 2091A, as added by 41 Del.Laws, c. 131, § 2. Federal United Corp. v. Havender, 1940, 11 A.2d 331. Corporations ⬅ 581

In construing proviso of statute relating to merger of corporations providing that all rights of creditors and all liens upon any property of the constituent corporations shall be preserved unimpaired and attached to resulting corporation, Legislature presumably intended to give to the words and terms employed by it their usual and ordinary meaning and significance. Rev.Code 1935, § 2092. Federal United Corp. v. Havender, 1940, 11 A.2d 331. Corporations ⬅ 581

2. Persons entitled to sue or defend

Where corporation merges and plaintiff receives shares of successor corporation, Delaware statute on standing to bring derivative suit poses no obstacle to the suit on behalf of successor corporation for premerger act; successor corporation succeeds to cause of action. 8 Del.C. §§ 259, 327. Blasband v. Rales, 1992, 971 F.2d 1034. Corporations ⬅ 207.1

Under Delaware law, neither plaintiff nor any other former stockholder of first corporation had standing to maintain derivative action on its behalf where, pending action, corporation was merged into other corporations and its stock was converted into preferred stock of parent corporation. 8 Del.C. § 259. Heit v. Tenneco, Inc., 1970, 319 F.Supp. 884. Corporations ⬗ 207

A merger which eliminates a shareholder's ownership of stock in a corporation also eliminates his or her status to bring a derivative suit on behalf of the corporation, on the theory that upon the merger the derivative rights pass to the surviving corporation which then has the sole right or standing to prosecute the action. In re Syncor Intern. Corp. Shareholders Litigation, 857 A.2d 994 (2004). Corporations ⬗ 207; Corporations ⬗ 589

A derivative shareholder must not only be a stockholder at the time of the alleged wrong and at the time of commencement of suit but that he must also maintain shareholder status throughout the litigation. 8 Del.C. §§ 259, 327; Chancery Court Rule 23.1. Lewis v. Ward, 852 A.2d 896 (2004). Corporations ⬗ 207

A merger which eliminates a complaining stockholder's ownership of stock in a corporation also ordinarily eliminates his status to bring or maintain a derivative suit on behalf of the corporation, whether the merger takes place before or after the suit is brought, on the theory that upon the merger the derivative rights pass to the surviving corporation which then has the sole right or standing to prosecute the action. 8 Del.C. §§ 259, 327; Chancery Court Rule 23.1. Lewis v. Ward, 852 A.2d 896 (2004). Corporations ⬗ 207; Corporations ⬗ 589

The "mere reorganization" exception to general rule that merger that eliminates derivative plaintiff's ownership of shares of corporation terminates plaintiff's standing did not apply in shareholder's derivative suit on behalf of corporation that merged with, and became subsidiary of, third-party corporation; merging corporations were unaffiliated, distinct corporations with separate boards of directors, officers, and stockholders, and not merely a holding company with affiliated directors and shareholders. Lewis v. Ward, 852 A.2d 896 (2004). Corporations ⬗ 207; Corporations ⬗ 589

Purpose of rule which requires that derivative shareholder be stockholder at time of alleged corporate wrong and at time of commencement of action and that shareholder maintain shareholder status throughout litigation is to eliminate abuses associated with derivative suit. 8 Del.C. §§ 259, 261, 327; Chancery Court Rule 23.1, Del.C.Ann. Lewis v. Anderson, 1984, 477 A.2d 1040. Corporations ⬗ 207

Exceptions to rule that shareholder in derivative action be stockholder at time of alleged wrong and at time of commencement of action and maintain shareholder status throughout litigation are where merger which terminates shareholder's status is itself subject of claim of fraud and where merger is in reality reorganization which does not affect plaintiff's ownership of business enterprise. 8 Del.C. §§ 259, 261, 327; Chancery Court Rule 23.1, Del.C.Ann. Lewis v. Anderson, 1984, 477 A.2d 1040. Corporations ⬗ 207

Plaintiff who ceases to be shareholder, whether by reason of merger or for any other reason, loses standing to continue derivative suit; disagreeing with Susman v. Lincoln American Corp., 587 F.2d 866, Abrams v. Occidental Petroleum Corporation, 20 F.R.Serv.2d 170, and Albert v. Salzman, 41 A.D.2d 501, 344 N.Y.S.2d 457. 8 Del.C. §§ 259, 261, 327. Lewis v. Anderson, 1984, 477 A.2d 1040. Corporations ⬗ 207

By virtue of merger, derivative rights of old company passed to surviving corporation and neither shareholders of old corporation who had nor those who had not demanded appraisal could sue derivatively. 8 Del.C. § 253, subd. (b). Braasch v. Goldschmidt, 1964, 199 A.2d 760. Corporations ⬗ 207; Corporations ⬗ 589

3. Actions between shareholders and officers or agents

Shareholder who brought derivative action against management of corporation which was merged into new corporation, with result that action, which was property right of former corporation, became vested in surviving corporation, and who did not assert that merger was perpetrated to deprive

former corporation of its claim against management, did not have standing to continue action. 8 Del.C. §§ 259, 261, 327. Lewis v. Anderson, 1984, 477 A.2d 1040. Corporations ⬅ 320(4)

Corporation which acquired former shareholder's derivative action against former management of merged corporation protesting their "golden parachutes" would not be denied standing to assume former shareholder's action on basis that recovery would constitute inequitable windfall, as acquiring corporation would be pursuing former corporation's assets and minimizing its liabilities, all of which passed to acquiring corporation by virtue of merger, and thus, dismissal of former shareholder's action would not leave "wrong" unremedied. 8 Del.C. § 259. Lewis v. Anderson, 1984, 477 A.2d 1040. Corporations ⬅ 320(4)

4. Status of original and consolidated corporations

Under Delaware law, statutory merger results in combination of two corporations with surviving corporation attaining property, rights, and privileges of absorbed corporation, as well as retaining its own property, rights, and privileges. 8 Del.C. §§ 251, 259. Texaco Refining and Marketing, Inc. v. Delaware River Basin Com'n, 1993, 824 F.Supp. 500, affirmed 30 F.3d 1488. Corporations ⬅ 586; Corporations ⬅ 589

5. Succession to rights of original corporations

Rights under certificates of entitlement that allowed holders to withdraw water from Delaware River Basin without charge were preserved upon statutory merger of various corporate holders; successor corporations were entitled to the certificates, which were granted under "grandfather" provision of Delaware River Basin Compact. 8 Del.C. §§ 103, 251, 253, 259. Texaco Refining and Marketing, Inc. v. Delaware River Basin Com'n, 1993, 824 F.Supp. 500, affirmed 30 F.3d 1488. Corporations ⬅ 589

Under Delaware law, tender offer is distinct from merger, and does not implicate requirements and protections of merger statute. 8 Del.C. § 251. Texaco Refining and Marketing, Inc. v. Delaware River Basin Com'n, 1993, 824 F.Supp. 500, affirmed 30 F.3d 1488. Corporations ⬅ 589

Under Delaware law, "ownership and control" test did not apply to determine whether rights under certificates of entitlement allowing holders to withdraw water from Delaware River Basin without charge were preserved upon merger of various corporate holders. Texaco Refining and Marketing, Inc. v. Delaware River Basin Com'n, 1993, 824 F.Supp. 500, affirmed 30 F.3d 1488. Corporations ⬅ 589

Under Delaware law, successful tender offer merely results in purchase of stock, not assets, of corporation; purchaser holds shares in corporation, but has no right to assets, rights, and privileges of corporation. Texaco Refining and Marketing, Inc. v. Delaware River Basin Com'n, 1993, 824 F.Supp. 500, affirmed 30 F.3d 1488. Corporations ⬅ 589

Any cause of action that a premerger company may have had against its attorney passes to surviving corporation under Delaware law. David B. Lilly Co., Inc. v. Fisher, 1992, 800 F.Supp. 1203. Corporations ⬅ 589

Surviving corporation was bound by terms of agreement between attorneys and clients, for purposes of the corporation's legal malpractice cause of action under Delaware law arising out of attorneys' alleged conduct in structuring corporate acquisition improperly; attorneys' duty of care could not be expanded after the fact. David B. Lilly Co., Inc. v. Fisher, 1992, 800 F.Supp. 1203. Corporations ⬅ 589

Shareholder who, upon acquisition of corporation, received stock of new parent corporation in exchange for his stock in the subsidiary did not have standing to maintain shareholder's derivative action, under Delaware law, on behalf of the subsidiary with respect to alleged breaches of fiduciary duties by subsidiary's directors prior to the merger, on theory that he continued to have an indirect interest in the subsidiary. 8 Del.C. § 327. Blasband on Behalf of Danaher Corp. v. Rales, 1991, 772 F.Supp. 850, vacated 971 F.2d 1034, certification dismissed 620 A.2d 858. Corporations ⬅ 589

Under Delaware law, surviving corporation of merger obtains all property and rights of any constituent corporation to merger. 8 Del.C. § 259. Phillips Petroleum Co. v. U.S. Steel Corp., 1983, 566 F.Supp. 1093, 221 U.S.P.Q. 852, affirmed 727 F.2d 1120. Corporations ⟐ 589

Under Delaware law, upon merger of first corporation into other corporations, all claims on behalf of first corporation were automatically transferred to successor corporation and first corporation, which ceased to exist, was barred from instituting or maintaining claims. 8 Del.C. § 259. Heit v. Tenneco, Inc., 1970, 319 F.Supp. 884. Corporations ⟐ 589

Shares sold by corporate insider need not be identical shares purchased, for corporation to be entitled to recover short-swing profits, but measure of recovery assumes that shares bought and sold are both fungible. Securities Exchange Act of 1934, § 16(b), 15 U.S.C.A. § 78p(b). Heit v. Tenneco, Inc., 1970, 319 F.Supp. 884. Corporations ⟐ 589

Allegations in shareholder's complaint, that directors of corporation had injured shareholders by approving "golden parachutes" and paying unnecessary fees and expenses in six months immediately preceding buy-out merger, stated derivative claim for waste that shareholder lacked standing to maintain following merger. Kramer v. Western Pacific Industries, Inc., 1988, 546 A.2d 348. Corporations ⟐ 589

Allegations in shareholder's complaint, that directors of corporation had injured shareholders by approving "golden parachutes" and paying unnecessary fees and expenses in six months immediately preceding buy-out merger, did not rise to level of attack on merger itself, for purpose of exception to rule that shareholder loses standing to bring derivative action following buy-out merger. Kramer v. Western Pacific Industries, Inc., 1988, 546 A.2d 348. Corporations ⟐ 589

Statute which provides that any action pending by or against corporation which is party to merger shall be prosecuted as if such merger had not taken place is directed solely to impact of merger on abatement of pending causes of action of constituent parties to merger and does not impinge on or amend statute which provides that all causes of action formally held by former corporation are transferred to surviving corporation nor require that premerger action be prosecuted to its ultimate end without regard to wishes of acquiring owner, but merely preserves acquiring owner's right to proceed with shareholder's action, should it choose to do so. 8 Del.C. §§ 259, 261. Lewis v. Anderson, 1984, 477 A.2d 1040. Corporations ⟐ 589

New corporation, which acquired former corporation, had exclusive control through its board of directors over its own affairs, including disposition of all choses in action and pending claims passing by reason of merger to it. 8 Del.C. § 259(a); Chancery Court Rule 23.1, Del.C.Ann. Lewis v. Anderson, 1984, 477 A.2d 1040. Corporations ⟐ 589

Derivative actions seeking money damages from successor corporation for improper management of acquired corporation were assets of acquired corporation which passed on merger to successor corporation, thereby rendering action against successor corporation moot. 8 Del.C. § 259. Bokat v. Getty Oil Co., 1970, 262 A.2d 246. Corporations ⟐ 589

6. Rights and remedies of dissenting stockholders

Once shareholder perfects his right to appraisal at time of merger, his status is transformed from that of equity owner to that of quasi-creditor with monetary claim against surviving corporation. 8 Del.C. § 262. Alabama By-Products Corp. v. Cede & Co. on Behalf of Shearson Lehman Bros., Inc., 1995, 657 A.2d 254. Corporations ⟐ 584

A holder of preference shares as to which dividends have accumulated through time is not a "creditor" of the corporation in the ordinary meaning of the word, nor is he the holder of a "lien" as that word is usually understood within the meaning of proviso of statute relating to merger of corporation providing that all rights of creditors and all liens upon any property of a constituent corporation shall be preserved and all debts, liabilities, and duties of constituent corporations shall attach to resulting

corporation on merger. Rev.Code 1935, § 2092. Federal United Corp. v. Havender, 1940, 11 A.2d 331. Corporations ⟸ 584

Under proviso of statute relating to merger of corporation that all rights of creditors and all liens upon any property of constituent corporation shall be preserved and attached to resulting corporation, words "liens" and "creditors" were not intended to include results of the contractual relation arising out of stock ownership either as stockholders inter sese or between the shareholder and the corporation, but are referable to persons external to the corporation, and to debts, liabilities, and duties due from the corporation to them. Rev.Code 1935, § 2092. Federal United Corp. v. Havender, 1940, 11 A.2d 331. Corporations ⟸ 584

Under proviso of statute relating to merger of corporation, that all rights of creditors and all liens upon any property of any constituent corporation shall be preserved unimpaired, and attached to resulting corporation the extinguishment of dividends accumulated on preference stock if the terms of merger proposal are fair and equitable, is authorized, since the unpaid dividends are not a "debt or liability" of the corporation enforceable against the resulting corporation. Rev.Code 1935, § 2092. Federal United Corp. v. Havender, 1940, 11 A.2d 331. Corporations ⟸ 584

The dividends accumulated on preferred stock could be extinguished on merger of subsidiary corporation with parent corporation by providing for the exchange of the old cumulative preferred stock for cumulative preferred stock and common stock in the resulting corporation, notwithstanding that statute in force when corporation was formed and stock issued provided that right to dividends could not be destroyed by charter amendment, where the merger was fair, and provision was made for the payment of the value of shares to the dissatisfied shareholder. Rev.Code 1935, §§ 2058, 2091, 2092, 2093, and § 2091A, as added by 41 Del.Laws, c. 131, § 2. Federal United Corp. v. Havender, 1940, 11 A.2d 331. Corporations ⟸ 584

Where stockholders objecting to merger of subsidiary with parent corporation made no charge of unfairness or illegality, did not suggest that they would take legal action, and did not attend meeting of stockholders to reaffirm their objection, and did not inform resulting corporation that they regarded merger proceeding as illegal until more than three months after being advised that merger had been effected, and did not institute legal action until seven months after merger was completed and after dividends had been declared and paid, and shares donated to company on merger had been retired and canceled and exchange of securities had been largely accomplished, shareholders were barred by 'laches' from contesting validity of merger. Code 1935, §§ 2091, 2092, 2093, and § 2091A, as added by 41 Del.Laws, c. 131, § 2. Federal United Corp. v. Havender, 1940, 11 A.2d 331. Corporations ⟸ 584

The statutes authorizing merger of corporations and contemplating conversion of shares of constituent corporations, with all rights attached thereto, into shares of resulting corporation, and requiring payment for stock of dissatisfied stockholders, were intended to have retrospective operation. Rev.Code 1935, §§ 2091, 2092, 2093, and § 2091A, as added by 41 Del.Laws, c. 131, § 2. Federal United Corp. v. Havender, 1940, 11 A.2d 331. Corporations ⟸ 584

7. Liabilities for debts and acts of original corporations--In general

As a general proposition, actions and conduct of constituent corporation may be attributed to surviving corporation following merger for purposes of determining surviving corporation's amenability to personal jurisdiction for liabilities incurred by constituent corporation. Goffe v. Blake, 1985, 605 F.Supp. 1151. Corporations ⟸ 590(1)

Actions and conduct of surviving corporation could be attributed to predecessor corporation for purposes of determining whether predecessor corporation was subject to jurisdiction in the District of Columbia. Goffe v. Blake, 1985, 605 F.Supp. 1151. Corporations ⟸ 590(1)

Corporation which survived merger was, under Delaware law, liable for any material misrepresentation in proxy statement issued by nonsurviving corporation in connection with merger. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 8 Del.C. § 259. Gould v. American

Hawaiian S. S. Co., 1971, 331 F.Supp. 981, motion denied 351 F.Supp. 853, supplemented 387 F.Supp. 163. Corporations ⟠ 590(1); Securities Regulation ⟠ 49.25(1)

Under Delaware law, the corporation surviving a merger possesses all rights and powers of the nonsurviving corporation as well as all liabilities and duties. 8 Del.C. § 259. Gould v. American Hawaiian S. S. Co., 1971, 331 F.Supp. 981, motion denied 351 F.Supp. 853, supplemented 387 F.Supp. 163. Corporations ⟠ 588; Corporations ⟠ 589; Corporations ⟠ 590(1)

Corporation that acquired parent of former shareholder of another corporation contractually assumed shareholder's statutory obligation to indemnify former director of other corporation, as shareholder's designee to other corporation's board, for attorney fees incurred in defending shareholder derivative action, where merger agreement provided for assumption of both parent's and its subsidiaries' indemnification obligations. 8 Del.C. § 145(c). Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ⟠ 590(1)

Corporation that assumed contractual obligation to indemnify former director of related corporation for attorney fees incurred in defending shareholder derivative action, and that paid those fees in full, was entitled to contribution from related corporation's present parent corporation, which also assumed contractual obligation to indemnify former director, and which was equally responsible for those fees under permissive provisions of indemnity statute, even though there was no contractual relationship between first indemnifying corporation and parent, where parent engaged in inequitable conduct in attempt to avoid its obligation. 8 Del.C. § 145(b). Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ⟠ 590(1)

Corporations that separately assumed contractual obligation to indemnify former director of related corporation for attorney fees in defending shareholder derivative action were equally responsible for those fees under permissive provisions of indemnity statute. 8 Del.C. § 145(b). Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ⟠ 590(1)

Parent corporation's assumed obligation to indemnify subsidiary's former director for attorney fees incurred in shareholder derivative action did not include fees incurred after director was dismissed from action. 8 Del.C. § 145(c). Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ⟠ 590(1)

Subsidiary's current parent corporation did not have a right of contribution against parent of former shareholder in subsidiary for attorney fees it paid for counsel it selected to defend former director of subsidiary in derivative action, where current parent acted unreasonably by choosing counsel that would not employ a defense that was in the director's best interest. 8 Del.C. § 145. Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ⟠ 590(1)

Merger agreement under which parent corporation acquired subsidiary contractually obligated parent to indemnify former director of subsidiary in connection with shareholder derivative action related to merger, where the merger agreement stated the parent "shall indemnify to the fullest extent permitted under [Delaware] law the present and former directors and officers" of subsidiary for all losses and costs, including reasonable attorney fees, incurred in connection with any claim or action arising from their service. Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ⟠ 590(1)

Parent corporation's right to select counsel for subsidiary's former director in shareholder derivative action, under indemnity clause of merger agreement, was subject to implied requirement of reasonableness. Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ⟠ 590(1)

Parent corporation's selection of group counsel for shareholder derivative action related to acquisition of subsidiary was violated implied requirement of reasonableness as to former director of subsidiary, who thus did not waive his indemnification rights under merger agreement when he rejected counsel, where counsel ignored director's unique defenses that he alone lacked a pecuniary interest in merger offer, and that subsidiary's chief executive officer (CEO) misled him. Chamison v. HealthTrust, Inc.--

Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ◁═ 590(1)

Former director of subsidiary was not obligated, pursuant to counsel selection clause contained in merger agreement's indemnification provisions, to accept alternative counsel proffered by parent corporation, after rejecting parent's inappropriate first choice, for director's defense of derivative action, where parent provided the list of alternative counsel late in the proceedings, and director would have been forced to abandon a law firm of his choice that spent considerable time and effort designing a defense director had confidence in. Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912 (1999), affirmed 748 A.2d 407. Corporations ◁═ 590(1)

Corporation into which another corporation was merged was liable for all debts, liabilities and duties of merged corporation. 8 Del.C. § 259. Beals v. Washington Intern., Inc., 1978, 386 A.2d 1156. Corporations ◁═ 590(1); Corporations ◁═ 590(3)

Where one corporation transfers all assets to another which issues its own stock direct to transferor's stockholders in exchange for their stock in transferor and assumes all debts and liabilities, tort or contract claims against transferor may generally be prosecuted at law against transferee. Rev.Code 1915, § 1973, as amended by 36 Del.Laws, c. 135, and § 1974, as amended by 35 Del.Laws, c. 85. Drug, Inc. v. Hunt, 1933, 35 Del. 339, 168 A. 87. Corporations ◁═ 590(1)

8. ---- Contracts, liabilities for debts and acts of original corporations

Interpreting mutual aid agreement entered into by air carriers to bind "successors and assigns," even though agreement did not contain a "successors and assigns" clause, was not against public policy. 8 Del.C. § 259(a). Western Air Lines, Inc. v. Allegheny Airlines, Inc., 1973, 313 A.2d 145. Contracts ◁═ 177

Absence of a "successors and assigns" clause from mutual aid agreement entered into by air carriers did not imply that parties intended that a withdrawal from agreement could be accomplished by a merger of a signatory and a nonsignatory carrier, in light of fact that agreement specifically detailed a method of withdrawal. Western Air Lines, Inc. v. Allegheny Airlines, Inc., 1973, 313 A.2d 145. Corporations ◁═ 590(2)

Mutual aid agreement entered into between air carriers was binding on air carrier which did not sign agreement, which signed merger agreement with signatory carrier accepting all of its predecessor's obligation and which survived the merger. Western Air Lines, Inc. v. Allegheny Airlines, Inc., 1973, 313 A.2d 145. Corporations ◁═ 590(2)

9. ---- Labor contracts, liabilities for debts and acts of original corporations

Under Delaware corporation law, rights of nonsurviving corporation's employees, who were covered by collective bargaining contracts between such corporation and union, would not be automatically terminated by merger of such corporation with surviving corporation. 8 Del.C. § 259. Fitzsimmons v. Western Airlines, Inc., 1972, 290 A.2d 682. Labor And Employment ◁═ 1299

10. ---- Labor dispute resolution, liabilities for debts and acts of original corporations

Complaint by union against corporate airlines which had entered into merger agreement seeking declaratory judgment that bargaining agreements survived the merger and would be binding upon surviving corporation under statute governing rights and liabilities of constituent and surviving corporations following a merger was sufficient to withstand motion to dismiss on ground court was without subject matter jurisdiction to consider controversy arising out of a contract between an airline and a union, even though the parties were subject to Railway Labor Act. Railway Labor Act, § 1 et seq., 45 U.S.C.A. § 151 et seq.; 8 Del.C. § 259; 10 Del.C. § 6501. Fitzsimmons v. Western Airlines, Inc., 1972, 290 A.2d 682. Labor And Employment ◁═ 1529

Complaint by union against corporations which had entered into merger agreement seeking declaratory judgment that bargaining agreements survived the merger and would be binding upon

surviving corporation under statute governing rights and liabilities of constituent and surviving corporations following a merger was sufficient to sustain motion to dismiss on ground court lacked jurisdiction over subject matter because action was in reality a union representation dispute within exclusive jurisdiction of National Mediation Board. 8 Del.C. § 259; 10 Del.C. § 6501. Fitzsimmons v. Western Airlines, Inc., 1972, 290 A.2d 682. Labor And Employment ⇐ 1529

Issues raised in pleadings, in federal court action, asking for declaration that nonsurviving corporation after merger was under no legal duty to arbitrate certain alleged grievances with union did not constitute sufficient basis for declining jurisdiction in state court action, brought by union against surviving and nonsurviving corporations, seeking declaration of rights and duties under state law as it applied to the p

**STATUTE:  8 Del. Code Ann. § 261**

8 Del.C. § 261

West's Delaware Code Annotated <u>Currentness</u>
  Title 8. Corporations
     <sup>×</sup>≣ <u>Chapter 1.</u> General Corporation Law
       <sup>×</sup>≣ <u>Subchapter IX.</u> Merger, Consolidation or Conversion
     ➡**§ 261. Effect of merger upon pending actions**

Any action or proceeding, whether civil, criminal or administrative, pending by or against any corporation which is a party to a merger or consolidation shall be prosecuted as if such merger or consolidation had not taken place, or the corporation surviving or resulting from such merger or consolidation may be substituted in such action or proceeding.

56 Laws 1967, ch. 50.

**Codifications:** 8 Del.C. 1953, § 261

LAW REVIEW AND JOURNAL COMMENTARIES

Delaware Resurrects the Common Law: Affirmation of Contractual Voting Restrictions Within a Class of Stock: *Providence & Worcester v. Baker.* 4 Del. J. Corp. L. 154 (1978).

LIBRARY REFERENCES

   <u>Corporations</u> ⇐<u>590</u>, <u>591</u>.
   Westlaw Key Number Searches: 101k590; 101k591.
   <u>C.J.S. Corporations § 810</u>.

RESEARCH REFERENCES

ALR Library

<u>168 ALR 906</u>, Right of Former Stockholder to Maintain Stockholder's Suit.

<u>149 ALR 787</u>, Liability of Corporation for Debts of Predecessor.

Treatises and Practice Aids

<u>Shareholder Derivative Actions: Law and Practice § 4:3</u>, Rules of Civil Procedure and Statutory Provisions Governing Derivative Suits--Plaintiff's Ownership of Shares.

NOTES OF DECISIONS

   Actions to enforce liability <u>3</u>
   Persons entitled to sue or defend <u>1</u>
   Succession to rights of original corporations <u>2</u>

   <u>1</u>. Persons entitled to sue or defend

Purpose of rule which requires that derivative shareholder be stockholder at time of alleged corporate wrong and at time of commencement of action and that shareholder maintain shareholder status throughout litigation is to eliminate abuses associated with derivative suit. <u>8 Del.C. §§ 259</u>, 261, <u>327</u>;

<u>Chancery Court Rule 23.1</u>, Del.C.Ann. <u>Lewis v. Anderson, 1984, 477 A.2d 1040</u>. <u>Corporations</u> ⇐ 207

Exceptions to rule that shareholder in derivative action be stockholder at time of alleged wrong and at time of commencement of action and maintain shareholder status throughout litigation are where merger which terminates shareholder's status is itself subject of claim of fraud and where merger is in reality reorganization which does not affect plaintiff's ownership of business enterprise. <u>8 Del.C. §§ 259</u>, 261, <u>327</u>; <u>Chancery Court Rule 23.1</u>, Del.C.Ann. <u>Lewis v. Anderson, 1984, 477 A.2d 1040</u>. <u>Corporations</u> ⇐ 207

Plaintiff who ceases to be shareholder, whether by reason of merger or for any other reason, loses standing to continue derivative suit; disagreeing with <u>Susman v. Lincoln American Corp., 587 F.2d 866</u>, Abrams v. Occidental Petroleum Corporation, 20 F.R.Serv.2d 170, and <u>Albert v. Salzman, 41 A.D.2d 501, 344 N.Y.S.2d 457</u>. <u>8 Del.C. §§ 259</u>, 261, <u>327</u>. <u>Lewis v. Anderson, 1984, 477 A.2d 1040</u>. <u>Corporations</u> ⇐ 207

Shareholder who brought derivative action against management of corporation which was merged into new corporation, with result that action, which was property right of former corporation, became vested in surviving corporation, and who did not assert that merger was perpetrated to deprive former corporation of its claim against management, did not have standing to continue action. <u>8 Del.C. §§ 259</u>, 261, <u>327</u>. <u>Lewis v. Anderson, 1984, 477 A.2d 1040</u>. <u>Corporations</u> ⇐ 320(4)

Statute providing that any action or proceeding, whether civil, criminal or administrative pending by or against any corporation which is party to merger or consolidation shall be prosecuted as if such merger or consolidation had not taken place, or the corporation resulting from or surviving such merger or consolidation may be substituted in such action or proceeding did not save derivative action filed by corporate shareholder from being rendered moot on ground that shareholder lost standing to bring suit after third party, through a combined tender offer and merger, acquired all of the outstanding stock of corporation, thereby terminating shareholder status of derivative plaintiff, subsequent to filing of suit. 8 Del.C. § 261. <u>Lewis v. Anderson, 1982, 453 A.2d 474</u>, affirmed <u>477 A.2d 1040</u>. <u>Corporations</u> ⇐ 207

   <u>2</u>. Succession to rights of original corporations

Statute which provides that any action pending by or against corporation which is party to merger shall be prosecuted as if such merger had not taken place is directed solely to impact of merger on abatement of pending causes of action of constituent parties to merger and does not impinge on or amend statute which provides that all causes of action formally held by former corporation are transferred to surviving corporation nor require that premerger action be prosecuted to its ultimate end without regard to wishes of acquiring owner, but merely preserves acquiring owner's right to proceed with shareholder's action, should it choose to do so. <u>8 Del.C. §§ 259</u>, 261. <u>Lewis v. Anderson, 1984, 477 A.2d 1040</u>. <u>Corporations</u> ⇐ 589

   <u>3</u>. Actions to enforce liability

Creditors of railroad company which had no assests, held not required to obtain judgment and have execution return unsatisfied. <u>Irvine v. Elliott, 1913, 203 F. 82</u>. <u>Corporations</u> ⇐ 261

Obtaining judgment and unsatisfied execution is not condition precedent to enforcement by receivers of stockholders' liability for unpaid subscriptions. <u>Du Pont v. Ball, 1918, 106 A. 39, 7 A.L.R. 955</u>. <u>Corporations</u> ⇐ 261

8 Del.C. § 261, DE ST TI 8 § 261
Current through 76 Laws 2008, chs. 252, 254-260, 262, 263, 269, 271, 283 and 285
Revisions to 2008 Acts made by the Delaware Code Revisors were unavailable
at time of publication.

Copr. © 2008 Thomson Reuters/West.
END OF DOCUMENT

Adobe Reader is required to view PDF images.


(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TREATISES:  15 Fletcher Cyc. Corp. (2008) § 7082**

15 Fletcher Cyc. Corp. § 7082

Fletcher Cyclopedia of the Law of Corporations
Current through February 2008 update

William Meade Fletcher

Chapter 61. COMBINATION, CONSOLIDATION AND MERGER OF CORPORATIONS
IV. EFFECT OF CONSOLIDATION OR MERGER RESPECTING CREATION OF NEW CORPORATION
AND DISSOLUTION OF OLD ONES

§ 7082. Merger of one company into another

**West's Key Number Digest**

West's Key Number Digest, Corporations ⟲586

Modern corporation statutes provide that when a merger becomes effective, the entity that is designated in the plan of merger as the surviving corporation continues, and the separate existence of every entity that is merged into the survivor ceases.[FN1]

Thus, a corporate merger consists of a combination whereby one of the constituent corporations remains in existence, absorbing in itself all the other constituent corporations, which cease to exist as separate corporate entities.[FN2] When corporations merge, the surviving corporation succeeds to both the rights and obligations of the constituent corporations.[FN3] The merger of one corporation by another may involve the latter retaining the absorbed corporation's name and corporate identity. [FN4] The fact that the name of the continuing corporation is changed does not tend to show that it is a new corporation, since a change in the name of a corporation works no change in its identity.[FN5] Generally, a corporate merger contemplates the continued existence of the enterprise and the shareholders' investment in it. [FN6]

Where a minority shareholder is given the right to purchase shares in another corporation, that right still exists when the corporation merges into a subsidiary. The minority shareholder is entitled to purchase shares of the parent, just as the employee shareholders of the merged corporation were entitled.[FN7]

It has been said that a contract whereby one corporation transfers all of its property and franchises to another, under legislative authority, is, unless a contrary intention appears, a surrender of its charter by the former with the consent of the state, and operates as a dissolution of that corporation, but the existence of the corporation to which the transfer is made continues. [FN8]

A constituent corporation merged into another corporation and becoming extinct cannot, of course, create new obligations, nor can it become liable for acts of the absorbing corporation.[FN9] Once a corporate merger has been completed, the absorbed corporation immediately ceases to exist as a separate entity, and may no longer be named a party in litigation in an action arising after the merger is consummated.[FN10] However, most modern corporation statutes allow proceedings that were pending at the time of the merger to continue in the name of the absorbed corporation.[FN11]

Actions and conduct of a constituent corporation may be attributed to the surviving corporation following a merger for purposes of determining the surviving corporation's amenability to personal jurisdiction for liabilities incurred by the constituent corporation.[FN12]

[FN1] See Rev Model Bus Corp Act § 11.07(a); Model Bus Corp Act (1969) § 76(a), (b).

[FN2]
  **U.S.**
  Atlantic & G. R. Co. v. Georgia, 98 US 359, 25 L Ed 185 (US Ga 1878); Central Railroad & Banking Co. v. Georgia, 92 US 665, 23 L Ed 757; Philadelphia & W. R. Co. v. Maryland, 10 How 376, 13 L Ed 461; Novartis Seeds, Inc. v. Monsanto Co., 190 F3d 868 (CA8 1999) (subsidiary not effected by parents merger with another corporation); Brown v. E.W. Bliss Co., 818 F2d 1405 (CA8 1987); Engle

v. Teleprompter Corp., 703 F2d 127 (CA5 1983); Forrest v. Beloit Corp., 278 F Supp 2d 471 (ED Pa 2003) (applying Pennsylvania law); Krull v. Celotex Corp., 611 F Supp 146 (ND Ill 1985); Parra v. Production Mach. Co., 611 F Supp 221 (ED NY 1985); Parson v. Roper Whitney, Inc., 586 F Supp 1447 WD Wis 1984; J.W.T., Inc. v. Joseph E. Seagram & Sons, Inc., 347 F Supp 965 (ND Ill 1972) (applying Illinois statute); Heit v. Tenneco, Inc., 319 F Supp 884 (applying Delaware law); **Asher v. Pacific Power & Light Co., 249 F Supp 671**.

As separate entity from that of the parent corporation, the subsidiary corporation was not the same "business enterprise" after the merger that it was prior to the merger. The regrouping of subsidiaries which have been treated as separate entities, with resultant changes in stated capital, total assets and net worth, has an effect on "continuity." Allied Central Stores, Inc. v. Commissioner of Internal Revenue, 339 F2d 503.

Where one or more corporations are merged into another corporation, the latter survives, while the former are dissolved. Jones v. Noble Drilling Co., 135 F2d 721.

Where one corporation loses its identity and is merged in another, the latter preserving its identity, and issuing new stock in favor of the shareholders of the former, it is not the creation of a new corporation but an enlargement of the old one. News Pub. Co. v. Blair, 29 F2d 955.

Under the Delaware statute only the separate existence of the merged or constituent corporation ceases to exist, and all the property, rights, privileges, powers and franchises theretofore enjoyed by such corporation become the property of the surviving corporation. Vulcan Materials Co. v. United States, 308 F Supp 53.

In the case of a statutory merger under Delaware law, when the merger becomes effective the separate existence of all the corporations to the merger except the survivor ceases to exist. Damon Alarm Corp. v. American Dist. Tel. Co., 304 F Supp 83.

**Ala.**
Meyer v. Johnston & Stewart, 64 Ala 603.
The resultant corporation following a merger of a constituent corporation into it is the successor in law of the merged corporations, and while a merger terminates the constituent corporation for some purposes, it is not dissolved as that term is generally used. First Nat. Bank of Birmingham v. Adams, 203 So 2d 124 (Ala).

**Cal.**
Heating Equipment Mfg. Co. v. Franchise Tax Board, 228 Cal App 2d 290, 39 Cal Rptr 453.

**Conn.**
Bishop v. Brainerd, 28 Conn 289.

**Del.**
Heit v. Tenneco, Inc., 319 F Supp 884.

**Ill.**
Chicago, S. F. & C. R. Co. v. Ashling, 160 Ill 373, 43 NE 373; Morris v. Interstate Iron & Steel Co., 257 Ill App 613.
J.W.T., Inc. v. Joseph E. Seagram & Sons, Inc., 347 F Supp 965 (ND Ill 1972).

**Ind.**
Booe v. Junction R. Co., 10 Ind 93.

**Kan.**
Berry v. Kansas City, Ft. S. & M. R. Co., 52 Kan 774, 36 P 724, s.c. 52 Kan 759, 34 P 805.

**Miss.**
Generally when a merger is accomplished, the charter of one corporation remains in existence and the charter of the other or others is extinguished. Coahoma Bank & Trust Co. v. Bowen, 218 So 2d 868 (Miss).

**Mo.**
Where merger of corporate lessee of baseball park with another corporation was effected pursuant to statute, the merged corporation succeeded to the rights of the original lessee by operation of law and therefore there was no assignment of the lease in violation of forfeiture provision contained in the lease. Dodier Realty & Investment Co. v. St. Louis Nat. Baseball Club, 361 Mo 981, 238 SW2d 321.

**N.J.**
Bingham v. Savings Investment & Trust Co. of East Orange, 101 NJ Eq 413, 138 A 659.

**N.Y.**
Sheldon v. Kimberly-Clark Corp., 105 AD2d 273, 482 NYS2d 867.
In a merger or consolidation of corporations, the new or consolidated company becomes and is the possessor of each of its component members. Guaranty Trust Co. of New York v. New York & Q.

C. Ry. Co., 226 App Div 299, 235 NYS 127.
**N.C.**
Carolina Coach Co. v. Hartness, 198 NC 524, 152 SE 489.
**Ohio**
ASA Architects, Inc. v. Schlegel, 75 Ohio St 3d 666, 665 NE2d 1083 (1996) (citing this treatise);
Morris v. Investment Life Ins. Co., 27 Ohio St 2d 26, 272 NE2d 105.
**Okla.**
First State Bank of Mangum v. Lock, 113 Okla 30, 237 P 606.
**Pa.**
While, in a corporate merger, the constituent companies are deemed dissolved, their powers and privileges, to the extent authorized by the merger contract and the law, are vested in the merged company as a new corporation, distinct from its constituents and drawing its life from the act of consolidation. In re Buist's Estate, 297 Pa 537, 147 A 606.
In case of a merger, the merging company loses its identity, abandons its names, and ceases to have a corporate existence as such, but its property and good will pass into control and ownership of the new corporation. Greater Adelphia Building & Loan Ass'n v. Trilling, 121 Pa Super 469, 183 A 651.
Forrest v. Beloit Corp., 278 F Supp 2d 471 (ED Pa 2003).
**R.I.**
Bader v. Alpine Ski Shop, Inc., 505 A2d 1162 (RI).
**Tex.**
Bailey v. Vanscot Concrete Co., 894 SW2d 757 (Tex 1995).
The surviving corporation in a statutory merger represents the continuation of business that was operated before in the form of its constituents. Reliance Ins. Co. v. Nutt, 403 SW2d 828 (Tex Civ App).
**Va.**
The merger of two corporations does not end the existence of either, but continues the existence of both in the merged corporation. Adams v. United States Distributing Corp., 184 Va 134, 34 SE2d 244.

[FN3]
**U.S.**
Halliburton Co. Benefits Committee v. Graves, 463 F3d 360 (CA5 2006) (applying Delaware law), citing this treatise; Elzinga Volkers, Inc., v. LSSC Corp., 838 F Supp 1306 (ND Ind 1993).
In a merger, both assets and liabilities of a disappearing corporation are vested in the surviving corporation. Engle v. Teleprompter Corp., 703 F2d 127 (CA5 1983).
**Del.**
Halliburton Co. Benefits Committee v. Graves, 463 F3d 360 (CA5 2006), citing this treatise.
**Neb.**
Kimco Addition, Inc. v. Lower Platte South Natural Resources Dist., 232 Neb 289, 440 NW2d 456 (1989) (cause of action vested in surviving corporation).
**Pa.**
Park v. Greater Delaware Valley Savings & Loan Ass'n, 362 Pa Super 54, 523 A2d 771 (involving underestimation of taxes and insurance).
**Tex.**
Bailey v. Vanscot Concrete Co., 894 SW2d 757 (Tex 1995).
Rights, powers, franchises, privileges and property of consolidated or absorbing corporation, see §§ 7084 et seq.; liens debts, liabilities and burdens, see §§ 7102 et seq.

[FN4]
**U.S.**
Parra v. Production Machine Co., 611 F Supp 221 (ED NY 1985).
Name of new or absorbing corporation, see § 7087.

[FN5]
**U.S.**
Elzinga Volkers, Inc., v. LSSC Corp., 838 F Supp 1306 (ND Ind 1993).
Where one corporation is merged into wholly owned subsidiary of a third corporation in a three-cornered merger and the subsidiary simultaneously changed its corporate name, the latter was a

separate corporation from the parental third corporation and would not be disregarded as mere sham even though it had no separate shareholders of its own. Broenen v. Beaunit Corp., 440 F2d 1244.

**Ala.**

Meyer v. Johnston & Stewart, 64 Ala 603.

[FN6]

**R.I.**

Bader v. Alpine Ski Shop, Inc., 505 A2d 1162 (RI 1986)

[FN7]

**Del.**

Continental Airlines v. American General, 575 A2d 1160 (Del 1990).

[FN8]

**Ill.**

Chicago, S. F. & C. R. Co. v. Ashling, 160 Ill 373, 43 NE 373; Abbott v. Fluid Power Pump Co., 112 Ill App 2d 303, 251 NE2d 93.

**Ind.**

Chicago & E. I. R. Co. v. State, 153 Ind 134, 51 NE 924.

**Pa.**

Lauman v. Lebanon Valley R. Co., 30 Pa 42.

[FN9]

**U.S.**

Court could not obtain jurisdiction over merged corporation by service of process on its purported assistant secretary. United States v. Borden Co., 28 F Supp 177, mod on other grounds 308 US 188, 84 L Ed 181, 60 S Ct 182.

**Del.**

United States v. Borden Co., 28 F Supp 177, mod on other grounds 308 US 188, 84 L Ed 181, 60 S Ct 182.

**N.Y.**

New York v. Sixth Ave. R. Co., 77 App Div 367, 79 NYS 319.

[FN10]

**Ga.**

Cordell v. Mohawk Industries, Inc., 269 Ga App 168, 603 SE2d 534 (2004).

**N.Y.**

Sheldon v. Kimberly-Clark Corp., 105 AD2d 273, 482 NYS2d 867 (1984).

[FN11] See Rev Model Bus Corp Act § 11.07(a)(5); Model Bus Corp Act (1969) § 76(e).

[FN12]

**U.S.**

Duris v. Erato Shipping, Inc., 684 F2d 352 (CA6 1982).

**Del.**

Goffe v. Blake, 605 F Supp 1151 (D Del 1985).

© 2008 Thomson/West

FLETCHER-CYC § 7082

END OF DOCUMENT

Adobe Reader is required to view PDF images.



(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TREATISES:  Friedman, Cal. Practice Guide:
Corporations, Ch. 8-B § 8:161**

Cal. Prac. Guide Corps. Ch. 8-B

(TREATISE)

California Practice Guide: Corporations
C. Hugh Friedman, Consulting Editor: Evridiki 'Vicki' Dallas

Chapter 8. Corporate Changes And Dissolution

B. Corporate Acquisitions And Reorganizations

1. [8:118] Introduction
   • [8:118a] Compare--acquisition of noncorporate entities
   a. [8:118.1] Acquisition methods
      (1) [8:118.2] Stock purchase
         (a) [8:118.3] Stock-for-stock exchange
      (2) [8:118.4] Asset purchase
         (a) [8:118.5] Assets purchased in exchange for stock
      (3) [8:118.6] Merger
   b. Considerations affecting choice of acquisition method
      (1) Corporate law considerations
         (a) [8:118.7] Shareholder approval requirements
            1) [8:118.8] Dissenter's rights
         (b) [8:118.9] Liabilities acquired
         (c) [8:118.10] Contract restrictions on transferability of assets
            1) [8:118.11] Using merger or stock acquisition to bypass transfer restrictions
         (d) [8:118.12] Bulk sale restrictions
         (e) [8:118.13] Antitrust restrictions
         (f) [8:118.14] Covenants not to compete
            1) [8:118.14a] Geographic/temporal limits
            2) [8:118.14b] Scope of covenant limited to protection of purchased business
            3) [8:118.14e] Tax treatment--payments amortizable
         (g) [8:118.15] Special employee notice requirements (layoffs, plant closures, relocations)
      (2) [8:118.16] Securities law considerations
      (3) [8:118.17] Tax considerations
         (a) [8:118.18] Tax-free acquisitions
         (b) [8:118.19] Sales taxes
         (c) [8:118.20] Property tax reassessments
   c. [8:118.21] Accounting treatment
      (1) [8:118.22] Goodwill
      (2) [8:118.23] "Pooling of interests" method abolished
   d. [8:118.26] Corporate "reorganizations"
     => [8:118.27] CAUTION--Duty to disclose
   e. [8:118.31] Acquisition and reorganization expenses generally not deductible
      (1) Application
      (2) [8:118.32] Compare--election to amortize investigation expenses
      (3) [8:118.33] Compare--limited deductibility of corporate start-up expenses
2. [8:119] Recapitalizations
   a. [8:120] Procedure
      (1) [8:121] Shareholder approval
      (2) [8:123] No dissenters' rights
   b. [8:124] Tax treatment
      (1) [8:125] Tax-free exchange generally
      (2) [8:126] Limitations

- • [8:127] Exchanges having effect of dividends
- • [8:128] Exchanges having effect of redemptions
- • [8:129] Exchanges accompanied by boot
- • [8:130] Exchanges with "bail out" potential

c. [8:131] Forms of recapitalization
  (1) [8:132] Exchanges of "new" preferred for "old" common
    (a) [8:133] Purpose
    (b) [8:134] Example
      • [8:134.1] Caution
    (c) [8:135] Amendment of articles
    (d) [8:136] Tax considerations
      1) [8:137] Caution--transfer of less than all stock
      2) [8:137.1] Caution--"nonqualified preferred stock" taxable
        a) [8:137.2] Exception for "family-owned corporation"
  (2) [8:138] Exchanges of "new" preferred for "old" preferred
    (a) [8:139] Purpose
    (b) [8:140] Amendment of articles
    (c) [8:141] Tax considerations
      1) [8:141.1] "Nonqualified preferred" taxable
      2) [8:142] Compare--effect of dividend
  (3) [8:143] Exchanges of "new" common for "old" preferred
  (4) [8:144] Exchanges of "new" common for "old" common
  (5) [8:145] Exchanges of "new" stock for "old" debt
    (a) [8:145.1] *Caution*--possibility of income to corporation
  (6) [8:146] Exchanges of "new" debt securities for "old" debt
    (a) [8:147] Tax considerations
  (7) [8:150] Compare--exchanges of "new" debt for "old" stock
  (8) [8:152] Plan essential

d. [8:152.6] Securities law requirements
  (1) [8:153] Federal and state exemptions for exchange with existing security holders
  (2) [8:153.5] Other *state law* exemptions
    (a) [8:153.6] Securities of "listed" corporations
      1) [8:153.7] Proxy rules applicable
    (b) [8:153.8] SEC Rule 506 and "qualified purchasers"
    (c) [8:156] Exemptions pertaining to recapitalizations
      1) [8:156.1] Notice requirement
  (3) [8:157] Qualification procedure
    • *FORM*
    (a) [8:158] Commissioner's standards
    (b) [8:159] Hearings
    (c) [8:160] Soliciting shareholder approval

3. [8:161] Mergers
  a. [8:163] Types of mergers
    • [8:164] Straight merger
    • [8:165] Triangular merger
    • [8:166] Reverse triangular mergers
    • [8:167] Short-form mergers
  b. Procedure to effect merger
    (1) [8:168] Plan or agreement of merger
      (a) [8:169] Parties
      (b) [8:170] Contents
        *FORM*
        1) [8:170.1] Terms may be dependent on facts ascertainable outside agreement
        2) [8:170.2] Terms may be dependent on extrinsic agreement
          a) [8:170.3] Shareholder approval of amendments to extrinsic agreements
            1/ [8:170.4] Change in shareholder rights, liabilities
            2/ [8:170.5] Change in principal terms of merger agreement
          b) [8:170.6] Copies must be maintained

3) [8:170.7] Agreement must provide fair treatment for fractional share interests
4) [8:170.8] Equal treatment for all shares of same class
  a) [8:170.9] Exception--shares held by constituent corporation
(c) [8:171] Execution
(2) [8:172] Board approvals
  (a) [8:172.1] Caution
  (b) [8:172.2] Agreement may be made binding and exclusive
    1) [8:172.3] Board duties re competing offers
    => [8:172.4] *PRACTICE POINTER*
  (c) [8:172.5] Mergers proposed by insiders
    1) [8:172.6] Who is an "interested party"
      a) [8:172.7] Exception--corporations with less than 100 shareholders
      b) [8:172.8] Exception--mergers qualified by permit
    2) [8:172.9] Independent fairness opinion
      a) [8:172.10] Opining person's qualifications
      b) [8:172.11] Delivery of opinion
    3) [8:172.12] Competing offers
      a) [8:172.13] Insider proposal delayed pending shareholder action on competing offer
      b) [8:172.14] Improving insider offer
    => [8:172.15] *PRACTICE POINTER*
(3) [8:173] Shareholder approvals
  (a) [8:173.1] Before or after board approval
  (b) [8:174] Mergers requiring greater-than-majority approval
    1) [8:175] Articles so require
    2) [8:176] Disappearing close corporation
    3) [8:177] Disparate treatment within class
    4) [8:177a] "Controlled" merger--disappearing corporation's common shareholders receive other than common shares
      a) [8:177b] Exception--Corporations Commissioner approval
      b) [8:177c] Controlling entity has burden of proving fairness
    5) [8:177.1] Shares cancelled without any consideration
    6) [8:177.2] Preferred shares to receive less than required by articles
  (c) [8:177.3] Foreign parent corporation shareholder approval
  (d) [8:178] Exceptions--mergers NOT requiring shareholder approval
    1) [8:179] Preferred shares unaffected by merger
    2) [8:180] Certain "short-form" mergers
    3) [8:181] Mergers resulting in limited dilution of voting power
      a) [8:182] Measuring dilution
      b) [8:183] Limitations
        1/ [8:183.1] Articles amendment required
        2/ [8:183.2] "Different" shares received
        3/ [8:183.3] Disappearing close corporation
(4) [8:184] Amendments to merger agreement
  => [8:185] *PRACTICE POINTER*
(5) [8:186] Power of boards to abandon merger
  (a) [8:187] Compare--contract liability
  => [8:188] *PRACTICE POINTER*
(6) [8:189] Merger documents filed with Secretary of State
  • *FORM*
(7) [8:190] Franchise Tax Board clearance not required
(8) [8:190.1] Correcting defects in merger documents
(9) [8:190.2] When merger effective
c. [8:191] Effect of merger
(1) [8:192] Transfer of assets
  (a) [8:192a] Recording merger certificate to effect realty transfer
  (b) [8:192.1] No sales tax
  (c) [8:192.2] Local business licenses and permits

    1) [8:192.3] "Change of ownership"
    2) [8:192.4] "Reevaluation" allowed
    3) [8:192.5] Tax reassessments allowed
   (d) [8:192.11] Attorney-client privilege
  (2) [8:193] Transfer of liabilities
   (a) [8:193.1] Franchise tax obligations
   (b) [8:194] Punitive damages claims
  (3) [8:195] Dissenters' rights
 d. [8:196] Compare--"short form" mergers
  (1) [8:196.1] "Upstream" mergers (subsidiary into parent)
   (a) [8:197] Wholly-owned subsidiary
   (b) [8:201] 90%-owned subsidiary
  (2) [8:205.2] "Downstream" mergers (parent into subsidiary)
   (a) [8:205.3] Procedure
   (b) [8:205.9] Dissenters' rights for subsidiary's minority shareholders
  (3) [8:206] Qualification not required
  (4) [8:207] Name changes
  (5) [8:208] Applicability to foreign corporations
  (6) [8:210] Dissenters' rights
 e. [8:210.1] Compare--mergers with noncorporate entities ("interspecies" mergers)
  => [8:210.1a] *Caveat--tax-free treatment available only in triangular merger*
  (1) [8:210.2] Compliance with laws governing noncorporate entities required
   (a) Entity approval requirements
    1) [8:210.3] General partnerships
    2) [8:210.4] Limited partnerships
    3) [8:210.4a] LLCs
    4) [8:210.4b] LLC members'/limited partners' unanimous consent to personal liability
   (b) [8:210.5] Equal treatment of limited partners or members
   (c) [8:210.5a] Shareholder's, partner's or LLC member's postmerger liability
   (d) [8:210.6] Dissenters' rights
  (2) [8:210.7] Procedure to effect merger
   (a) [8:210.8] Merger agreement
    1) [8:210.9] Equal treatment for all shares of same class
    2) [8:210.10] Execution by corporation
   (b) [8:210.11] Approval by board of constituent corporation
   (c) [8:210.12] Mergers proposed by insiders
   (d) [8:210.13] Approval by shareholders
    1) [8:210.14] No exception for mergers resulting in limited dilution
    2) [8:210.14a] Unanimous consent required where shareholders become personally liable
    3) [8:210.15] "Controlled" merger--unanimous consent required where common shareholders receive other than common shares or noncorporate equity securities
     a) [8:210.16] Exception--Corporations Commissioner approval
   (e) [8:210.17] Amendments to merger agreement; abandonment
   (f) [8:210.18] Merger documents filed with Secretary of State
    1) [8:210.19] Noncorporate entity as survivor
     a) [8:210.19a] Execution of certificate
     b) [8:210.19b] Additional information permitted on form
    2) [8:210.20] Corporation as surviving entity
    3) [8:210.21] Filing fee
    4) [8:210.21a] Franchise Tax Board clearance not required
  (3) [8:210.22] Effect of merger
  (4) [8:210.23] Dissenting shareholders' rights
 f. [8:210.26] Compare--mergers with *foreign* entities
  • Caveat--tax-free treatment generally unavailable
  (1) [8:210.27] Shareholders' rights (California corporation)
  (2) [8:210.28] California corporation as survivor
   (a) [8:210.29] When merger effective

      (3) [8:210.30] Foreign entity as survivor
         (a) [8:210.31] When merger effective
            1) [8:210.32] Exception--delayed California filing
      (4) [8:210.32a] Franchise Tax Board clearance not required
      (5) [8:210.33] Effect on disappearing foreign entities
         (a) [8:210.34] Exception--delayed California filing
  g. [8:211] Tax consequences ("A reorganizations")
      (1) [8:212] Straight merger
         (a) [8:213] Basis carryovers
         (b) [8:214] Taxability of "boot"
            1) [8:214.1] "Postreorganization" approach
            2) [8:214.2] "Nonqualified preferred stock" as "boot"
         (c) [8:215] Continuity of interest requirement
            1) [8:216] Must be stock or stock rights
               a) [8:216.1] Caution--"nonqualified preferred" probably not acceptable
               b) [8:217] Debt
               c) [8:218] Stock exchanged for combination of stock, debt and/or cash
               d) [8:218.1] Compare--debt exchanged for debt
             2) [8:218.5] Sale of interest
         (d) [8:218.10] Continuity of business requirement
            1) [8:218.11] Merger coupled with partial asset sale
      (2) [8:219] Triangular mergers
         (a) [8:219.1] Merger into noncorporate entity permitted
      (3) [8:220] Reverse triangular mergers
      (4) [8:222.1] Mergers of 80%-owned subsidiaries
      (5) [8:223] Advantage of merger ("A reorganization") over stock-for-stock exchange ("B reorganization")
         (a) [8:224] Example
         (b) [8:225] Further example
  h. Securities laws considerations
      (1) [8:226] Federal securities laws
         (a) [8:227] Proxy rules
         (b) [8:228] Registration requirements
         (c) [8:229] Antifraud rules
      (2) [8:230] California Corporate Securities Law
         (a) [8:231] "Nonresidents" exemption
            1) [8:232] Distinguish--other recapitalization exemptions inapplicable
         (b) [8:232.1] "Limited exchange transaction" exemption
           • [8:232.2] Shareholder approval
           • [8:232.3] Merger solely to change form or domicile
            1) [8:232.4] Notice of transaction
               • *FORM*
         (c) [8:232.10] Exchanges approved by bankruptcy court
         (d) [8:233] Commissioner's standards re granting permit
            => [8:233.1] *PRACTICE POINTER*
         (e) [8:234] Soliciting shareholder approval
4. [8:235] Exchange Reorganizations (Stock-for-Stock)
    • [8:235.1] *Compare*--share exchange *not* resulting in controlling interest
    • [8:235.2] *Compare*--equity exchange with noncorporate entity
  a. Procedure
      (1) [8:236] Tender offer by acquiring corporation
         (a) [8:237] Terms
      (2) [8:237.1] Offer made by insider
         (a) [8:237.2] Who is an "interested party"
            1) [8:237.3] Exception--corporations with fewer than 100 shareholders
            2) [8:237.4] Exception--exchange qualified by permit
         (b) [8:237.5] Independent fairness opinion
            1) [8:237.6] Delivery of opinion

2) Opining person's qualifications
(c) [8:237.7] Competing offers
1) [8:237.8] Insider proposal delayed pending shareholder action on competing offer
2) Improving insider offer
=> [8:237.9] *PRACTICE POINTER*
(3) [8:238] Shareholder approval by acquiring corporation
(a) [8:238.1] Measuring shareholder approval
1) Foreign corporation shareholder approval
(b) [8:238.2] Before or after board approval
(c) [8:239] Exceptions--share exchanges NOT requiring shareholder approval
1) [8:240] Preferred shares unaffected by share exchange
2) [8:241] Exchanges resulting in limited dilution of voting power
a) [8:241.1] Limitation--articles amendment required
b) [8:241.2] Limitation--disappearing close corporation
(d) [8:242] Dissenters' rights
(4) [8:243] Abandonment
b. [8:244] Tax treatment ("B reorganization")
(1) [8:245] Continuity of interest
(2) [8:246] Solely for voting stock of acquiring corporation
(a) [8:246a] Caution--"voting stock" excludes "nonqualified preferred"
(b) [8:246b] Exception--concomitant exchange of bonds
• [8:246c] Example
(c) [8:246.1] Exception--payment for fractional shares; target corporation's expenses
(3) [8:247] At least 80% control acquired
(4) [8:248] Compare--merger requirements
c. Securities laws considerations
(1) [8:249] Federal securities laws
(a) [8:250] Registration requirements
(b) [8:251] Proxy rules
(c) [8:252] Tender offer rules
(d) [8:253] Antifraud rules
(2) [8:254] California Corporate Securities Law
(a) [8:254.1] Limited offering exemption (§ 25102(f)) applicable
(b) [8:255] Exemption--"forced sale" exchange where less than 25% of target held by California residents
=> [8:258.2] *PRACTICE POINTER*
5. [8:259] Sale-of-Assets Reorganizations
• [8:260.1] *Compare*--reorganization with noncorporate entity
a. [8:261] All or "substantially all" assets
b. [8:262] Procedure
(1) [8:263] Approval by both boards
(2) [8:264] Approval by shareholders of both corporations
(a) [8:264.1] Measuring shareholder approval
1) Foreign corporation shareholder approval
(b) [8:264.2] Before or after board approval
(c) [8:265] Exception as to unaffected preferred shareholders
1) Preferred shares to receive less than required by articles
(d) [8:266] Exception where limited dilution of voting power
(e) [8:270] 90% approval required if corporations under common control
1) Exceptions
a) [8:271] Seller given equity in purchaser
b) [8:271.1] Sale approved by Commissioner
2) [8:272] Compare--alternatives available
(f) [8:273] Dissenters' rights
(3) [8:273.1] Sale-of-assets reorganization proposed by insider
(a) [8:273.2] Who is an "interested party"
1) [8:273.3] Exception--corporations with fewer than 100 shareholders
2) [8:273.4] Exception--exchange qualified by permit

      (b) [8:273.5] Independent fairness opinion
        1) Opining person's qualifications
        2) Delivery of opinion
      (c) [8:273.6] Competing offers
        1) Insider proposal delayed pending shareholder action on competing offer
        2) Improving insider offer
        => [8:273.7] *PRACTICE POINTER*
    (4) [8:274] Abandonment
    (5) [8:275] Documentation
    (6) [8:275.1] Seller corporation's liabilities imposed on acquiring corporation ("de facto mergers")
      (a) [8:275.2] Compare--product liability claims
    (7) [8:275.3] Special employee notice requirements (layoffs, plant closures, relocations)
  c. [8:276] Tax treatment ("C reorganization")
    (1) [8:277] Substantially all assets sold
      (a) [8:278] IRS guidelines
      (b) [8:278.1] Applies where portion of assets sold for cash
    (2) [8:279] Exchange for purchaser's voting stock
      (a) [8:281] Assumption of liabilities disregarded
      (b) [8:281.1] Asset sale to existing shareholder permitted
      (c) [8:282] "Boot" permitted if at least 80% of assets acquired for stock
    (3) [8:282.1] Transferor corporation must distribute stock
    (4) [8:282.2] No gain or loss recognized by corporation
      (a) [8:282.3] Exception for "boot" and other assets
  d. [8:283] Securities laws considerations
    (1) [8:284] Federal securities laws
      (a) [8:285] Proxy rules
      (b) [8:286] Registration requirements
      (c) [8:287] Antifraud rules
    (2) [8:288] California Corporate Securities Law
      (a) [8:289] Exemptions
        1) [8:289.1] "Nonresident shareholders exemption"
        2) [8:289.2] "Limited exchange transaction exemption"
          a) [8:289.4] Compare--less than all (or substantially all) assets exchanged for stock
        3) [8:289.5] Exchanges approved by bankruptcy court
      (b) [8:290] Caution--§ 25102(n) not applicable
      (c) [8:291] Qualification procedure
6. [8:292] Dissenters' Rights
  a. [8:293] Purpose
  b. [8:294] Shares eligible for appraisal rights
    (1) [8:295] Shares outstanding
      (a) [8:296] Compare--unexercised stock rights
    (2) [8:297] Shares NOT readily marketable
      (a) [8:298] Shares deemed readily marketable
        1) [8:299] Shares listed on national exchange or NASDAQ/NMS
        2) [8:300] Not restricted as to transferability
        3) [8:301] Less than 5% dissenting
        4) [8:302] Holders notified of appraisal rights
    (3) [8:303] Shares entitled to vote on reorganization
      (a) [8:304] Shares ineligible because not entitled to vote
        1) [8:305] Preferred shares unaffected by reorganization
        2) [8:306] Shares whose voting power not significantly diluted
          a) [8:307] Exception--dissenters in a statutory close corporation
      (b) [8:308] Compare--short-form mergers
      (c) [8:309] Compare--shareholder approval required under other provisions
        1) [8:310] Example
        2) [8:311] Rationale

(4) [8:312] Shares not voted in favor of reorganization
    (a) [8:313] Compare--listed shares must be voted against
    (b) [8:314] Comment
(5) [8:315] Shares qualified procedurally
c. [8:316] Procedure for exercising appraisal rights
    (1) [8:321] Shareholder demand upon corporation
        (a) [8:322] Time limit for shareholder demand
            1) [8:325] When prior notice required from corporation
            2) [8:325.1] Contents of corporation's notice
            3) [8:326] Notice as irrevocable offer
        (b) [8:327] Contents of shareholder demand
            1) [8:328] Demand as irrevocable offer
    (2) [8:329] Delivering certificate for endorsement
        (a) [8:330] Time limit for delivery
        (b) [8:331] Endorsement by corporation
    (3) [8:332] Obtaining payment where value agreed upon
        (a) [8:333] Plus interest
    (4) [8:334] Action to enforce payment where no
        (a) [8:335] Time limit for commencing action
        (b) [8:336] Joinder and consolidation of actions
        (c) [8:337] Issues to be tried
            1) [8:338] Valuation date
        (d) [8:340] Procedure for determining value (appraisal process)
            1) [8:341] Report by appraisers
            2) [8:342] Court may accept or reject
                a) [8:342.1] "Net book value" method may be proper
            3) [8:343] Determination by court
            4) [8:344] Other evidence of value
        (e) [8:345] Judgment
            1) [8:346] Interest
            2) [8:347] Costs
d. [8:350] Effect of lack of lawful source for payment
e. [8:351] Effect of dividends paid
f. [8:352] Termination of dissenting share status
g. [8:358] Appraisal rights exclusive remedy
    (1) [8:361] Exception--action to enforce special articles provision
        (a) [8:361.1] Limitation--when merger or sale-of-assets agreement controls
    (2) [8:362] Exception--action to test validity of shareholder approval
        (a) [8:363] Application
        (b) [8:364] Suspends other proceedings
    (3) [8:365] Exception--action to set aside reorganization not at "arms' length"
        (a) [8:366] Either as bar to other
        (b) [8:367] Burden of proof on controlling party
            1) [8:367.1] Compliance with special procedures for "controlling person"
              reorganizations
        (c) [8:368] Relief available
        • [8:369] Comment
    (4) [8:370] Compare--action under federal securities laws
        (a) [8:371] Anti-fraud rules
        (b) [8:372] Proxy rules
            1) [8:372.1] Causal nexus required between fraud and injury
7. [8:373] Divisive Reorganizations
a. [8:374] Forms of reorganization
    (1) [8:375] Spin off
        (a) [8:376] Example
        (b) Procedural considerations
            1) [8:377] Formation
            2) [8:378] Distributions limitations

(c) [8:379] Securities law considerations
   1) [8:380] Federal law
     a) [8:381] Compare--spin offs not treated as "sales"
     => [8:382] *PRACTICE POINTER*
   2) [8:383] California law
(2) [8:385] Split offs
   (a) [8:386] Example
   (b) [8:387] Procedural considerations
     1) [8:388] Formation
     2) [8:389] Distributions limitations
   (c) [8:390] Securities law considerations
     1) [8:391] Federal law
     2) [8:392] California law
(3) [8:394] Split ups
   (a) [8:395] Example
   (b) Procedural considerations
     1) [8:396] Formation
     2) [8:397] Shareholder approval required
     3) [8:398] Liquidation distribution
   (c) [8:399] Securities law considerations
b. [8:401] Tax treatment ("D reorganization")
  (1) [8:402] Requirements
   (a) [8:403] "Device" rule
     1) [8:404] Example
   (b) [8:405] Distribution of control
     • [8:406] Solely stock or securities
     • [8:407] At least 80%
   (c) [8:408] Five-year active business
     1) [8:409] "Passive" business distinguished
     2) [8:409.1] Spin-off of business acquired during five-year period ("expansion
       doctrine")
  (2) [8:410] Gain or loss computations
   (a) [8:411] Carryover basis
   (b) [8:412] Taxability of "boot"
     1) [8:412a] "Nonqualified preferred stock" as "boot"
   (c) [8:412.1] Exception--corporate gain recognized upon certain stock distributions/sales
   (d) [8:413] Compare--nonqualifying transactions
  (3) [8:413.1] California property tax reassessment
8. [8:414] Other Nontaxable Reorganizations

1. **[8:118] Introduction:** The acquisition of a corporate business can be structured in many ways, each involving different corporate, tax and securities law requirements with potentially differing consequences to the buyer and seller. Counsel for both buyer and seller must carefully analyze various factors in advising their clients on the most suitable acquisition method.

   • **[8:118a] Compare--acquisition of noncorporate entities:** Corporations are free, of course, to acquire businesses that operate in other than corporate form (e.g., limited partnerships or LLCs) and may even *merge* with noncorporate entities (see ¶ *8:210.1 ff.*). However, except in limited circumstances (¶ *8:219.1*), acquisitions of noncorporate entities or their assets do not have the potential for tax-free treatment that acquisitions of corporate businesses enjoy under IRC § 368(a)(1). Hence, acquisitions involving noncorporate entities are discussed only briefly in the paragraphs that follow.

a. **[8:118.1] Acquisition methods:** There are three basic methods by which a corporation can acquire another corporate business (see *Superbrace, Inc. v. Tidwell* (2004) 124 CA4th 388, 405, 21 CR3d 404, 416 (citing text)):

  (1) **[8:118.2] Stock purchase:** One corporation can acquire another by obtaining the other corporation's stock from the owners. The acquiring corporation becomes the *parent corporation* and the acquired corporate entity continues intact as its *subsidiary*.

   (a) **[8:118.3] Stock-for-stock exchange:** Where the acquiring corporation obtains another corporation's stock by issuing its own (or its parent's) stock or other equity

securities in exchange for a controlling interest in the target corporation, the acquisition is considered a "stock-for-stock exchange reorganization" and is subject to special corporate, tax, and securities law treatment (*see* ¶ *8:235 ff.*).

(2) [8:118.4] **Asset purchase:** A corporation's business and assets can be acquired directly by purchase, leaving its share ownership unchanged. The selling corporation's shareholders must approve the sale (*see* ¶ *8:581 ff.*). Typically, the selling corporation will dissolve and liquidate after the sale, distributing to its shareholders its remaining assets-- i.e., the consideration received in the sale (*see* ¶ *8:751 ff.*).

(a) [8:118.5] **Assets purchased in exchange for stock:** If the acquiring corporation acquires another corporation's business and assets partly or wholly in exchange for its (or its parent's) stock or certain debt securities, the acquisition is considered a "sale-of-assets reorganization" and is subject to special corporate, tax and securities law treatment (*see* ¶ *8:259*).

(3) [8:118.6] **Merger:** A statutory merger, whereby one corporation is absorbed into another, is the third acquisition method. Where the acquired corporation is merged directly into the acquiring corporation, the surviving corporation receives all of the disappearing corporation's business, assets and liabilities by operation of law. Unless cashed out, the disappearing corporation's shareholders become shareholders of the surviving corporation. A merger acquisition is a "reorganization" subject to special corporate, tax and securities law treatment (*see* ¶ *8:161 ff.*).

b. **Considerations affecting choice of acquisition method**

(1) **Corporate law considerations**

(a) [8:118.7] **Shareholder approval requirements:** Depending upon the acquisition method, the shareholders (as well as the directors) of one or both combining corporations must approve the transaction.
Generally, approval of the outstanding shares of each class of *both* corporations must be obtained for a merger (¶ *8:173*) or "stock-for-assets reorganization" (¶ *8:264*). In contrast, only the *seller's* outstanding shares need approve a "stock-for-stock exchange reorganization" (¶ *8:238*) or an acquisition of all, or substantially all, the assets of the selling corporation that is not a "reorganization" (i.e., a sale of assets; ¶ *8:589*).

1) [8:118.8] **Dissenter's rights:** Further, shareholders who have the right to vote on the transaction may have "dissenter's rights," entitling them to cash payment of their shares' appraised value (*see* ¶ *8:292 ff.*).

(b) [8:118.9] **Liabilities acquired:** The acquiring corporation in a merger transaction directly assumes *all* the acquired corporation's liabilities, known and unknown, actual or contingent (¶ *8:193 ff.*). The acquired corporation's liabilities are indirectly assumed in a "stock-for-stock exchange" where such corporation becomes the acquiror's *subsidiary*.
But, through careful planning, a corporation *may* be able to *purchase* another corporation's assets without incurring any of the seller's liabilities. However, such a transaction might be treated as a "de facto merger," rendering the acquiror responsible for the seller's liabilities (*see* ¶ *8:275.1 ff., 8:663 ff.*).

(c) [8:118.10] **Contract restrictions on transferability of assets:** It is important to determine whether either corporation is a party to an outstanding agreement limiting the ability to effect any sale, acquisition or combination. Such limitations may apply to some acquisition methods, but not to others.

1) [8:118.11] **Using merger or stock acquisition to bypass transfer restrictions:** For example, the acquired corporation may have advantageous leases, contracts, loans, etc., which are nontransferable or transferable only after securing difficult consents. Such valuable rights *might* be retained notwithstanding the transfer restriction where the transaction is cast as a merger, but only if the restriction does not apply to transfers "by operation of law."
Alternatively, the acquiror could purchase the acquired corporation's stock so that it continues in existence as a subsidiary without transferring any assets. (But this will not bypass a transfer restriction that applies to such a change in stock ownership.)

(d) [8:118.12] **Bulk sale restrictions:** The bulk sales law will apply to the bulk sale of

inventories, e.g., in a sale of assets transaction (*see* ¶ *4:511 ff.*).

(e) [8:118.13] **Antitrust restrictions:** Although beyond the scope of this Practice Guide, application of the federal and state antitrust laws must be considered in any corporate acquisition or combination. [See 15 USC §§ 1, 2, 18; Bus. & Prof.C. § 16700 et seq.; see also *California v. American Stores Co.* (1990) 495 US 271, 296, 110 S.Ct. 1853, 1867--Clayton Act authorizes *private* divestiture remedy for anticompetitive mergers] However, it is unlikely that the acquisition method chosen will have any effect on the application of these restraints on anticompetitive combinations.

(f) [8:118.14] **Covenants not to compete:** The acquiring corporation may wish the acquired corporation's officers, directors and/or shareholders to enter into a covenant not to compete with it. California law generally disfavors covenants not to compete because they are contracts in restraint of trade (Bus. & Prof.C. § 16600, ¶ *6:401.1*). However, such covenants are valid where given by:

- The seller of a business, including its goodwill;
- A "substantial" shareholder selling *all* of his or her shares (*see* ¶ *6:401.2 ff.*);
- Any shareholder of a corporation which sells all or substantially all of its operating assets (or the assets of any of its divisions or subsidiaries) together with the goodwill; or
- Any shareholder of a corporation that sells all of its ownership interest in a subsidiary. [Bus. & Prof.C. § 16601]

1) [8:118.14a] **Geographic/temporal limits:** A covenant not to compete will be enforced only to prevent competing activities (i.e., "carrying on a similar business") within a specified geographic area in which the sold business was conducted, and only for so long as the buyer or its successors carry on a like business therein. [Bus. & Prof.C. § 16601; see *Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 CA4th 1292, 1301, 72 CR3d 259, 266-267; *Fleming v. Ray-Suzuki, Inc.* (1990) 225 CA3d 574, 583-584, 275 CR 150, 155-156--covenant not to compete in same type of mail order business "in the United States" enforceable because represented area of existing goodwill sold with business]

2) [8:118.14b] **Scope of covenant limited to protection of purchased business:** The purpose of Bus. & Prof.C. § 16601 is to protect the value of the *business acquired by the buyer.* A noncompete covenant that goes beyond that scope--e.g., shielding the buyer from competition unrelated to the purchased business--is unenforceable. [*Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 CA4th 1068, 1072-1073, 48 CR3d 614, 616; *Monogram Indus., Inc. v. Sar Indus., Inc.* (1976) 64 CA3d 692, 701, 134 CR 714, 720]

- [8:118.14c] A covenant not to solicit the acquired business' employees and customers is permissible ... because it prevents the seller from eroding the very goodwill it sold. On the other hand, a covenant barring the seller from soliciting *all* employees and customers of the seller, including those who were not employees or customers of the acquired business, would give the buyer unduly broad protection against competition. [*Strategix, Ltd. v. Infocrossing West, Inc.*, supra, 142 CA4th at 1073-1074, 48 CR3d at 617]
[8:118.14d] *Reserved.*

3) [8:118.14e] **Tax treatment--payments amortizable:** Payments made under a covenant not to compete are amortizable over a 15-year period by the acquiring corporation. The payments are not otherwise deductible or depreciable. [IRC § 197; see Treas.Temp.Regs. § 1.197-1T; also see *Frontier Chevrolet Co. v. Commr.* (9th Cir. 2003) 329 F3d 1131, 1134-1135--redemption of majority shareholder's stock to give minority shareholder complete ownership treated as IRC § 197 "acquisition" amortizable over 15 years (not over 5-year contract term)]

(g) [8:118.15] **Special employee notice requirements (layoffs, plant closures, relocations):** If an acquisition results in a *mass layoff* or a *plant closure or relocation* affecting at least 50 employees, special notice requirements may need to be satisfied pursuant to the federal Worker Adjustment and Retraining Notification Act ("WARN Act," 29 USC §§ 2101-2109) and its California counterpart (Lab.C. § 1400 et seq.). *See discussion at* ¶ *8:1041 ff.*

(2) [8:118.16] **Securities law considerations:** Application of the federal and California

securities laws must be considered where the acquiror offers its (or its parent's) shares or other securities for the assets or stock being acquired. The securities law requirements vary depending upon which acquisition method is employed (*see ¶ 8:226 ff., 8:249 ff., 8:283 ff.*). The only acquisition method that clearly avoids any securities law complication is an all-cash asset acquisition (¶ *8:711*).

   (3) [8:118.17] **Tax considerations:** The selling corporation or shareholders will usually want the transaction to be "tax-free" (i.e., structured to avoid presently taxable gains on the sale). On the other hand, the acquiror may want the acquisition to be taxable to the sellers in order to obtain a "step-up" in basis of the assets acquired. The transaction's form will determine whether it is taxable or nontaxable, or trigger sales and property taxes.

     (a) [8:118.18] **Tax-free acquisitions:** An acquisition is taxable unless it qualifies as one of the *three* tax-free "reorganizations" described in IRC § 368--i.e., an "A" reorganization applicable to statutory mergers (¶ *8:211 ff.*); a "B" reorganization applicable to "stock-for-stock exchanges" (¶ *8:244 ff.*); or a "C" reorganization applicable to "stock-for-assets exchanges" (¶ *8:276 ff.*). The requirements for tax-free treatment vary significantly, depending upon which acquisition method is employed.

     (b) [8:118.19] **Sales taxes:** Sales taxes may be imposed on a sale of assets (¶ *8:703*), but not on a merger or stock acquisition.

     (c) [8:118.20] **Property tax reassessments:** A real property transfer will generally trigger revaluation for property tax purposes. Even a transfer "by operation of law" (e.g., a merger) will result in revaluation if the property-owning corporation disappears. [See *Sav-on Drugs, Inc. v. County of Orange* (1987) 190 CA3d 1611, 1621, 236 CR 100, 105]
Likewise, even though the property-owning corporation *remains in existence*, a change in its ownership or ownership of its parent may trigger a reassessment. For example, a subsidiary corporation's real property must be revalued when its parent's *controlling* stock is acquired in a merger reorganization. [*Title Ins. & Trust Co. v. County of Riverside* (1989) 48 C3d 84, 92-94, 255 CR 670, 674-676--acquisition of parent's stock in merger constituted "change of ownership" of subsidiary's real property]
In other words, a "change of ownership" triggering reassessment occurs any time there is a change in the corporate *entity* that *owns* the real property *or* in its controlling shareholder(s). [See *Twentieth Century Fox Film Corp. v. County of Los Angeles* (1990) 223 CA3d 1158, 1163-1164, 273 CR 76, 79; *Kraft, Inc. v. County of Orange* (1990) 219 CA3d 1104, 1108-1109, 268 CR 643, 646-- corporation's acquisition of property-owning corporation in merger triggered reassessment even though acquired corporation's shareholders became majority shareholders in new parent corporation; *and ¶ 2:177.8*]

  c. [8:118.21] **Accounting treatment:** An acquisition is accounted for as a "purchase." The acquirer must allocate the fair market value of the consideration paid for the acquired assets in accordance with their fair market values. As a result, the assets are brought onto the acquirer's balance sheet at their fair market ("stepped-up") values, not the former ("carryover") values shown on the acquired corporation's books. [See Financial Accounting Standards Board Statement No. 141 (2001)]

   (1) [8:118.22] **Goodwill:** Where the total price paid *exceeds* the fair market value of the acquired assets, the difference is "goodwill," which must be *amortized* against the acquirer's earnings for financial accounting purposes. [See Financial Accounting Standards Board Statement No. 141, supra]
(For tax purposes, "goodwill" is not deductible but must be amortized over a 15-year period. See IRC § 197; Treas.Temp.Regs. § 1.197-1T.)

   (2) [8:118.23] **"Pooling of interests" method abolished:** The "pooling of interests" method permitted an acquiring corporation, in certain stock-for-stock acquisitions, to combine the acquired corporation's assets and liabilities (including current and retained earnings) with its own at their former ("carryover") value shown on the acquired corporation's books. This "pooling" approach precluded the creation of any "goodwill." However, "pooling of interests" is no longer permitted in combinations of "for-profit" corporations. [Financial Accounting Standards Board Statement No. 141, supra]
[8:118.24-118.25] *Reserved.*

  d. [8:118.26] **Corporate "reorganizations":** Any change in the corporate structure that

significantly alters creditor or shareholder interests may be considered a "reorganization." This includes purely *internal* changes entirely within an existing corporation (i.e., recapitalizations); acquisitions or *combinations* involving more than one corporation (e.g., merger or other acquisitive reorganizations, above); and *divisions* of the corporation into new entities.

    => [8:118.27] ***CAUTION--Duty to disclose:*** Management and other "insiders" have a duty to disclose *pending* reorganization plans and negotiations where they constitute "material" investor information under the securities law anti-fraud rules. *See discussion at ¶ 6:370.1.*
    [8:118.28-118.30] *Reserved.*

e. [8:118.31] **Acquisition and reorganization expenses generally *not* deductible:** Expenses incurred in connection with corporate acquisitions, reorganizations and recapitalizations (e.g., legal, accounting and investment banking fees) are *not* deductible as "ordinary and necessary" business expenses (IRC § 162(a)) if the benefits of the transaction extend *beyond the year in which it occurred*. Such expenses are more akin to *capital expenditures*, and thus must be amortized and depreciated over the useful life of the asset to which they pertain or, if no specific asset or useful life can be ascertained, deducted upon final disposition (IRC § 167). [*INDOPCO, Inc. v. Commr.* (1992) 503 US 79, 88- 90, 112 S.Ct. 1039, 1045-1046; see Treas.Regs. § 1.263(a)-5]

  (1) **Application**
    • [8:118.31a] Thus, expenses incurred by a target corporation in a friendly takeover were *not* deductible under § 162(a). [*INDOPCO, Inc. v. Commr.*, supra, 503 US at 88-90, 112 S.Ct. at 1045-1046]
      [8:118.31b-118.31d] *Reserved.*
    • [8:118.31e] But fees paid to *resist a hostile takeover* were *deductible*--even where the takeover was eventually accepted. [*A.E. Staley Mfg. Co. & Subsidiaries v. Commr.* (7th Cir. 1997) 119 F3d 482, 487-493; *Matter of Federated Dept. Stores, Inc.* (SD OH 1994) 171 BR 603, 608-610; compare *Dana Corp. v. United States* (Fed.Cir. 1999) 174 F3d 1344, 1350-1352--annual retainer paid to law firm to secure its availability in case of hostile takeover not deductible where retainer was applied to legal services rendered in connection with corporate client's acquisition of another company (capital expenditure)]
    • [8:118.31f] Corporate officers' salaries were fully deductible as "ordinary and necessary" expenses notwithstanding that the officers spent a portion of their time on a friendly takeover: The officers' salaries originated from their employment relationship with the corporation and were only *indirectly related to the takeover*. [*Wells Fargo & Co. & Subsidiaries v. Commr.* (8th Cir. 2000) 224 F3d 874, 886-888]

  (2) [8:118.32] **Compare--election to amortize investigation expenses:** Expenses made in connection with *investigating* the acquisition of an existing trade or business may be amortized and deducted ratably over a period of *not less than 60 months*, commencing with the month in which the trade or business is acquired. (In contrast, expenses occurring after a specific company is targeted and the decision to acquire is made must be amortized and depreciated as *capital expenditures; see ¶ 8:118.31*.) [IRC § 195; see Rev.Rul. 99-23, 1999-1 CB 998; also see Treas.Regs. § 1.195-1; *Wells Fargo & Co. & Subsidiaries v. Commr.*, supra, 224 F3d at 888-889]
    If the acquired business is completely disposed of before the end of the amortization period, any remaining expenses may be deducted as a loss to the extent allowed under IRC § 165. [IRC § 195(b)(2)]

  (3) [8:118.33] **Compare--limited deductibility of corporate *start-up* expenses:** *See ¶ 2:196.*

2. [8:119] **Recapitalizations:** In broad terms, any purely internal reshuffling of the capital structure of an existing corporation is a "recapitalization." Normally, it results from an agreement between the corporation and some or all of its shareholders or creditors, whereby outstanding securities or debt are *exchanged* for other debt or securities--all within the framework of a single, existing corporation. [See *Helvering v. Southwest Consolidated Corp.* (1942) 315 US 194, 202-203, 62 S.Ct. 546, 551]

  a. [8:120] **Procedure:** The board of directors simply adopts a resolution whereby some or all of the existing shareholders or creditors are to be offered "new" securities for "old." The issuance and exchange of securities effects the recapitalization.

    (1) [8:121] **Shareholder approval:** Shareholders to whom the exchange is offered must, of

course, accept or approve the offer. But generally there is no need for other shareholders to approve (any more than for other share issuances).

[8:122] The rule is otherwise, however, where the recapitalization requires *amendment of the articles*; e.g., to increase authorized capital, or to create a class of securities having the rights or preferences agreed upon. In such cases, the rules and procedures on amending articles (¶ *8:48 ff.*), including shareholder approval, are an essential step in the recapitalization.

   (2) [8:123] **No dissenters' rights:** Since the reshuffling of capital structure is purely internal, shareholders disagreeing with the recapitalization have no right to be cashed out (as they may have in mergers and other acquisitive reorganizations; see ¶ *8:292*).

b. [8:124] **Tax treatment:** A "recapitalization" is one of the seven forms of corporate reorganizations recognized in the Internal Revenue Code (see <u>IRC § 368(a)(1)(E)</u>). The term is not defined by the Code. Rather, whether a particular exchange of securities is a "recapitalization" for tax purposes is determined by whether it results in a *substantial change* in the investor's interest in the corporation.

   (1) [8:125] **Tax-free exchange generally:** If stock is exchanged *solely* for other stock in the same corporation (or if securities are exchanged solely for other securities having no greater face amount), then there is a substantial *continuity* of investment interest. Hence, such an exchange is generally tax-free. [<u>IRC § 354(a)</u>: "No gain or loss is recognized if stock or securities in a corporation ... are exchanged solely for stock or securities in such corporation ... "]

The security holder's tax basis in the "old" stock or securities is carried over and becomes his or her basis in the "new" stock or securities. [<u>IRC § 358(a)(1)</u>]

   (2) [8:126] **Limitations:** But an exchange is not tax-free where the investor's interest is substantially *different* after the exchange; particularly:

- [8:127] **Exchanges having effect of dividends:** An exchange of securities which results in *disparate treatment* among security holders of the same class (e.g., giving some shareholders preferential rights to income over others) is treated as a taxable dividend to the favored shareholders (see ¶ *7:199*).
- [8:128] **Exchanges having effect of redemptions:** Where debt securities are issued in exchange for outstanding shares, the transaction is treated as a repurchase or redemption of the shares, and is taxed accordingly (see ¶ *7:228*).
- [8:129] **Exchanges accompanied by boot:** An exchange that results in the shareholder receiving cash or other property in addition to securities results in taxable income to the extent of the "boot" received. [<u>IRC § 356</u>]
- [8:130] **Exchanges with "bail out" potential:** Where preferred shares are issued in exchange for outstanding common shares, and the exchanging shareholders retain other common shares, there is a potential for "bailing out" corporate earnings, and therefore the preferred shares may be treated as "Section 306 stock" (see ¶ *7:296*).

c. [8:131] **Forms of recapitalization:** The following are the most commonly encountered forms of recapitalization, and particular considerations applicable:

   (1) [8:132] **Exchanges of "new" preferred for "old" common:** Pursuant to a plan or agreement with its shareholders, a corporation may issue preferred stock, having designated rights and preferences, in exchange for some of its outstanding common stock.

      (a) [8:133] **Purpose:** The purpose usually is to facilitate *transfer of control* (and risk) from one group of shareholders to another; e.g., as where older shareholders wish to retire from active management in favor of other, younger shareholders. The older shareholders end up with preferred shares, giving them greater security as to income, priority on liquidation, etc. The younger shareholders end up with control of the corporation, and greater growth opportunity (and risks).

      (b) [8:134] **Example:** Father, the principal shareholder of XYZ Corp., wants to encourage Son to participate in ownership. Yet Father wants to retain control of the corporation and have an adequate income during his lifetime. Father also wants to fix the value of his shares ("freeze" the value for estate tax purposes), so future growth will inure to Son.

Father can amend the articles to authorize a new class of voting preferred shares (with the desired dividend and liquidation preferences), and a class of nonvoting common. Father would then exchange his existing common shares for the new preferred and the

nonvoting common (allocating to the preferred substantially the full value of his investment). Father would then make a gift of the nonvoting common shares to Son. (There is no gift tax to pay because the nonvoting common has little present value.) If properly implemented as a tax-free recapitalization, Father will have frozen the value of his investment, and all future growth will go to Son (through the common shares). At the same time, Father will have retained control (through the voting preferred). Later, Father can transfer voting control to Son by inter vivos or testamentary gifts of the preferred.
- • [8:134.1] **Caution:** The transferred interest still may be subject to a higher gift tax valuation; see ¶ *2:240.1.*

(c) [8:135] **Amendment of articles:** Unless the articles already authorize a class of preferred shares having the rights and preferences agreed upon, it will be necessary to amend the articles (requiring shareholder approval) to create such a class.

(d) [8:136] **Tax considerations:** As long as the transferors exchange all of their common stock for preferred, the recapitalization will generally be tax-free under IRC § 354(a) (¶ *8:125*).

   1) [8:137] **Caution--transfer of less than all stock:** If the transferors *retain* any common stock, there is a risk the preferred may be treated as "Section 306 stock." (In determining whether the transferors still own any common shares, the IRC § 318 attribution rules fully apply; see ¶ *7:232.*) [IRC § 306(c)(1)(B); Rev.Rul. 59-84, 1959-1 CB 71; see ¶ *7:296 ff.*]

   2) [8:137.1] **Caution--"nonqualified preferred stock" taxable:** Unless issued in connection with the recapitalization of a "family-owned corporation" (below), "nonqualified preferred stock" (i.e., preferred stock having debt-like attributes, ¶ *3:340.1 ff.*) received in exchange for the common stock is treated as taxable "boot." [IRC §§ 354(a)(2)(C)(i), 356(e)]

      a) [8:137.2] **Exception for "family-owned corporation":** The rule that treats "nonqualified preferred stock" as boot does *not* apply in a recapitalization of a "family-owned corporation"--i.e., a corporation wherein at least 50% of the voting stock and 50% of all other classes of stock are owned by members of the same family for a period beginning 5 years before and ending 3 years after the recapitalization. (Family members include uncles, nieces, cousins, etc.) [IRC §§ 354(a)(2)(C)(ii), 447(d)(2) (C)(i) & (e)]

(2) [8:138] **Exchanges of "new" preferred for "old" preferred:** Another type of recapitalization is for the corporation to issue "new" preferred stock, having designated rights and preferences, in exchange for an existing class of preferred stock having different rights and preferences. [See Corps.C. § 903(a)(6),(7)]

(a) [8:139] **Purpose:** This kind of recapitalization is often encountered with corporations having financial problems. It provides changes in the dividend rates or other priorities, or even the elimination of cumulative dividend arrearages, in order to obtain additional capital from other investors or lenders.

(b) [8:140] **Amendment of articles:** An amendment of the articles will ordinarily be required to create and authorize the "new" preferred (requiring shareholder approval by voting shares and by the "old" preferred shares, voting or not; Corps.C. § 903(a); ¶ *8:54*).

(c) [8:141] **Tax considerations:** In addition to the general reorganization rules (IRC §§ 368(a) and 354), the Code specifically provides that an exchange of preferred-for-preferred in the same corporation is tax-free: "No gain or loss shall be recognized if common stock is exchanged solely for common stock in the same corporation, or if preferred stock is exchanged solely for preferred stock in the same corporation." [IRC § 1036]

   1) [8:141.1] **"Nonqualified preferred" taxable:** "Nonqualified preferred stock" issued in exchange for "old" preferred will be taxed as "boot" (unless issued by a "family-owned corporation" or in return for "old" preferred that is also "nonqualified"). [IRC §§ 354(a)(2)(C)(i), 356(e); see ¶ *8:137.1-137.2*]

   2) [8:142] **Compare--effect of dividend:** However, issuance of "new" preferred may be treated as a taxable *stock dividend* if it results in *disparate treatment* among security holders of the same class (see ¶ *7:289*).

For example, "new" preferred shares are exchanged only with certain holders of the "old" preferred, and its fair market value (or liquidation preference) exceeds the original issue price (or liquidation preference) of the surrendered stock. This would result in a disproportionate increase in such holders' ownership interest in the corporation's assets and earnings. [Treas. Regs. § 1.305-7(c)]

(3) [8:143] **Exchanges of "new" common for "old" preferred:** This form of recapitalization is encountered wherever the outstanding preferred shares have *conversion rights*, making them convertible into common. Upon exercise of such rights, the "old" preferred is exchanged for "new" common.

Amendment of the articles is required only if there is not enough common stock remaining unissued under the corporation's original authorized capital (¶ *8:28*).

Again, such exchange of "stock for stock in the same corporation" is normally tax-free. Gain or loss is deferred until the shares are ultimately sold. [IRC § 354(a), above; Treas.Regs. § 1.368-2(e); and Rev. Rul. 77-238, 1977-2 CB 115]

(4) [8:144] **Exchanges of "new" common for "old" common:** As with exchanging "new" preferred for "old" common, this form of recapitalization can be used to transfer or alter control of the corporation. For example, issuing nonvoting common stock in exchange for outstanding voting shares (or vice versa).

Unless the "new" common shares had been previously authorized (which is rarely the case), amendment of the articles will be required (¶ *8:28*).

Again, such an exchange is generally tax-free. [IRC §§ 1036, 368, 354]

(5) [8:145] **Exchanges of "new" stock for "old" debt:** Not infrequently, a corporation may enter into an agreement with its creditors to issue shares of stock (either common or preferred) to pay off outstanding debt securities (bonds, debentures, notes, etc.). The usual purpose is to "clean up" or strengthen the corporation's balance sheet, and thus perhaps to encourage others to invest in or make loans to the corporation.

Amendment of the articles is usually required only where, to effect the exchange, it needs more shares than it has remaining unissued from its original authorized capital (¶ *8:28*).

(a) [8:145.1] ***Caution--possibility of income to corporation:*** To the extent the *fair market value* of the stock is *less* than the amount of the debt, the corporation must recognize the difference as *income* from discharge of indebtedness. [IRC § 108(e)(8)]

(6) [8:146] **Exchanges of "new" debt securities for "old" debt:** These are basically *refinancing* transactions. For example, the holders of existing bonds or debentures may be offered "new" debt having extended maturity, but with higher interest rates, better lien protection, etc.

(a) [8:147] **Tax considerations:** The exchange is tax-free as long as the *principal* amount of the debt is unchanged. [IRC § 354(a)]

[8:148] In contrast, where a *greater* amount is due under the "new" debt securities than under the securities surrendered, the fair market value of the excess is treated as "boot" to the security holder. [IRC §§ 354(a)(2), 356(d)(2)(B)]

[8:149] Compare: If a *lesser* amount is due under the "new" securities, the difference may be taxable income to the *corporation* (as forgiveness-of-debt income). [IRC §§ 108(e), 61(a)(12)]

(7) [8:150] **Compare--exchanges of "new" debt for "old" stock:** The issuance of debt securities (bonds, debentures, notes) solely in exchange for outstanding stock is *not* a tax-free recapitalization. Rather, it is taxed as a *redemption* of the surrendered stock (*see* ¶ *7:228, 7:231.3, 8:128*). [Treas.Regs. § 1.354-1(d)]

[8:151] If the "old" stock was exchanged for a *combination* of debt securities and *some* "new" stock, the transaction would be treated as a tax-free exchange of stock (IRC § 356), with the value of the debt securities taxed as "boot." [IRC §§ 354(a)(2), 356(d)]

(8) [8:152] **Plan essential:** To qualify for tax-free treatment, a recapitalization must be pursuant to a formally-adopted plan (i.e., directors' resolutions, shareholders' approval, etc.). The plan must contain a detailed description of the exchange and a statement of its business purpose. [Treas.Regs. §§ 1.368-2(g), 1.368-3(a)]

[8:152.1-152.5] *Reserved.*

d. [8:152.6] **Securities law requirements:** An exchange of securities for other securities is considered a "sale" under both federal and California law. [See SA § 2(a)(3); Corps.C. § 25017(a)]

A change in the rights under or restrictions on outstanding securities is also considered a "sale" under California law (Corps.C. § 25017(a)), but not under federal law. Therefore, *federal* securities law issues arise only in recapitalizations involving *exchanges* (unless the corporation is a 1934 Act reporting company, in which event the federal *proxy* rules (SEA § 14) may apply to recapitalizations requiring *shareholder approval*).

(1) [8:153] **Federal and state exemptions for exchange with existing security holders:** An exchange of securities with a corporation's existing security holders exclusively is *exempt* from the 1933 Act registration requirements and the California qualification requirements so long as no commission or other remuneration is paid for soliciting the exchange. [SA § 3(a)(9); Corps.C. § 25102.1(c)]

[8:153.1-153.4] *Reserved.*

(2) [8:153.5] **Other *state law* exemptions:** Even where the exchange does *not* fall within the above exemption (i.e., the exchange is not limited to existing security holders or involves payment of a commission), it may fall within other exemptions from the California qualification requirements. The major ones are described below.

(a) [8:153.6] **Securities of "listed" corporations:** State law conforms to the 1933 Act preemption provisions (see ¶ *5:18.6*) by expressly exempting from all qualification requirements *and from notice and fee filing requirements* (i) securities listed (or authorized for listing) on the New York or American Stock Exchanges, (ii) NASDAQ Global Market or Global Select Market securities, and (iii) securities (including debt instruments) equal or senior to these securities. [Corps.C. § 25100.1(a); see SA § 18 (a), (b)(1)]

1) [8:153.7] **Proxy rules applicable:** One of the prerequisites for listing on the New York and American Stock Exchanges and NASDAQ is that the corporation must be a 1934 Act reporting company. Consequently, a corporation that qualifies for the "listed corporation" exemption (above) is ipso facto subject to the SEA § 14 proxy requirements for any *shareholder approval* sought in connection with the recapitalization.

(b) [8:153.8] **SEC Rule 506 and "qualified purchasers":** Conforming again to the 1933 Act preemption provisions (see ¶ *5:18.6*), California exempts from the qualification requirements (except for a "notice" filing and accompanying fees, ¶ *5:185.1*) an exchange of securities (i) with "qualified purchasers," as defined by SEC rules (not yet adopted), or (ii) in reliance on Rule 506 (¶ *5:171 ff.*) or such other SEC rules or regulations as may be issued in the future under SA § 4(2). [Corps.C. § 25102.1(a), (d); see SA § 18(a), (b)(3) & (b)(4)(D)]

[8:154-155] *Reserved.*

(c) [8:156] **Exemptions pertaining to recapitalizations:** An exchange of securities for other securities may be exempt from qualification under the recapitalization exemptions set forth in Corps.C. § 25103, discussed earlier in connection with "Amendment of Articles" (see ¶ *8:90 ff.*).

In addition, the Corporations Commissioner has, by rule, specifically exempted exchanges of securities by the corporation where:

• The exchange is *exclusively with existing security holders* (or changes in the rights or restrictions of their securities); and

• An original issuance of such securities would have been exempt under Corps.C. § 25102 (including the § 25102(f) "limited offering" exemption and the § 25102(n) "qualified purchaser" exemption). [Corps.Commr.Rule 260.103(a)]

1) [8:156.1] **Notice requirement:** Although exempt under such Rule, the corporation is required to file *notice* of any such exchange with the Corporations Commissioner if the exemption so requires. [Corps.Commr.Rule 260.103(b); see Notice form, *Form 5:F*]

(3) [8:157] **Qualification procedure:** Where no exemption applies, a recapitalization--i.e., an exchange of securities by a corporation with its existing security holders or any material change in the rights under or restrictions on their securities--must be qualified by permit (and if no federal exemption applies, must be registered with the SEC). [Corps.C. §§ 25120, 25121]

• *FORM:* Application for Recapitalization Permit, *see Cal. Prac. Guide Corps. Form 8:E.*

(a) [8:158] **Commissioner's standards:** A permit may be conditioned on the

corporation's obtaining an affirmative vote of a specified percentage of the outstanding stock (excluding shares held by persons having a conflict of interest in connection with the adoption of the reorganization plan). [Corps.Commr.Rule 260.140.61]

(b) [8:159] **Hearings:** The corporation may request a hearing on the application for permit to issue securities in any recapitalization or reorganization. Also, under "unusual circumstances," the Corporations Commissioner may initiate and order such a hearing. [Corps. Commr.Rule 260.140.62]

(c) [8:160] **Soliciting shareholder approval:** Shareholder proxies or consents to a recapitalization (or other reorganization) may not be solicited until *after* a permit has been issued.

Moreover, any materials distributed to the shareholders designed to elicit their approval must be cleared in advance with the Corporations Commissioner. (Preliminary copies must be attached as an exhibit to the application for permit.) [Corps.Commr. Rule 260.140.60]

3. [8:161] **Mergers:** A merger is a reorganization in which one corporation is absorbed into another. By plan or agreement, **shares** of **stock** in the **absorbed** or "disappearing" corporation are converted into shares of stock or other securities of the "survivor" corporation. Provided statutory requirements are met, the assets and liabilities of the disappearing corporation are transferred by operation of law to the survivor. [See Corps.C. §§ 1100-1112]

[8:162] **Compare--consolidations:** A consolidation is also a combination of two or more existing corporations, but instead of absorbing one into the other (as in a merger), the two are "consolidated" by merging into a *third* corporation (the "survivor"). The procedures for mergers and consolidations are identical, and there is no distinction drawn under the Corporations Code. [See *Ortiz v. South Bend Lathe* (1975) 46 CA3d 842, 848, 120 CR 556, 559 (disapproved on other grounds in *Ray v. Alad Corp.* (1977) 19 C3d 22, 34, 136 CR 574, 582)]

a. [8:163] **Types of mergers:** A merger transaction may take various forms, of which the following are most common:

- [8:164] **Straight merger:** One or more corporations are merged into a surviving corporation, with the shareholders (and other security holders) of all the constituent corporations becoming shareholders (and/or security holders) of the survivor (except to the extent any of them are "cashed out" in the merger).

- [8:165] **Triangular merger:** One corporation (parent) acquires another (target) by merging it into a third corporation, which is a wholly-owned subsidiary of the parent. The shareholders of the acquired corporation, however, receive stock or securities of the *parent* corporation (rather than of the subsidiary-"survivor").

  The result is to keep the acquired corporation's assets and liabilities in a separate entity (the wholly-owned subsidiary), rather than have the parent absorbing them directly as in a straight merger. But the acquisition is still "paid for" by issuance of the parent's securities.

- [8:166] **Reverse triangular mergers:** Where it is important to preserve the target corporation's separate legal identity (e.g., because it holds a valuable nontransferable license or permit), a triangular merger can be effected in which the target, and not the subsidiary, "survives."

  This is how it works: First, the acquiring corporation ("parent") forms a wholly-owned subsidiary to which it contributes shares of its own stock (to be used for the acquisition) in exchange for the subsidiary's stock. That subsidiary is then merged into the corporation to be acquired (the "target" corporation) with the target's voting shares being issued to the parent. The shares of the "parent" (previously held by the absorbed subsidiary and now held by the "target") are then distributed to the "target" corporation's shareholders in exchange for their stock. When the smoke clears, the "parent" has voting control of the "target," and the former shareholders of the "target" have become shareholders in the "parent" corporation. The legal identity of both the parent and the "target" have been preserved intact.

- [8:167] **Short-form mergers:** Mergers between parent and subsidiary corporations, where the parent owns at least 90% of each class of the subsidiary's stock. Because the parent already has almost complete ownership of the subsidiary, this type of merger is treated differently than other mergers and is *not* subject to the "reorganization" rules of the Corporations Code (see ¶ *8:196 ff.*).

b. **Procedure to effect merger**

(1) [8:168] **Plan or agreement of merger:** The first step in a merger is for the constituent corporations to enter into an agreement or plan of merger. [Corps.C. § 1101]

   (a) [8:169] **Parties:** The parties to the agreement are the respective ("constituent") corporations. If either is a subsidiary of a third corporation, that parent corporation may also be a party to the merger agreement. [Corps.C. § 1101]

   (b) [8:170] **Contents:** The merger agreement must state the following:

- The name and place of incorporation of each constituent corporation to the merger, and which is to be the surviving corporation;
- The terms and conditions of the merger, including the manner or ratio by which shares in the disappearing corporation will be converted into shares or other securities of the surviving corporation, and any cash, property or other rights which the existing shareholders are to receive;
- Any other details, including how fractional share interests will be "cashed out" or otherwise treated consistent with Corps.C. § 407 (below);
- If the shares are to be cancelled *without* any consideration; and
- Any amendment to the survivor's articles of incorporation to be effected by the merger. [Corps.C. § 1101]

**FORM:** Agreement of Merger, *see Cal. Prac. Guide Corps. Form 8:E.1*.

   1) [8:170.1] **Terms may be dependent on facts ascertainable outside agreement:** The terms of a merger agreement may be made dependent upon facts ascertainable *outside* of the agreement itself ... provided the agreement *clearly* and *expressly* sets forth the *manner* in which such facts operate upon the terms in question. [Corps.C. § 109.5(a); *see ¶ 4:60.1*]

   Thus, specified terms of a merger agreement may be dependent upon such ascertainable extraneous facts as the price of the constituent corporations' shares.

   2) [8:170.2] **Terms may be dependent on extrinsic agreement:** In addition, merger agreement terms may be made dependent upon facts ascertainable outside the merger agreement through reference to an extrinsic *agreement* or document. [Corps.C. § 109.5(a), (b)]

   Example: By using this procedure, the constituent corporations may form executive committees to work out arrangements for executive compensation and other matters and not include their agreements in the merger instrument.

      a) [8:170.3] **Shareholder approval of amendments to extrinsic agreements:** Shareholder approval may be required for any amendment or revision of such an extrinsic agreement if a constituent corporation is a *party* to the agreement. [Corps.C. § 109.5(c)]

      (Compare: The statute does not require shareholder approval where the corporation is *not a party* to the agreement or to documents referenced in the merger agreement.)

         1/ [8:170.4] **Change in shareholder rights, liabilities:** The affected shareholders must approve an amendment to such an extrinsic agreement if it would result in a *material change* in (1) the rights, preferences, privileges or restrictions of any share class or series; or (2) certain enumerated rights or liabilities of any share class or series (*see ¶ 4:60.3 ff. for list*). [Corps.C. § 109.5(c) (1)-(3)]

         2/ [8:170.5] **Change in principal terms of merger agreement:** Moreover, if any amendment or revision of the extrinsic agreement would result in a change in any of the *principal* terms of the merger agreement, it must be approved by the shareholders of the constituent corporations, just as if the "principal terms" of the merger agreement itself were being amended (*see ¶ 8:184*). [Corps.C. § 109.5(c)(4)]

      b) [8:170.6] **Copies must be maintained:** The constituent corporations must maintain copies of such extrinsic agreements (and all amendments thereto) at their principal offices. If the shareholders of any constituent corporation request in writing, they must be provided with copies of such extrinsic agreements free of charge. [Corps.C. § 109.5(b)]

   3) [8:170.7] **Agreement must provide fair treatment for fractional share interests:** The merger agreement must provide for cash payments in lieu of

fractional shares or for any other treatment of fractional share interests consistent with <u>Corps.C. § 407</u>. [<u>Corps.C. § 1101(e)</u>]

    4) [8:170.8] **Equal treatment for all shares of same class:** Each share of the same class (or series) must be treated equally regarding any distribution of cash, property, rights or securities in the merger ... unless *all* shareholders of the class (or series) agree otherwise. [<u>Corps.C. § 1101</u>]

        a) [8:170.9] **Exception--shares held by constituent corporation:** However, shares of one constituent corporation held by another constituent corporation to the merger (or by its parent or a wholly-owned subsidiary of either) may be treated differently from other shares--i.e., cancelled rather than cashed out, exchanged for other shares, etc. [<u>Corps.C. § 1101</u>]

  (c) [8:171] **Execution:** Each corporation must sign the merger agreement by its chairman of the board, president or a vice president, *and* its secretary or an assistant secretary. [<u>Corps.C. § 1102</u>]

(2) [8:172] **Board approvals:** The boards of each corporation (and of any *controlling parent corporation* whose equity securities are being issued in the merger) must adopt and approve the merger agreement and authorize or ratify its execution by corporate officers. [<u>Corps.C. § 1101</u>]

  (a) [8:172.1] **Caution:** The board has a clear responsibility to inform itself of the merger terms before adopting and approving the merger. This includes reviewing the merger agreement and related documents. Directors should *not* rely solely on representations of management! (See <u>Smith v. Van Gorkom</u> (Del. 1985) 488 A2d 858, 874, *discussed at ¶ 6:247.2-247.2a*.)

Also, the board and officers may have a duty to disclose the merger even before agreement has been reached on its principle terms (*see* ¶ *6:370.1 ff.*)

  (b) [8:172.2] **Agreement may be made binding and exclusive:** Where the proposed merger is with an *unaffiliated* party (i.e., *not* proposed by the corporation's controlling persons or management), the agreement may be made binding and govern the parties' conduct pending submission for shareholder approval (e.g., it may require the directors to use their "best efforts" to obtain such approval, below). Moreover, the respective boards may make the merger agreement *exclusive*--i.e., it may forbid negotiating or agreeing to competing offers prior to the shareholder vote. [See <u>Jewel Cos. v. Pay Less Drug Stores Northwest, Inc.</u> (9th Cir. 1984) 741 F2d 1555, 1564]

    1) [8:172.3] **Board duties re competing offers:** It is unclear whether a "best efforts" provision in a merger agreement (above) requires the board to recommend the merger to the shareholders despite the existence of a *higher* competing offer (i.e., a higher offer actually presented to the board).

Some courts in other states have held the directors to a fiduciary duty to *investigate* competing offers and recommend the highest one to the shareholders, despite the existence of a "best efforts" clause in a merger agreement. [See, e.g., <u>ConAgra, Inc. v. Cargill, Inc.</u> (Neb. 1986) 382 NW2d 576, 587--applying Delaware law]

It appears that at a minimum the board is obligated to *disclose* the higher offer to the shareholders from whom approval is sought.

      => [8:172.4] ***PRACTICE POINTER:*** If a merger agereement contains such a "best efforts" provision, the board should always try to leave itself an "out"--i.e., a clause in the agreement relieving the board from using its best efforts to obtain shareholder approval if a higher competing offer is presented to it before the merger is consummated.

  (c) [8:172.5] **Mergers proposed by insiders:** If the merger is proposed by an *insider*-- i.e., an "interested party" (below)--special requirements are imposed to assure that the shareholders will be treated fairly in the non-arm's-length transaction.

    1) [8:172.6] **Who is an "interested party":** The special requirements apply to merger proposals made to a corporation by anyone who:

      • Directly or indirectly *controls* the corporation;

      • Is directly or indirectly controlled by any of the corporation's officers or directors; or

      • Is an entity in which any of the corporation's directors or "executive

officers" (i.e., president, vice-president, or other persons serving similar policymaking functions) holds a *material financial interest.* [Corps.C. § 1203(a)]

    a) [8:172.7] **Exception--corporations with less than 100 shareholders:** The special requirements do not apply where the merger proposal is made to a corporation with *less than 100* shareholders of record. [Corps.C. § 1203(a)]

    b) [8:172.8] **Exception--mergers qualified by permit:** Nor do the special requirements apply to a merger transaction that has been qualified by permit from the Corporations Commissioner. [Corps.C. § 1203(a)]

2) [8:172.9] **Independent fairness opinion:** The interested party must provide the shareholders with an independent written opinion as to the fairness of the consideration they will receive in the transaction. [Corps. C. § 1203(a)]

    a) [8:172.10] **Opining person's qualifications:** The opinion must be provided by someone who:

- Engages for compensation in "the business of advising others as to the value of properties, businesses, or securities" (e.g., an investment banker, California probate referee, etc.); and
- Is *unaffiliated* with any interested party (however, a person who previously rendered services to an interested person or related entity, or who is simultaneously providing advice or assistance regarding the proposed transaction on a contingent fee basis, is not necessarily disqualified). [Corps.C. § 1203(a)(5)]

    b) [8:172.11] **Delivery of opinion:** The fairness opinion must be delivered to the shareholders with the notice of the meeting at which the merger is to be approved. Where written shareholder consents are solicited, the opinion must accompany the solicitation.

If shareholder approval is not required to consummate the transaction (*see* ¶ *8:178 ff.*), the opinion must be delivered to the board of directors before it authorizes completion of the transaction. [Corps.C. § 1203(a)]

3) [8:172.12] **Competing offers:** The board of directors must notify the shareholders of any competing offer requiring shareholder acceptance or approval made at least 10 days before the interested party proposal is to be approved, whether a tender offer, a merger offer, a stock-for-stock exchange (¶ *8:235 ff.*), a sale-of-assets reorganization (¶ *8:259 ff.*) or a straight sale-of-assets (¶ *8:581 ff.*). The directors must also forward to the shareholders any written materials provided by the later offeror (at such offeror's expense!). [Corps.C. § 1203(b)(1)]

    a) [8:172.13] **Insider proposal delayed pending shareholder action on competing offer:** Further, the directors must delay completion of the interested party transaction for at least 10 days after notifying the shareholders of the competing offer. The purpose is to give them a reasonable opportunity to withdraw any vote, consent or proxy previously given in connection with the interested party merger proposal. [Corps.C. § 1203(b)(2)]

    b) [8:172.14] **Improving insider offer:** Insiders can always *improve* their offers when faced with a competing offer ("up-the-ante"). But, in this event, the other bidders can also amend their offers; and the above-described procedures would presumably apply to *each* further offer!

    => [8:172.15] ***PRACTICE POINTER:*** When submitting an insider proposal to the shareholders for approval, counsel should disclose that competing offers received 10 days before the proposal is approved will be submitted for shareholder consideration.

(3) [8:173] **Shareholder approvals:** The merger agreement must also be approved by majority vote of *each class of shares of each corporation* whose board approval was required (¶ *8:172*)--whether or not that class otherwise has voting rights (except as noted below). [Corps.C. § 1201(a)]

    (a) [8:173.1] **Before or after board approval:** Such shareholder approval may be given either before or after approval by the respective boards of directors. [Corps.C. § 1201 (h)]

    (b) [8:174] **Mergers requiring greater-than-majority approval:** There are a number of situations in which more than a mere majority of each class is required:

1) [8:175] **Articles so require:** If the articles of either corporation require approval by more than a majority of the shares of each class (either for reorganizations or for shareholder action generally), such provisions control. [Corps.C. §§ 1201(a), 152]

2) [8:176] **Disappearing close corporation:** If a statutory close corporation is merged into a survivor corporation that is *not* a close corporation, at least *two-thirds* of each class of shares in the close corporation must approve the merger. (The articles may reduce this, but not to less than a majority.) [Corps.C. §§ 1111, 1201(e)]

3) [8:177] **Disparate treatment within class:** Equal treatment among shares of the same class is required unless 100% of the shareholders agree otherwise. Thus, if the merger plan calls for *unequal* distributions of cash, property or other securities among shareholders of the same class (and the Corporations Commissioner has not approved the "fairness" of the exchange), the merger agreement must be approved by *all* shares of that class. [Corps.C. §§ 1101, 1101.1]

4) [8:177a] **"Controlled" merger--disappearing corporation's common shareholders receive other than common shares:** Where one constituent corporation (or its parent) directly or indirectly owns more than 50% of the voting power of another constituent corporation (but less than 90% of each class), the nonredeemable common stock of the disappearing corporation may be converted only into nonredeemable common stock of the surviving corporation (or its parent) *unless all the holders of such common stock unanimously consent to receiving other consideration.* [Corps.C. § 1101]

   a) [8:177b] **Exception--Corporations Commissioner approval:** The unanimous consent requirement (above) does *not* apply to any transaction approved by the Commissioner of Corporations following a hearing on the fairness of its terms and conditions (Corps.C. § 25142). [Corps.C. § 1101.1]

   b) [8:177c] **Controlling entity has burden of proving fairness:** In any action challenging the validity of a "controlled" merger, the controlling entity has the burden of proving the transaction is "just and reasonable" to the controlled entity's shareholders. [Corps.C. § 1312(c); see ¶ 8:365-369]

5) [8:177.1] **Shares cancelled without any consideration:** If the merger agreement provides that all outstanding shares are to be cancelled without consideration, its principal terms must be approved by *all outstanding shares.* [Corps.C. § 1202(a)]

6) [8:177.2] **Preferred shares to receive less than required by articles:** The principal terms of a merger agreement providing that a class (or series) of preferred shares will receive less than required by applicable articles provisions must be approved by the same percentage of outstanding shares of the affected class (or series) as would be required to amend the articles provisions accordingly (*see ¶ 8:38 ff.*). [Corps.C. § 1202(b)]

(c) [8:177.3] **Foreign parent corporation shareholder approval:** Shareholder approval of a merger involving issuance of equity securities by a controlling *foreign* corporate parent (e.g., a triangular merger; ¶ 8:165) is governed by the law of the state in which the foreign corporation is incorporated, unless it is a pseudo-foreign corporation subject to Corps.C. § 2115 (*see ¶ 3:5 ff.*). [Corps.C. § 1202(c)]

(d) [8:178] **Exceptions--mergers NOT requiring shareholder approval:** There are also a few situations in which majority shareholder approval is not required:

1) [8:179] **Preferred shares unaffected by merger:** Approval is not required by the holders of preferred shares of the survivor corporation (or parent in a triangular merger) if they otherwise have no voting rights and their preferences, privileges and restrictions are unchanged by the merger. [Corps.C. § 1201(a)]

2) [8:180] **Certain "short-form" mergers:** Shareholder approval is not ordinarily required for mergers between parent and subsidiary corporations (one at least 90% owned by the other). In most cases, a "short-form" merger can be effected solely by the board(s) of directors--solely by a "100%-owning" parent's board and, otherwise, by both the parent's and subsidiary's boards. Exception: In a "downstream" merger, each class of the parent's shareholders must approve the

merger's principal terms if they will receive shares with different attributes than those converted. (*See further discussion at ¶ 8:196 ff.*) [Corps.C. § 1110]

   3) **[8:181] Mergers resulting in limited dilution of voting power:** No is approval required by the holders of voting shares of either corporation if they retain more than 5/6ths (83.3%) of the voting power after the merger; i.e., if they suffer one-sixth (16.7%) dilution of their voting power, their approval must be obtained. [Corps.C. § 1201(b)]

     a) **[8:182] Measuring dilution:** So long as the increase in outstanding voting shares is *less than 20%*, the "limited dilution test" is met, and shareholder approval is not required.

     "Voting power" is determined by assuming that all securities convertible into voting shares have been converted. But mere options or warrants to purchase voting shares are disregarded. [Corps.C. § 1201(b)]

     b) **[8:183] Limitations:** The result is different, and approval by shareholders is still required in the following cases:

       1/ **[8:183.1] Articles amendment required:** The merger requires *amendment* of the surviving corporation's *articles*. [Corps.C. § 1201(c)]

       2/ **[8:183.2] "Different" shares received:** As a result of the merger, they receive shares in any way *different* from those previously held (shares in a foreign corporation are deemed different). [Corps.C. § 1201(d)]

       3/ **[8:183.3] Disappearing close corporation:** Approval will still be required (by two-thirds vote) of shareholders of a close corporation who receive shares of a *non*-close corporation in the reorganization. [Corps.C. §§ 1111, 1201(e); see ¶ 8:176]

**(4) [8:184] Amendments to merger agreement:** A merger agreement may be amended by the boards of each corporation any time before the merger becomes effective. Even if the original agreement was already approved by the shareholders, the amendments need not be submitted for shareholder approval unless the "principal terms" of the original agreement are changed. In that event, the amendment is subject to the same shareholder approval requirements as the original merger agreement. [Corps.C. § 1104; see ¶ 8:173 ff.]

  => **[8:185] *PRACTICE POINTER:*** Since obtaining shareholder approval may be burdensome and costly, consider including a provision in the original agreement authorizing the board alone to amend the principal terms within prescribed limits. Then, once the shareholders have approved, subsequent changes will not require further approvals.

**(5) [8:186] Power of boards to abandon merger:** Even though a merger has been approved by the shareholders of both corporations, the board of either corporation has power to abandon the proposed merger *without* further shareholder approval. [Corps.C. § 1105]

   (a) **[8:187] Compare--contract liability:** However, such abandonment may expose such corporation to contractual liability either to the other corporation or to third parties (e.g., creditor beneficiaries who have detrimentally relied on the contract). [Corps.C. §§ 1105, 1201(h)]

  => **[8:188] *PRACTICE POINTER:*** The risk of contract liability to either corporation can be eliminated by appropriate language in the merger agreement. For example, it may be a good idea to include wording giving either constituent corporation the "absolute, unconditioned right to withdraw" any time prior to the merger taking effect, if its board determines "in its sole discretion" that it is not in the best interest of the corporation to proceed with the merger.

**(6) [8:189] Merger documents filed with Secretary of State:** After the requisite board and shareholder approvals, the surviving corporation must file with the Secretary of State a copy of the merger agreement, accompanied by an officers' certificate of *each corporation* setting forth:

  • The number of outstanding shares of each class entitled to vote;

  • That the principal terms of the merger were approved by each such class (specifying each class and the required percentage); or in the case of "short-form" mergers, below, that the agreement was approved by the board alone; and

- Where equity securities of a parent corporation are issued in the merger, that approval of the parent's shareholders was obtained or that none was required. [Corps.C. § 1103]

(The filing fee for a merger is $100; see Gov.C. § 12186(j).)

[8:189.1] The officers' certificate must be signed and verified by the chairman of the board, president or any vice-president, *and* by the secretary, chief financial officer, treasurer or any assistant secretary or assistant treasurer. [Corps.C. § 173]

- **FORM:** Certificate of Approval of Merger Agreement, *see Cal. Prac. Guide Corps. Form 8:F.*

(7) [8:190] **Franchise Tax Board clearance not required:** At one time, the Secretary of State could not file a merger agreement without a "certificate of satisfaction" from the Franchise Tax Board stating all of the disappearing corporation's tax liabilities have been paid or secured. However, the certificate is no longer required. Instead, after filing the merger documents, the Secretary of State notifies the Franchise Tax Board of the merger, and the survivor is deemed to assume the disappearing corporation's franchise tax obligations (*see ¶ 8:193.1*). [Corps.C. § 1107.5(b)]

(8) [8:190.1] **Correcting defects in merger documents:** Mistakes or defects in the merger documents (or in their execution) can be corrected by filing a certificate of correction with the Secretary of State (*see ¶ 8:117.1 ff.*). The certificate must be in the form of an officers' certificate of the *surviving corporation* (*see ¶ 8:82*). [Corps.C. § 109(c),(e)]

(9) [8:190.2] **When merger effective:** The merger is effective upon *filing* of the merger documents by the Secretary of State (¶ 8:189) ... unless a delayed effective date is set forth in the filing pursuant to Corps.C. § 110(c). [Corps.C. §§ 1108(c), 1113(j)(3)]

c. [8:191] **Effect of merger:** On the effective date (above), the disappearing corporation ceases to exist. It is absorbed into the surviving corporation, and all of its business, assets, rights and liabilities pass to the survivor by operation of law. The shareholders of the disappearing corporation are now shareholders in the survivor (except to the extent they were cashed out under the terms of the merger agreement). [Corps.C. § 1107(a); see *Maudlin v. Pacific Decision Sciences Corp.* (2006) 137 CA4th 1001, 1016, 40 CR3d 724, 734- 735]

(1) [8:192] **Transfer of assets:** The merger itself is effective to transfer to the survivor all of the rights and properties of the disappearing corporation. No further documentation is required. [Corps.C. § 1107(a)]

(a) [8:192a] **Recording merger certificate to effect realty transfer:** *Record* ownership of the disappearing corporation's real property may be transferred into the name of the surviving corporation by recording a certified copy of the agreement or certificate of merger in the recorder's office of the county in which the property is located. [Corps.C. § 1109]

(b) [8:192.1] **No sales tax:** State sales tax is not applicable to transfers of assets by merger. Thus, where a substantial sales tax is involved, a merger may be preferable over a purchase of assets (¶ 8:259 ff.).

(c) [8:192.2] **Local business licenses and permits:** So long as the merger does not involve a "change of ownership" (below), the surviving corporation succeeds, without payment of any transfer fee, to all licenses, permits, registrations and other privileges granted by any local agency (i.e., county, city or other political subdivision). Of course, the surviving corporation is subject to the disappearing corporation's duties and obligations thereunder. [Corps.C. § 1107(b),(g)]

1) [8:192.3] **"Change of ownership":** "Change of ownership" is not defined. Instead, Corps.C. § 1107(b) provides *examples of mergers not resulting in a " change of ownership"*: mergers between (i) a corporation and its wholly-owned subsidiary, (ii) a corporation and the wholly-owned subsidiary of its wholly-owned subsidiary, and (iii) two wholly-owned subsidiaries of the same corporation. [Corps.C. § 1107 (b)]

2) [8:192.4] **"Reevaluation" allowed:** Nothing in § 1107(b) limits or restricts a local agency from "reevaluating" privileges received by the successor corporation if the local agency determines, in its sole discretion, that the reevaluation is necessary for *public health, safety or welfare.* [Corps.C. § 1107(f)]

3) [8:192.5] **Tax reassessments allowed:** Similarly, nothing in § 1107(b) limits or restricts a tax assessor from reassessing real property upon a transfer of title.

[Corps.C. § 1107(e); *see ¶ 8:118.20*]
   [8:192.6-192.10] *Reserved.*

   (d) [8:192.11] **Attorney-client privilege:** After a merger, the successor corporation becomes the holder of the attorney-client privilege previously held by the disappearing corporation. Hence, the disappearing corporation's former officers and directors can no longer assert or waive the attorney-client privilege once held by the disappearing corporation. [Ev.C. § 953(d); *Venture Law Group v. Sup.Ct. (Singhania)* (2004) 118 CA4th 96, 103-104, 12 CR3d 656, 661]

(2) [8:193] **Transfer of liabilities:** Creditors are fully protected. The surviving corporation is liable by operation of law for the debts of the disappearing corporation. Liens on property of either corporation continue unimpaired. [Corps.C. § 1107(c)]

   Any pending action or proceeding against the disappearing corporation may be prosecuted to a judgment binding and enforceable against the survivor (whether or not named as party to the action). [Corps.C. § 1107(d)]

   (a) [8:193.1] **Franchise tax obligations:** The survivor is "deemed to have assumed" the disappearing corporation's obligation to file franchise tax and information returns and to pay any franchise taxes determined to be due. [Corps.C. § 1107.5(a)]

   (b) [8:194] **Punitive damages claims:** If punitive damages could have been recovered against the disappearing corporation, they can be recovered against the survivor corporation (even though the survivor otherwise had no responsibility for the wrongful acts involved). [See *Moe v. Transamerica Title Ins.Co.* (1971) 21 CA3d 289, 304-305, 98 CR 547, 557]

(3) [8:195] **Dissenters' rights:** Shareholders entitled to vote on the merger and who oppose it, have the right to be cashed out for the appraised value of their shares. (*See detailed discussion of dissenters' rights at ¶ 8:292 ff.*).

d. [8:196] **Compare--"short form" mergers:** Streamlined procedures are available for mergers between parent-subsidiary corporations, where the parent owns at least 90% (hereafter "90%-owned") of each class of the subsidiary's outstanding shares. No formal "merger agreement" is required.

   The simplified procedures vary depending upon whether the subsidiary merges into the parent ("upstream" merger) or the parent merges into the subsidiary ("downstream" merger). Such mergers can be effected as follows:

   (1) [8:196.1] **"Upstream" mergers (subsidiary into parent):** Neither a formal merger agreement nor shareholder approval is required to merge a "90%-owned" subsidiary into its parent corporation.

   (a) [8:197] **Wholly-owned subsidiary:** If the subsidiary is 100% owned by its parent corporation, it can be merged into the parent by:

      1) [8:198] *Resolution or merger plan* adopted by the *parent* corporation's board of directors providing for the merger and for the parent's assumption (as the surviving corporation) of the disappearing subsidiary's liabilities. (There is no need for any action by the subsidiary's board.) [Corps.C. § 1110(a)]

      2) [8:199] Filing with the Secretary of State a *certificate of ownership* of the subsidiary. This consists of an officers' certificate of the parent corporation (*see ¶ 8:189.1*) identifying the corporations being merged, and setting forth the 100% share ownership by the parent of the subsidiary, and the resolution (or merger plan) adopted by the parent's board. [Corps.C. § 1110(a), (e) & (f)]
         [8:200] *Reserved.*

   (b) [8:201] **90%-owned subsidiary:** If the parent owns less than 100% of the subsidiary's shares (but at least 90% of each outstanding class), merger into the parent requires a slightly more elaborate procedure in order to protect the minority shareholders in the subsidiary:

      1) [8:202] The resolution or merger plan must be adopted by the boards of *both* corporations. [Corps.C. § 1110(b)]

      2) [8:203] The *parent* board's resolution or merger plan must state that it assumes the subsidiary's debts. It must also state what it is paying to the minority shareholders of the subsidiary: i.e., what "securities, cash, property or other rights" are to be issued or paid by the parent corporation for each share of stock in the subsidiary not owned by the parent. [Corps.C. § 1110(a) & (b)]

3) [8:204] Along with approval of the resolution or merger plan, the *subsidiary's* board must also approve the consideration to be received by its minority shareholders. [Corps.C. § 1110(b)]

4) [8:205] A *certificate of ownership* must be filed with the Secretary of State in the same manner as with a 100% subsidiary (*see* ¶ *8:199*). [Corps.C. § 1110(a) & (e)]

5) [8:205.1] The parent corporation must also mail written *notice* to each *minority shareholder* of record of the subsidiary at least *20 days* before the effective date of the merger (i.e., before filing with the Secretary of State). Such notice must:
- State when the merger will be effective;
- Be accompanied by copies of the resolution or merger plan adopted by the boards of both the parent and subsidiary; and
- Furnish information as to the minority shareholders' rights to demand payment of cash for their shares under the Code provisions applicable to dissenting shareholders (Corps.C. § 1301(a), ¶ *8:292*). [Corps.C. § 1110(h)]

(2) [8:205.2] **"Downstream" mergers (parent into subsidiary):** Streamlined procedures also apply to mergers of parent corporations into their "90%-owned" subsidiaries. (Here, no distinction is made between wholly-owned (100%) or 90%- owned subsidiaries, except for minority shareholder dissenters' rights; ¶ *8:205.9, below.*)

(a) [8:205.3] **Procedure:** A "downstream" merger may be effected by:

1) [8:205.4] *Resolution or merger plan* adopted by *both* the parent's and subsidiary's boards of directors providing for the pro-rata conversion of the parent's outstanding shares into shares of the surviving subsidiary corporation. And the adopted resolution or merger plan must also include the subsidiary's assumption (as the surviving corporation) of the disappearing parent's liabilities. [Corps.C. § 1110(a) & (c)]

2) [8:205.5] *Approval* of the merger's principal terms *by each class of the parent's shareholders* who will receive shares having *different* attributes from those converted. [Corps.C. §§ 1110(c), 1201(d)]
(The *subsidiary's* minority shareholders do not vote on the downstream merger since the vote's outcome is preordained by the "90%-owning" parent's approval!)

3) [8:205.6] Filing with the Secretary of State a *certificate of ownership* of the subsidiary. This consists of an officers' certificate of the parent corporation (*see* ¶ *8:189.1*) identifying the corporations being merged and setting forth the share ownership by the parent of the subsidiary, the resolution (or merger plan) and its approval by the parent's board (and shareholders, if required, above) and the subsidiary's board. [Corps.C. § 1110(a),(e) & (f)]

4) [8:205.7] Mailing notice to the subsidiary's minority shareholders, if any (below). [8:205.8] *Reserved.*

(b) [8:205.9] **Dissenters' rights for subsidiary's minority shareholders:** Where the parent owns less than 100% (but at least 90%) of the subsidiary and merges into it, the subsidiary's minority shareholders have the right to be cashed out for the appraised value of their shares. [Corps.C. § 1300(a); *see* ¶ *8:292 ff.*] To protect this right, the parent corporation must mail written *notice* to each of the subsidiary's *minority shareholders* of record at least *20 days* before the effective date of the merger (i.e., before filing with the Secretary of State). Such notice must:
- State when the merger will be effective;
- Be accompanied by copies of the resolution or merger plan adopted by the boards of both the parent and subsidiary; and
- Furnish information as to the minority shareholders' rights to demand cash payment for their shares under the Code provisions applicable to dissenting shareholders (Corps.C. § 1301 et seq., ¶ *8:292*). [Corps.C. § 1110(h)]

(3) [8:206] **Qualification not required:** Provided *no issuance or exchange of securities* is involved, the qualification requirements of the Corporate Securities Law do not apply to:
- Short-form mergers where the minority is entirely cashed out; or
- The merger of a wholly-owned subsidiary into its parent. [Corps.C. § 25120; *Giannini Controls Corp. v. Sup.Ct. (Schutzbank)* (1966) 240 CA2d 142, 154-155, 49 CR 643, 651-652]

(4) [8:207] **Name changes:** As part of a short-form merger, the surviving corporation may

change its name by amending its articles in the resolution or merger plan. [Corps.C. § 1110 (d)]

(5) [8:208] **Applicability to foreign corporations:** In addition to California parent-subsidiary mergers, the procedure described above also applies to the following "short-form" mergers: (a) California parent-foreign subsidiary, and (b) foreign parent-California subsidiary. But no merger with or into a foreign corporation may be effected unless the laws of its state of incorporation so permit. [Corps.C. § 1110(a) & (g)]

[8:209] And, a foreign parent corporation may not effect a "short-form" merger of its California subsidiary unless it files the required certificate of ownership (¶ *8:199*) or certificate of merger (¶ *8:189*) as to that subsidiary. [Corps.C. § 1110(g)]

(6) [8:210] **Dissenters' rights:** As noted above, minority shareholders in the subsidiary are entitled to special notice of a proposed short-form merger, and of their rights to be "cashed out" for the appraised value of their shares.

Dissenters' rights are discussed in detail at ¶ *8:292 ff.* But it should be noted at this point that minority shareholders in a 90%-owned subsidiary are *not limited* to such dissenters' rights. Rather, they may seek *injunctive relief* to restrain or rescind the short-form merger, if unfairness can be shown. (But by seeking equitable relief, they waive their statutory right to be "cashed out.") [Corps.C. § 1312; *see* ¶ *8:366*]

e. [8:210.1] **Compare--mergers with noncorporate entities ("interspecies" mergers):** California corporations can merge with California limited liability companies, limited partnerships, general partnerships, business trusts, real estate investment trusts and/or unincorporated associations (other than nonprofit associations). Either the corporation or the other entity may be the survivor. [Corps.C. §§ 174.5, 1113(a)]

California corporations can also merge with *foreign* noncorporate entities. *See* ¶ *8:210.26 ff.* [Corps.C. § 1113]

=> [8:210.1a] *Caveat--tax-free treatment available only in triangular merger:* A merger between a corporation and a noncorporate entity does *not* qualify as a tax-free "A reorganization" (IRC § 368(a)(1)(A); ¶ *8:211 ff.*) ... *except* in the limited circumstance where a corporation merges into a noncorporate entity that is *wholly-owned by another corporation* and the disappearing corporation's shareholders receive stock of the *other corporation* (or its *parent*). [Treas.Temp.Regs. § 1.368-2T(b)(1)(iii) & (iv); *see* ¶ *8:165, 8:219.1*]

In all other mergers involving noncorporate entities (including a *reverse* triangular merger, ¶ *8:166*), securities of the survivor (or its parent) received in exchange for securities of the disappearing entity will be treated as a taxable "sale or exchange" requiring the recognition of any realized gain (or loss). Tax-free treatment will result only if the transaction can be structured to comply with some other applicable Code provision (e.g., IRC § 351, ¶ *2:159 ff.*).

(1) [8:210.2] **Compliance with laws governing noncorporate entities required:** The discussion below focuses on the relevant law applicable to *corporations*. Noncorporate entities desiring to merge must comply with *their respective governing laws*.

Some of the significant provisions of applicable California law that could impact the decision or ability of corporations to merge with *general partnerships*, *limited partnerships* or *LLCs* are:

(a) **Entity approval requirements**

1) [8:210.3] **General partnerships:** The merger agreement must be approved by the number or percentage of partners specified for merger in the partnership agreement. If the partnership agreement does not specify the required partner approval, the merger must be approved by the number or percentage of partners specified by the partnership agreement to approve an *amendment* to the partnership agreement (unless the merger effects a change for which the partnership agreement requires a greater number or percentage than that required to amend the agreement, in which event the merger must be approved by that greater number or percentage). If the partnership agreement contains *no* provision specifying the vote required to amend the partnership agreement, the merger must be approved by *all* partners. [Corps.C. § 16911(a)]

2) [8:210.4] **Limited partnerships:** The merger agreement must be approved by *all* general partners; and the principal terms of the merger must be approved by a

*majority* in interest of each class of limited partners, unless a greater approval of limited partners is required by the partnership agreement. [Corps.C. § 15678.2(a) (CRLPA); Corps.C. § 15911.12(a) (ULPA)]

    3) [8:210.4a] **LLCs:** The merger agreement must be approved by a *majority* in interest of the LLC members, unless a greater percentage is required by the articles of organization or written operating agreement. [Corps.C. § 17551(a)]

    4) [8:210.4b] **LLC members'/limited partners' unanimous consent to personal liability:** Approval of *all* limited partners or *all* LLC members (as the case may be) may be required where the merger results in *personal liability* of the limited partners or LLC members for any obligations of any constituent entity. [Corps.C. §§ 15678.2(a), (CRLPA), 15911.12(a) (ULPA), 17551(a)]

(b) [8:210.5] **Equal treatment of limited partners or members:** Certain restrictions apply in mergers with *any* LLC or with a partnership having *more than 35* limited partners.

In general, all limited partners of the same class, or all LLC members of the same class, must be treated equally with regard to any distribution of cash, property, securities and other interests, unless *all* limited partners or LLC members consent otherwise. Other restrictions apply where one constituent entity owns more than 50% (but less than 90%) of the voting securities of another constituent entity. All restrictions can be obviated by obtaining the approval of the Corporations Commissioner. [See Corps.C. §§ 15678.2(b), 15678.3 (partnerships under CRLPA); Corps.C. §§ 15911.12(b), 15911.13 (partnerships under ULPA); Corps.C. § 17551(b) (LLCs)]

(c) [8:210.5a] **Shareholder's, partner's or LLC member's postmerger liability:** A shareholder of a *surviving* corporation, a partner of a *surviving* general or limited partnership, or a member of a *surviving* LLC is liable for:

    • All obligations of a party to the merger for which that person was personally liable *before* the merger;

    • All other obligations of the surviving entity incurred *before* the merger by a *party* to the merger, but those obligations may be satisfied only out of *property of the entity*; and

    • All obligations of the surviving entity incurred *after* the merger, but those obligations may be satisfied only out of property of the entity where the person is a shareholder in a surviving corporation, a limited partner in a surviving limited partnership or, unless expressly provided otherwise in the articles of organization, a member in a surviving LLC. [Corps.C. § 16914(c)]

If the obligations incurred before the merger by a party are not satisfied out of the property of the surviving entity, the general partners of that party immediately before the merger (to the extent such party was a general or limited partnership) shall contribute the amount necessary to satisfy that party's obligations to the surviving entity in the same manner as if the party were dissolved. [Corps.C. § 16914(d)]

(d) [8:210.6] **Dissenters' rights:** Like dissenting shareholders, dissenting limited partners, LLC members or partners of a general partnership have the right to be *cashed out* for the value of their interests. [See Corps.C. §§ 15679.1 et seq. (partnerships under CRLPA), 15911.20 et seq. (partnerships under ULPA), 17600 et seq. (LLCs), 16701 & 16914(e) (general partnerships)]

(2) [8:210.7] **Procedure to effect merger:** The procedure to effect a merger of one or more corporations with one or more noncorporate entities is essentially the same as in purely corporate mergers (*see ¶ 8:168 ff.*).

(a) [8:210.8] **Merger agreement:** The constituent entities must approve an *agreement of merger*, which must set forth:

    • The names and places of organization of each constituent entity, and the identity of the surviving entity;

    • The terms and conditions of the merger, including the manner by which shares of the corporation will be converted into shares, interests or other securities of the surviving entity, and any cash, property or other rights which the shareholders receive for their shares (or, if applicable, a statement that the shares are canceled without consideration);

- Any amendment to the surviving corporation's articles (if applicable) to be effected by the merger;
- Any other provisions required by the laws under which any constituent entity is organized; and
- Any other provisions desired by the parties, including a provision for the payment of cash in lieu of fractional shares or for any other arrangement consistent with <u>Corps.C. § 407</u> (*see ¶ 8:170.7*). [<u>Corps.C. § 1113</u>(b)(1)- (6)]

    1) [8:210.9] **Equal treatment for all shares of same class:** As in the case of a corporate merger, shares of the same class of the constituent corporation must generally be treated equally regarding any distribution of cash, property, rights or securities; *see ¶ 8:170.8-170.9*. [<u>Corps.C. § 1113</u>(c)]

    2) [8:210.10] **Execution by corporation:** *See ¶ 8:171*. [<u>Corps.C. § 1113</u>(f)]

(b) [8:210.11] **Approval by board of constituent corporation:** *See ¶ 8:172 ff.*

(c) [8:210.12] **Mergers proposed by insiders:** *See ¶ 8:172.5 ff.*

(d) [8:210.13] **Approval by shareholders:** In general, the constituent corporation is subject to the same shareholder approval requirements that apply in corporate mergers. *See ¶ 8:173 ff.* [<u>Corps.C. § 1113</u>(g)]

    1) [8:210.14] **No exception for mergers resulting in limited dilution:** While approval of voting shareholders is not required in corporate mergers where the shareholders retain more than 5/6ths of the voting power after the merger (*see ¶ 8:181 ff.*), in the case of a merger with a noncorporate entity as the *survivor*, approval by a majority of the constituent corporation's outstanding shares is required of each class that receives interests in the noncorporate entity ... regardless of how little dilution of their voting power the shareholders may suffer. [<u>Corps.C. § 1201</u>(f)]
Such shareholders are also entitled to "dissenters' cash-out appraisal rights" (*see ¶ 8:292 ff.*). [<u>Corps.C. § 1300</u>(a)]

    2) [8:210.14a] **Unanimous consent required where shareholders become personally liable:** The merger must be approved by *all* shareholders of any class or series if, as a result of the merger, the holders of that class or series become *personally liable* for any obligations of a party to the merger. (But such unanimous consent is *not* required where all holders of the class or series have *dissenters' rights*, ¶ 8:292 ff.) [<u>Corps.C. § 1201</u>(g)]

    3) [8:210.15] **"Controlled" merger--unanimous consent required where common shareholders receive other than common shares or noncorporate equity securities:** Where one constituent entity (or its parent) directly or indirectly owns *more than 50%* of the voting power of a constituent corporation, the nonredeemable common shares of the corporation may be converted *only* into nonredeemable common shares of the surviving corporation (or a parent party as defined in <u>Corps.C. § 1200</u>(e)) or nonredeemable equity securities of the noncorporate survivor *unless all the holders of such common stock unanimously consent otherwise*. [<u>Corps.C. § 1113</u>(c)]

        a) [8:210.16] **Exception--Corporations Commissioner approval:** Unanimous consent of the common shareholders (above) is *not* required where the Corporations Commissioner approves the fairness of the merger terms and conditions upon a fairness hearing (¶ *8:177b*). [<u>Corps.C. § 1101.1</u>]

(e) [8:210.17] **Amendments to merger agreement; abandonment:** As in corporate mergers, the board of a constituent corporation may amend the merger agreement any time before the merger becomes effective; *see ¶ 8:184-185*. [<u>Corps.C. § 1113</u>(d), (e)]
Likewise, the board of a constituent corporation may abandon the merger any time before the merger becomes effective, subject to any resulting contractual liability to third parties and to other constituent entities; *see ¶ 8:186-188*. [<u>Corps.C. § 1113</u>(e)]

(f) [8:210.18] **Merger documents filed with Secretary of State:** After the requisite board and shareholder approvals (and approvals of the constituent entities), appropriate filings must be made with the Secretary of State.

    1) [8:210.19] **Noncorporate entity as survivor:** If the surviving entity is a noncorporate entity and no public benefit corporation (<u>Corps.C. § 5060</u>), mutual

benefit corporation (Corps.C. § 5059), religious corporation (Corps.C. § 5061) or corporation organized under the Consumer Cooperative Corporation Law (Corps.C. § 12200) is a party to the merger, a "certificate of merger" *on the form prescribed by the Secretary of State* must be filed. [Corps.C. § 1113(g) (2)]

**FORM:** Certificate of Merger, see *Cal. Prac. Guide Corps. Form 8:F.1*.

a) [8:210.19a] **Execution of certificate:** The certificate of merger must be executed:

- on behalf of each constituent *corporation* by (i) the chairperson of the board, president or a vice president, and (ii) the secretary or an assistant secretary;
- on behalf of each constituent *general partnership* by *two* partners, unless the partnership agreement provides for a lesser number (but only *one* or more general partners need execute the certificate of merger on behalf of a *foreign* partnership);
- on behalf of each constituent *limited partnership* by *all* general partners, unless the certificate of limited partnership provides for a lesser number (but only *one* or more general partners need execute the certificate of merger on behalf of a *foreign* partnership);
- on behalf of each constituent *LLC* by *all* managers, unless a lesser number is specified in the articles of organization or operating agreement (but only *one* or more managers need execute the certificate on behalf of a *foreign* LLC); and
- on behalf of each *other form of constituent entity* by those persons required or authorized to execute the certificate by the laws under which that entity is organized, specifying the provision of law or other basis for the signing persons' authority. [Corps.C. § 1113(g)(2)]

b) [8:210.19b] **Additional information permitted on form:** In addition to the information contained on the printed form, the certificate of merger may set forth any other information required by the laws under which any noncorporate constituent entity was organized. [Corps.C. § 1113(g)(1) & (2)]

2) [8:210.20] **Corporation as surviving entity:** If the surviving entity is a corporation, or if a public benefit corporation (Corps.C. § 5060), mutual benefit corporation (Corps.C. § 5059), religious corporation (Corps.C. § 5061) or corporation organized under the Consumer Cooperative Corporation Law (Corps.C. § 12200) is a party to the merger, the same filing requirements apply as in corporate mergers--i.e., filing a copy of the *merger agreement*, accompanied by an *officers' certificate* of each constituent *corporation* (see ¶ *8:189-189.1*). Also, the "*certificate of merger*" (¶ *8:210.19-210.19b*) must be filed for each disappearing *noncorporate entity*. [Corps.C. § 1113(g)(1)]

3) [8:210.21] **Filing fee:** The fee for filing documents merging one or more corporations with one or more noncorporate entities is $150. [Gov.C. § 12186(*l*)]

4) [8:210.21a] **Franchise Tax Board clearance not required:** See ¶ *8:190*.

(3) [8:210.22] **Effect of merger:** Unless a future date or time is specified in the certificate of merger, the merger is effective upon filing with the Secretary of State in the same manner as with corporate mergers. And it has the same legal effect (i.e., survivor succeeds to the assets and liabilities of the disappearing entity; *see ¶ 8:191 ff.*). [Corps.C. § 1113(g) & (i)]

(4) [8:210.23] **Dissenting shareholders' rights:** Shareholders who were entitled to vote on the merger and who opposed it have the right to be cashed out for the appraised value of their shares. (*See ¶ 8:292 ff.* for detailed discussion of dissenters' rights.) [Corps.C. § 1300]

[8:210.24-210.25] *Reserved*.

f. [8:210.26] **Compare--mergers with *foreign* entities:** Interstate mergers (i.e., mergers between domestic (California) and *foreign* corporations or noncorporate entities) involve some of the same requirements applicable to strictly domestic mergers so as to protect the constituent California corporation's shareholders, as discussed below. Of course, somewhat different procedures necessarily apply to interstate mergers, depending on whether the California or foreign entity is the *survivor*.

- **Caveat--tax-free treatment generally unavailable in mergers with *noncorporate***

entities: *See ¶ 8:210.1a.*

(1) [8:210.27] **Shareholders' rights (California corporation):** The requirements of equal treatment of shares of the same class (¶ *8:170.8*), fair treatment of fractional share interests (¶ *8:170.7*), board and shareholder approvals (¶ *8:172 ff., 8:173 ff.*), and dissenters' rights (¶ *8:292 ff.*) all apply to protect California corporation shareholders in mergers with foreign entities. [Corps.C. §§ 1108(b),(f), 1113(j)(2)]

(2) [8:210.28] **California corporation as survivor:** If a California corporation is the surviving entity, the merger procedures are essentially the same as in a merger of domestic entities:

- The merger agreement (¶ *8:189, 8:210.7*) or certificate of ownership in "short-form" corporate mergers (¶ *8:199*) must be filed; and
- Attached to the merger agreement must be an officers' certificate for each constituent corporation (¶ *8:189*) and the appropriate certificate of merger for any noncorporate constituent entities (¶ *8:210.19-210.20*).

(a) [8:210.29] **When merger effective:** Upon *filing* of the appropriate documents (above), the merger is effective as to each constituent California entity (unless a delayed effective date is set forth in the filing pursuant to Corps.C. § 110(c)). [Corps.C. §§ 1108(c), 1113(j)(3)]

(3) [8:210.30] **Foreign entity as survivor:** If the survivor is a foreign entity, the merger proceedings may be in accordance with, and governed by, the law of the jurisdiction in which the foreign entity is organized (subject to specifically-applicable requirements of California law for the protection of domestic corporation shareholders, ¶ *8:210.27*). [Corps.C. §§ 1108(b),(f), 1113 (j)(2)]

(a) [8:210.31] **When merger effective:** The merger with a surviving foreign entity is effective as to any disappearing California corporation at the time of effectiveness in the foreign jurisdiction, but only when appropriate documentation (below) is *filed* with the California Secretary of State. [Corps.C. §§ 1108(d), 1113(j)(4)]

Where the merger involves a noncorporate entity and the survivor is a foreign entity, the appropriate documentation to be filed consists of a copy of the merger agreement, with an officers' certificate of each constituent corporation, and the appropriate certificate of merger of any noncorporate constituent entities (¶ *8:210.19-210.20*). [Corps.C. § 1113(j) (4)]

Where only corporations are involved, the appropriate documentation consists of *any one* of the following:

- A copy of the agreement, certificate or other document filed by the survivor in its jurisdiction of incorporation to effectuate the merger (certified by the public official having custody of the original); or
- An executed counterpart of the agreement, certificate or other document filed in the foreign jurisdiction to effectuate the merger; or
- A copy of the merger agreement with an officers' certificate (¶ *8:189*) of the surviving foreign corporation and of each constituent California corporation; or
- A certificate of ownership (¶ *8:199*) in the case of a "*short-form*" merger. [Corps.C. § 1108(d) (1)-(4)]

1) [8:210.32] **Exception--delayed California filing:** If the California filing occurs *more than six months* after the merger's effective date in the foreign jurisdiction (or the California corporation's powers are suspended on such date), the merger becomes effective as to any disappearing California corporation only at such time as the required filing (above) is made in this state. [Corps.C. §§ 1108(e), 1113(j) (5)]

(4) [8:210.32a] **Franchise Tax Board clearance not required:** *See ¶ 8:190.*

(5) [8:210.33] **Effect on disappearing foreign entities:** Effective upon filing of the merger documents in California (or upon such later effective date as may be set forth in the merger documents pursuant to Corps.C. § 110(c), ¶ *8:190.2*), any disappearing foreign corporation qualified to transact intrastate business automatically surrenders its right to do so, and any disappearing foreign noncorporate entity registered in California cancels its certificate of registration. [Corps.C. §§ 1108(c),(e), 1113(j)(6)]

(a) [8:210.34] **Exception--delayed California filing:** If the filing in California occurs *more than six months* after the merger's effective date in the foreign jurisdiction, a

disappearing foreign *corporation* qualified to transact intrastate business automatically surrenders its right to transact intrastate business as of the date of *filing*. [Corps.C. § 1108(e); *see ¶ 8:210.32*]

g. [8:211] **Tax consequences ("A reorganizations"):** Statutory mergers and consolidations are called "A reorganizations" because they are the first of the seven types of corporate reorganizations listed in IRC § 368(a)(1)(A)-(G).

(1) [8:212] **Straight merger:** Subject to qualifications noted below, a straight merger (in which the security holders of the disappearing corporation receive securities of the survivor; *¶ 8:164*) is a *tax-free* exchange. [IRC § 354(a)(1)]

Unlike the "B" and "C" reorganizations discussed below, no particular type or class of stock is required to be received by the shareholders of the disappearing corporation. (The survivor may issue them preferred or common, voting or nonvoting shares, or, subject to the "continuity of interest requirement" for tax-free treatment (*¶ 8:215 ff.*), even debt securities or cash or other property; Corps.C. § 1101(d),(e).)

(a) [8:213] **Basis carryovers:** The survivor takes the disappearing corporation's tax basis on the assets acquired from the disappearing corporation. [IRC § 362(b)]

The shareholders of the disappearing corporation retain the same basis in the stock or securities received in the merger as in the stock or securities surrendered. (The carryover basis is adjusted for receipt of "boot" or dividends.) [See IRC § 358(a)(1)]

(b) [8:214] **Taxability of "boot":** Any cash or other property received in addition to the exchange of securities is currently taxable as "boot." [IRC § 356(a)(1)]

As a general rule, "boot" is treated as gain from the sale or exchange of property (i.e., *capital gain*). However, if the "boot" has the "effect of the distribution of a dividend," the gain recognized will be taxed as a *dividend* to the extent of the shareholder's ratable share of the corporation's earnings and profits (*see ¶ 7:177 ff.*). [IRC § 356(a)(2)]

1) [8:214.1] **"Postreorganization" approach:** In determining whether the "boot" has the "effect of the distribution of a dividend," the U.S. Supreme Court has held that the stock-for-stock exchange must be viewed as an *integrated whole*, rather than examining the "boot" payment in isolation.

Under this analysis, the "boot" is treated as a *postreorganization stock redemption* subject to the "substantially disproportionate" redemption test of IRC § 302 (*see ¶ 7:234-235*). Thus, if the hypothetical redemption falls within any one of the four categories set out in § 302 (i.e., there is a meaningful reduction in the taxpayer's ownership interest), the "boot" is treated as capital gain and not dividend income. [*Commr. v. Clark* (1989) 489 US 726, 729, 109 S.Ct. 1455, 1458--cash payment received in merger treated as capital gain where taxpayer gave up more than 20% of his holdings and retained less than 1% voting interest after merger]

2) [8:214.2] **"Nonqualified preferred stock" as "boot":** "Nonqualified preferred stock" (*¶ 3:340.1 ff.*) received in a merger is treated as "boot" (unless received in exchange for other "nonqualified preferred stock"). [IRC §§ 354(a) (2)(C)(i), 356 (e)]

(c) [8:215] **Continuity of interest requirement:** Tax-free treatment applies only if the disappearing corporation's shareholders (i.e., the transferring shareholders) retain a *continuing proprietary interest* in the survivor corporation. [Treas.Regs. § 1.368-1(b); see *LeTulle v. Scofield* (1940) 308 US 415, 420-421, 60 S.Ct. 313, 316; *J.E. Seagram Corp. v. Commr.* (1995) 104 TC 75, 99-100]

1) [8:216] **Must be stock or stock rights:** Transfers in which the shareholders receive only stock or stock rights (i.e., warrants or options) in return for stock in the acquiring corporation clearly qualify. (The stock may be either common or preferred, voting or nonvoting ... provided it is nonredeemable.) [*Le Tulle v. Scofield*, supra, 308 US at 420-421, 60 S.Ct. at 316]

a) [8:216.1] **Caution--"nonqualified preferred" probably not acceptable:** "Nonqualified preferred stock" *probably would not* satisfy the "continuity of interest" requirement, because:

• By definition, it does *not participate in corporate growth* to any significant extent; and

• For many purposes, it is treated as the functional equivalent of debt, and debt

does *not* satisfy the "continuity of interest" requirement (see below). [See IRC §§ 351(g)(2)(A) & (3), 354(a)(2)(C); *and ¶ 3:340.1 ff.*]

b) [8:217] **Debt:** Transfers for debt do not satisfy the continuity of interest requirement: The transferor no longer has the same proprietary interest in the surviving corporation that he or she had in the disappearing corporation. [Treas.Regs. § 1.354-1(d); *Roebling v. Commr.* (3rd Cir. 1944) 143 F2d 810, 814]

c) [8:218] **Stock exchanged for combination of stock, debt and/or cash:** If *both* stock and debt securities (or stock and cash) are received in return for stock, the exchange will be tax-free as to the stock, provided the stock constitutes a "substantial part" of the consideration received in the exchange. Although "substantial part" is not defined, stock having a value of *at least 50%* of the total consideration would be deemed "substantial." (The debt securities will be taxable as "boot" along with any cash or other property received.) [Treas.Regs. § 1.368-1(e)(1) & (6), ex. 1]

d) [8:218.1] **Compare--debt exchanged for debt:** Some mergers may involve an exchange of stock for stock *and debt for debt* (e.g., bondholders in the disappearing corporation receive new bonds in the surviving corporation). The debt-for-debt exchange will not violate the continuity of interest requirement so long as:

--all debt instruments involved in the exchange constitute "*securities*" (generally, a term of at least *five years* is required); *and*

--the debt securities received in the exchange represent a continuation of the debtholders' investment *in substantially the same form.* [See Rev.Rul. 2004- 78, 2004-31 IRB 108]

[8:218.2-218.4] *Reserved.*

2) [8:218.5] **Sale of interest:** The disappearing corporation's shareholders can sell their proprietary interest without jeopardizing the "continuity of interest" test so long as the sale is to *third parties* and not back to the acquiring corporation. [Treas.Regs. § 1.368-1(e)(1); compare Rev.Rul. 99- 58, 1999-2 CB 701--publicly-held corporation's market purchases of same number of shares previously issued in merger did not jeopardize continuity of interest where purchases made to avoid dilution and not as part of merger plan]

(Under prior law, an exchange of securities followed by a resale that had been planned at the time of the merger could, under the step transaction doctrine, be considered tantamount to a cash sale, causing the exchange to fail the "continuity of interest" test. See, e.g., *McDonald's Restaurants of Ill., Inc. v. Commr.* (7th Cir. 1982) 688 F2d 520, 525-527.)

[8:218.6-218.9] *Reserved.*

(d) [8:218.10] **Continuity of business requirement:** Tax-free treatment also requires that the surviving corporation either continue the disappearing corporation's *historic business* (generally, the business it conducted most recently) or use a *significant portion* of the disappearing corporation's historic business assets. Where the disappearing corporation had more than one line of business, the surviving corporation need continue only *a significant line of business.* [Treas.Regs. § 1.368-1(d); see *Berry Petroleum Co. v. Commr.* (1995) 104 TC 584, 635-636, aff'd (9th Cir. 1998) 142 F3d 442; *Honbarrier v. Commr.* (2000) 115 TC 300, 312-315]

1) [8:218.11] **Merger coupled with partial asset sale:** For various reasons, the surviving corporation may not want all of the disappearing corporation's operating assets. Fortunately, the surviving corporation may, as part of the merger plan, sell a substantial portion (even as much as half) of the assets to an unrelated third party without violating the continuity of business requirement ... so long as the survivor *continues to hold the sale proceeds* along with its other operating assets. [See Rev.Rul. 2001-25, 2001-1 CB 1291]

(2) [8:219] **Triangular mergers:** The above rules also generally apply to triangular mergers (in which the acquired "target" corporation is merged into a subsidiary of the acquiring corporation, *see ¶ 8:165*). [IRC § 368(a)(2)(D); see Rev.Rul. 2001-24, 2001-1 CB 1290--subsidiary's stock may be transferred to "sister" corporation as part of merger plan (i.e.,

target effectively becomes subsidiary of acquiring corporation's subsidiary) and still qualify as tax-free "A" reorganization]

    (a) [8:219.1] **Merger into noncorporate entity permitted:** A triangular merger in which the acquired "target" corporation is merged into a *noncorporate* entity that is wholly owned by the acquiring corporation will qualify for tax-free treatment (so long as the merger otherwise complies with the above rules). In such circumstances, the transaction is tantamount to a merger with the acquiring corporation because, for tax purposes, the noncorporate entity is not regarded as separate from the acquiring corporation. [Treas.Temp.Regs. § 1.368- 2T(b) (1)(iii) & (iv), exs. 2, 3 & 4; *see* ¶ *8:210.1a*]

(3) [8:220] **Reverse triangular mergers:** The same rules apply to reverse triangular mergers (¶ *8:166*), but with two limitations:

- [8:221] *Control*--i.e., at least 80% of the total combined voting shares *plus* at least 80% of all other classes of shares of the target corporation--must be acquired *solely* in exchange for voting stock of the acquiring (parent) corporation. (The remaining shares of the target corporation's stock may be acquired for cash, property or other securities.) [IRC § 368(c) & (a)(2)(E)(ii)]

- [8:222] After the merger, the target corporation (now a controlled subsidiary of the acquiring corporation) must *retain* intact "substantially all of its properties" and those of the disappearing former subsidiary (used by the parent corporation for the acquisition, ¶ *8:166*). [IRC § 368(a)(2)(E)(i)] (The term "substantially all" has the same meaning here as in a type "C" reorganization; *see* ¶ *8:277*.)

(4) [8:222.1] **Mergers of 80%-owned subsidiaries:** Where a subsidiary is merged into a parent owning 80% or more of its stock, the transaction is treated for tax purposes as a tax-free *liquidation* instead of a tax-free reorganization. [IRC § 332(b); ¶ *8:1166 ff.*]

(5) [8:223] **Advantage of merger ("A reorganization") over stock-for-stock exchange ("B reorganization"):** As discussed below, a stock-for-stock exchange ("B reorganization") is tax-free only if stock is exchanged *solely* for voting stock in the acquiring corporation. If any other consideration is paid to *any* exchanging shareholder, the exchange is taxable to all (even to those who received only voting stock in the acquiring corporation; *see* ¶ *8:246*).

Thus, any form of statutory merger or consolidation--even the reverse triangular form, with its limitations, above--is more flexible than the stock-for-stock exchange for reorganization purposes, as it allows use of cash, debt or property (i.e., other than voting stock).

    (a) [8:224] **Example:** Parent Corp. wants to acquire all of the stock of Target Corp. It is desirable that Target's legal identity be preserved. Target is owned 80% by X, and 20% by Y. X insists on a tax-free exchange, but Y wants to be cashed out or to receive notes for his stock.

If Parent issues stock to X in exchange for his Target stock, and purchases Y's shares for cash, the transaction is fully taxable to *both* of them! (It is not a tax-free "B reorganization" because not "solely" in exchange for voting stock.)

But the parties' objectives can be accommodated through a *reverse triangular merger* (¶ *8:166*): i.e., Parent forms Subsidiary, and capitalizes it with enough of its voting stock to acquire X's shares and enough cash or notes to buy Y's shares in Target. Subsidiary is then merged into Target (whereby Parent receives voting control of Target). Parent then causes Target to use the cash or notes acquired from Subsidiary to purchase Y's shares and to exchange its voting stock in Parent for X's shares. The transaction is tax-free to X, even though Y was cashed out as part of the merger.

    (b) [8:225] **Further example:** Suppose Y owned 25% of Target's stock, rather than just 20%. In this case, a reverse triangular merger would *not* be tax-free ... because of the special requirement that at least 80% of all voting stock of all other classes of the corporation be exchanged for voting stock in the acquiring corporation (¶ *8:221*). But a straight merger or triangular merger could still be utilized, since neither is subject to the 80% requirement. (Utilizing these forms of merger, however, would sacrifice the goal of preserving Target's legal identity; *see* ¶ *8:166*.)

h. **Securities laws considerations**

    (1) [8:226] **Federal securities laws:** Various provisions of federal securities laws may apply

to a statutory merger or consolidation:

    (a) [8:227] **Proxy rules** (SEA § 14, and SEC Reg. 14A), where shareholder approvals or consents are required as to securities issued by a corporation subject to the registration and reporting requirements of the 1934 Act.

    (b) [8:228] **Registration requirements** of the 1933 Act, since, in voting on the merger, shareholders are in effect being asked to make a new investment decision; i.e., whether to accept new and different securities in exchange for their existing securities. [SEC Rule 145]

    (Of course, most of the *exemptions* from registration would potentially be available, including SA § 4(2) and Regulation D, ¶ *5:107 ff.*; and SA § 3(a)(10) if California qualification is obtained upon a "fairness hearing," ¶ *5:194.1 ff.* Also, the *preemption* provisions of the 1933 Act (¶ *5:18.5 ff.*) may apply.)

    (c) [8:229] **Antifraud rules** (SEA § 10b and SEC Rule 10b-5) apply whether or not the securities are registered under federal law; transferring shareholders are covered as "purchasers" of the acquiring corporation's securities (and as involuntary or forced "sellers" if they exercise their dissenters' rights to be cashed out; *see* ¶ *6:372.2*).

(2) [8:230] **California Corporate Securities Law:** Negotiations and agreements leading up to a merger, prior to soliciting approval by the holders of equity securities, are specifically exempt from qualification. [Corps.C. § 25103(a)]

However, once shareholder approval is sought, qualification is required (unless federally preempted; *see* ¶ *5:18.5 ff.*). It is unlawful to *offer to exchange stock or securities* incident to a merger or consolidation (or other form of reorganization) unless the securities are qualified by permit or an exemption is available. [Corps.C. §§ 25120, 25121]

(This would *not* apply to mergers where the minority is entirely cashed out, or where a wholly-owned subsidiary is merged into its parent, where *no issuance or exchange of securities* is involved; *see* ¶ *8:206*.)

    (a) [8:231] **"Nonresidents" exemption:** A principal exemption for merger transactions is the "nonresidents" exemption (also applicable to sale-of-assets reorganizations; discussed later): basically exempting issuance or exchange of securities incident to a merger where *less than 25%* of the *outstanding* shares of any class being exchanged are held by California residents. [Corps.C. § 25103(c), (d)]

    For purposes of this exemption, shares are *not* considered "outstanding" if they are known to be held in the names of broker-dealers (or their nominees), or are held by any person controlling 50% or more of the class. [Corps.C. § 25103(d)(1),(2)]

        1) [8:232] **Distinguish--other recapitalization exemptions inapplicable:** The other major statutory exemptions available for *recapitalizations* (§ 25103(b), (e), (f),(g); *see* ¶ *8:90 ff.*) do *not* apply to mergers.

        In particular, note that the § 25102(f) "limited offering" exemption and the § 25102(n) "qualified purchaser" exemption, which may be available for recapitalizations (*see* ¶ *8:156*), are *not* likewise available for mergers. [Corps.Commr.Rule 260.103]

    (b) [8:232.1] **"Limited exchange transaction" exemption:** Also applicable to mergers (other than certain proscribed rollups; *see* Corps.C. § 25104.6) is the so-called "limited exchange transaction" exemption, which exempts issuances of any securities incident to a merger (or sale of assets, ¶ *8:289.2*) if the issuance *satisfies the conditions of the § 25102(f) "limited offering exemption"* (¶ *5:256 ff.*) *and either*:

        • [8:232.2] **Shareholder approval:** The transaction is approved by at least *75%* of the outstanding equity securities of each constituent entity entitled to vote on the transaction, not more than *10%* of such securities vote against it, and each entity whose security holders are entitled to vote on the transaction is subject to a state statute providing dissenters' rights to equity security holders not approving the transaction;
        *OR*

        • [8:232.3] **Merger solely to change form or domicile:** The sole purpose of the transaction is to change the issuer's state or form of organization, all security holders of the same class or series are treated equally (unless they all consent otherwise), and the holders of nonredeemable voting equity securities receive only nonredeemable voting equity securities. [Corps.C. § 25103(h)(1)(A) & (B)]

1) [8:232.4] **Notice of transaction:** The acquiring or surviving entity must file a notice of transaction with the Corporations Commissioner within *15 calendar days* after the first sale of the securities in California, and must pay a $600 filing fee. The notice should be filed in the Commissioner's Los Angeles office: 320 West 4th St., Los Angeles, CA 90013-2344. [Corps.C. §§ 25103(h)(2), 25608(z); Corps. Commr.Rule 260.103.6; Corps.Commr. Rel.No. 13-G (revised 2004)]

As with the other limited offering exemptions, failure to file the notice will not affect the exemption's availability. However, an acquiring entity that fails to file the notice as required by the Commissioner's Rule, must, within 15 business days after demand by the Commissioner, file the notice and pay a fee equal to that payable to qualify the transaction (see Corps.C. § 25608). [Corps.C. § 25103(h)]

- **FORM:** Notice of Exchange Transaction Pursuant to Corporations Code § 25103 (h), *see Cal. Prac. Guide Corps. Form 8:F.2.*

[8:232.5-232.9] *Reserved.*

(c) [8:232.10] **Exchanges approved by bankruptcy court:** Also exempt from qualification is any exchange of securities in connection with any merger, consolidation or sale of corporate assets in consideration wholly or in part of the issuance of securities pursuant to a plan of reorganization or arrangement that is confirmed (or subject to confirmation) by a court pursuant to the U.S. Bankruptcy Code. [Corps.C. § 25103(i)]

(Securities issued upon bankruptcy court approval are likewise exempt from federal registration; *see* ¶ *5:194.1.*)

(d) [8:233] **Commissioner's standards re granting permit:** If no exemption is available, the exchange will have to be qualified in accordance with the procedure discussed in connection with recapitalizations (*see* ¶ *8:157*).

The Commissioner's Rules require that any plan combining two or more corporations by way of merger or consolidation "should provide for the issuance of securities which *fairly reflect the relative values* of the corporations which are parties to the plan ... " [Corps.Commr.Rule 260.140.61]

=> [8:233.1] **PRACTICE POINTER:** Whether exempt or not, it may be desirable to qualify the merger issuance on a requested *fairness hearing.* This will exempt the transaction from federal registration under SA § 3(a)(10), ¶ *5:194.1 ff.*

(e) [8:234] **Soliciting shareholder approval:** If a permit is required, shareholder approvals may not be sought until *after* such permit has been granted. Whatever materials are distributed to the shareholders must be submitted in advance to the Corporations Commissioner (usually by attaching same as an exhibit to the application for permit). [Corps.Commr.Rule 260.140.60]

4. [8:235] **Exchange Reorganizations (Stock-for-Stock):** The most direct method for one corporation to acquire control of another is an "exchange reorganization": The acquiring corporation simply issues some of its own (or a parent corporation's) equity securities in *exchange,* in whole or in part, for a controlling interest in the target corporation. [Corps.C. § 181(b)] ("Control" means ownership, directly or indirectly, of more than 50% of its voting shares; Corps.C. § 160(b).)

No merger or consolidation of the two corporations is effected thereby. Rather, the acquired corporation simply becomes a *subsidiary* of the acquiring corporation.

- [8:235.1] **Compare--share exchange *not* resulting in controlling interest:** An exchange of shares whereby *less than a controlling interest* in the target company is acquired is *not* an "exchange reorganization" (Corps.C. § 181(b)); rather, it is a "share exchange tender offer" (Corps.C. § 183.5). While both types of transactions are subject to similar shareholder approval requirements (¶ *8:238 ff.*) and special "interested party proposal" procedures (¶ *8:237.1 ff.*), "dissenters' rights" are available *only* in connection with "reorganizations" (¶ *8:292 ff.*).--not pursuant to share exchange tender offers.

- [8:235.2] **Compare--equity exchange with noncorporate entity:** A corporation may also use an "exchange reorganization" to acquire control of a *noncorporate* entity (e.g., limited partnership or LLC) by issuing the corporation's (or a parent entity's) equity securities in exchange, in whole or in part, for equity securities that give the corporation more than 50% of the voting power of the noncorporate entity. (Similarly, a noncorporate entity may use an exchange reorganization to acquire control of a corporation by issuing equity securities of the

noncorporate entity (or its parent) in exchange for shares constituting more than 50% of the voting power of the corporation.) Here again, dissenting shareholders have the right to be "cashed out" (¶ *8:242*). [Corps.C. §§ 160(b), 168, 181(b)]

However, an exchange reorganization with a noncorporate entity does *not* qualify as a tax-free "B reorganization" (IRC § 368(a)(1)(B), ¶ *8:244 ff.*). For this reason, the remainder of this discussion focuses on purely corporate exchange reorganizations.

### a. Procedure

(1) **[8:236]** **Tender offer by acquiring corporation:** The first step in an exchange reorganization (or "share exchange tender offer") normally is for the board of directors of the acquiring corporation to authorize an "exchange tender offer" to the holders of the voting stock of the target corporation. [Corps.C. § 1200(b),(d)]

    (a) **[8:237]** **Terms:** In an exchange reorganization, the offer typically provides that the acquiring corporation will issue a certain number of its equity shares (common, preferred or a combination) in exchange for *controlling* (more than 50%) voting shares of the target corporation. A payment of cash, debt securities or other property to the target corporation's shareholders may also be included (but if so, the exchange will not be tax-free; see below). The offer usually will also provide that the offeror corporation is not obligated to purchase any shares unless enough are tendered to transfer control of the target corporation.

(2) **[8:237.1]** **Offer made by insider:** If the exchange reorganization tender offer (or "share exchange tender offer," *see* ¶ *8:235.1*) is proposed by an *insider*--i.e., an "interested party" (below)--special requirements are imposed to ensure that the shareholders will be treated fairly in the non-arm's-length transaction.

    (a) **[8:237.2]** **Who is an "interested party":** The special requirements apply to exchange offers made to a corporation by anyone who:
- Directly or indirectly *controls* the corporation;
- Is directly or indirectly controlled by any of the corporation's officers or directors; or
- Is an entity in which any of the corporation's directors or "executive officers" (i.e., president, vice-president, or other persons serving similar policymaking functions) holds a *material financial interest*. [Corps.C. § 1203(a)]

        1) **[8:237.3]** **Exception--corporations with fewer than 100 shareholders:** The special requirements do not apply where the proposal is made to a corporation with *fewer than 100* shareholders of record. [Corps.C. § 1203(a)]

        2) **[8:237.4]** **Exception--exchange qualified by permit:** Nor do the special requirements apply to an exchange transaction that has been qualified by permit from the Corporations Commissioner. [Corps.C. § 1203(a)]

    (b) **[8:237.5]** **Independent fairness opinion:** The interested party proposing the stock-for-stock exchange must provide the shareholders with an independent written opinion as to the fairness of the consideration they will receive in the transaction. [Corps.C. § 1203(a)]

        1) **[8:237.6]** **Delivery of opinion:** Ordinarily, the fairness opinion must be delivered to the shareholders when the exchange offer is first made in writing to them. However, if the exchange offer is commenced by *publication* and offering materials are subsequently sent to the target shareholders, the opinion may be included in those offering materials. [Corps.C. § 1203(a)(2)]

        2) **Opining person's qualifications:** See ¶ *8:172.10*.

    (c) **[8:237.7]** **Competing offers:** The board of directors must notify the shareholders of any competing offer requiring shareholder acceptance or approval made at least 10 days before the interested party proposal is to be approved, whether a tender offer, a merger offer, a stock-for-stock exchange (¶ *8:235 ff.*), a sale-of-assets reorganization (¶ *8:259 ff.*) or a straight sale-of-assets (¶ *8:581 ff.*). The directors must also forward to the shareholders any written materials provided by the later offeror (at such offeror's expense!). [Corps.C. § 1203(b)(1)]

        1) **[8:237.8]** **Insider proposal delayed pending shareholder action on competing offer:** The interested party must delay completion of the exchange transaction for at least 10 days after notice to the shareholders of the competing offer. The purpose is to give the shareholders a reasonable opportunity to withdraw their acceptance and any tendered shares. [Corps.C. § 1203(b)(2)]

2) **Improving insider offer:** See ¶ *8:172.14.*
=> [8:237.9] ***PRACTICE POINTER:*** When submitting an insider proposal to the shareholders for approval, counsel should disclose that competing offers received 10 days before the proposal is approved will be submitted for shareholder consideration.

(3) [8:238] **Shareholder approval by acquiring corporation:** Except as noted below, the principal terms of the exchange must be approved by a majority of the outstanding shares of each class of the *acquiring* corporation (or of its controlling parent whose equity securities are being issued), or any greater percentage required by its articles. (Approval by the target corporation's board of directors or shareholders is not required because the offer is being made individually to the shareholders.) [Corps.C. §§ 1200(b) & (d), 1201(a), 1201.5(a)]

   (a) [8:238.1] **Measuring shareholder approval:** See ¶ *8:173.*
      1) **Foreign corporation shareholder approval:** See ¶ *8:177.3.*
   (b) [8:238.2] **Before or after board approval:** See ¶ *8:173.1.*
   (c) [8:239] **Exceptions--share exchanges NOT requiring shareholder approval:** Unless the articles provide otherwise, the acquiring corporation's (or its parent's) shareholders need *not* approve a share exchange in the following cases:
      1) [8:240] **Preferred shares unaffected by share exchange:** Approval is not required by nonvoting *preferred* shareholders if their rights are not affected by the proposed issuance (e.g., in the typical case where only common shares are being issued). [Corps.C. §§ 1201(a), 1201.5(a); see ¶ *8:179*]
      2) [8:241] **Exchanges resulting in limited dilution of voting power:** Nor is shareholder approval required where the share exchange transaction results in only a limited dilution of the voting power of the acquiring corporation's shareholders. [Corps.C. §§ 1201(b), 1201.5(b); *and see discussion of "limited dilution test," ¶ 8:181-182*]
         a) [8:241.1] **Limitation--articles amendment required:** Regardless of limited dilution, shareholder approval may still be required if an articles amendment is necessary to effect the share exchange. [Corps.C. §§ 902(a), 903; *see ¶ 8:52 ff.*]
         b) [8:241.2] **Limitation--disappearing close corporation:** Likewise, regardless of limited dilution, shareholder approval (by two-thirds vote) is required in an exchange *reorganization* where, through issuance of additional shares, the acquiring corporation loses its status as a statutory close corporation. [Corps.C. § 1201(e); *see ¶ 8:176*]
   (d) [8:242] **Dissenters' rights:** In an exchange *reorganization* (but *not* a "share exchange tender offer," ¶ *8:235.1*), shareholders of the acquiring corporation whose approval is required and who dissent from the exchange are entitled to be cashed out at the appraised value of their shares. (See detailed discussion of dissenters' rights at ¶ *8:292 ff.*)

(4) [8:243] **Abandonment:** The board of directors of the acquiring corporation can abandon the proposed exchange even after it has been approved by its shareholders. [Corps.C. § 1201(h)]
   However, such abandonment might expose the acquiring corporation to contractual liability to the target corporation's stockholders who have accepted the offer, or others who have detrimentally relied thereon. [See Corps.C. § 1201(h)]

b. [8:244] **Tax treatment ("B reorganization"):** An exchange of stock is normally taxable the same as a sale; i.e., gain or loss is recognized at the time of the exchange.
   But a stock-for-stock exchange will be *tax-free* to the exchanging shareholders (no gain or loss recognized at the time of exchange, and the basis on their former shares carried over to the newly-received shares), if the following requirements are met: (Such an exchange is referred to as a "B reorganization" because it is the second of the seven types of corporate reorganizations recognized in IRC § 368(a)(1).) [IRC § 368(a)(1)(B)]

   (1) [8:245] **Continuity of interest:** The same "continuity of interest" required in "A reorganizations" applies here as well; *see ¶ 8:215.*
   (2) [8:246] **Solely for voting stock of acquiring corporation:** Subject to the exceptions noted below, there is no room for mixed consideration in a "B reorganization." The

exchange must be *solely* for *voting stock* in the acquiring corporation. Any other form of consideration--such as cash, debt securities or even nonvoting stock of the acquiring corporation--renders the *entire* transaction taxable to the exchanging shareholders. [*Turnbow v. Commr.* (1961) 368 US 337, 343-344, 82 S.Ct. 353, 357; see Treas. Regs. § 1.368- 2(c); see also *Chapman v. Commr.* (1st Cir. 1980) 618 F2d 856, 860]

   (a) [8:246a] **Caution--"voting stock" excludes "nonqualified preferred":** "Nonqualified preferred stock" (¶ *3:340.1 ff.*) is *not* treated as "voting stock" for purposes of a "B reorganization," and thus receipt of *any* "nonqualified preferred stock" (except in exchange for other "nonqualified preferred stock") will render the transaction *taxable*. [IRC § 354(a)(2) (C)]

   (b) [8:246b] **Exception--concomitant exchange of bonds:** A stock-for-stock exchange that, as part of the plan of reorganization, involves an exchange of bonds (or debentures) can still receive tax-free treatment so long as the principal amount of the bonds surrendered equals the principal amount of the bonds received. [Rev.Rul. 98-10, 1998-1 CB 643]

   - [8:246c] **Example:** X corporation acquires all the voting stock of Y corporation in exchange for stock in X corporation. X also exchanges all the outstanding bonds of Y for bonds of X having the same principal amount, interest rate and maturity. Some, but not all, Y shareholders are also Y bondholders.
   So long as the Y shareholders receive X voting stock *solely in return for their Y voting stock*, and so long as the Y bondholders receive X bonds *solely in return for their Y bonds*, the stock-for-stock exchange is tax-free under § 368(a)(1)(B) and the bond-for-bond exchange is tax-free under § 354(a)(1) (see ¶ 8:125, 8:212). [Rev.Rul. 98-10, supra]

   (c) [8:246.1] **Exception--payment for fractional shares; target corporation's expenses:** But the "solely for voting stock" requirement does not prevent the acquiring corporation from paying the target's reorganization expenses, or paying cash in lieu of issuing fractional shares to the target's shareholders. [Rev.Rul. 73-54, 1973-1 CB 187; Rev.Rul. 66-365, 1966-2 CB 116]

(3) [8:247] **At least 80% control acquired:** As a result of the exchange, the acquiring corporation must end up with at least 80% of the target corporation's outstanding voting stock, as well as 80% of the total number of shares of all other classes of stock outstanding. [IRC § 368(c)]

(4) [8:248] **Compare--merger requirements:** If the above requirements cannot be met through a stock-for-stock exchange, tax-free treatment may still be possible through an "A reorganization"; i.e., a statutory merger or consolidation (¶ 8:211).

c. **Securities laws considerations**

(1) [8:249] **Federal securities laws:** By definition, a "share exchange tender offer" or an exchange reorganization involves the "offer" and "sale" of securities. Thus, various provisions of the federal securities laws may apply to these types of transactions, including:

   (a) [8:250] **Registration requirements** of the 1933 Act (whether the securities "offered" are securities of the acquiring corporation, or of its parent); see ¶ 5:19 ff.
   Of course, various *exemptions* from registration may also be available ... especially the exemption under SA § 3(a)(10), where the exchange is qualified in California upon a "fairness hearing" (¶ 5:194.1 ff.). Similarly, the preemption provisions of the 1933 Act may preclude state regulation (see ¶ 5:18.5 ff.).

   (b) [8:251] **Proxy rules** (SEA § 14 and SEC Reg. 14A) must be complied with if the exchange requires shareholder approval (see above), and the acquiring corporation is subject to the registration and reporting requirements of the 1934 Act.

   (c) [8:252] **Tender offer rules** (SEA §§ 13(d), 14(d) and 14(e)) require special disclosures and regulate tender offers for any class of equity security registered under the 1934 Act.

   (d) [8:253] **Antifraud rules** (SEA § 10b, and SEC Rule 10b-5) apply, regardless of registration requirements, to exchanges involving the "purchase" and "sale" of securities in interstate commerce; see ¶ 6:360.

(2) [8:254] **California Corporate Securities Law:** Likewise, an exchange is treated as an "offer" and "sale" under the Corporate Securities Law, and therefore must be qualified by

permit unless exempt (or preempted by federal law, ¶ *5:18.5 ff.*). [Corps.C. § 25110]

To the extent applicable, the same exemptions are available as in the case of any offer and sale (*see* ¶ *5:200 ff.*). (Thus, share exchanges are treated differently from recapitalizations (¶ *8:156-156.1*), mergers (¶ *8:230 ff.*), and sale-of-assets reorganizations (¶ *8:288 ff.*).) [See Corps.C. § 25120]

(a) [8:254.1] **Limited offering exemption (§ 25102(f)) applicable:** Section 25102(f) is available to exempt share exchange tender offer and exchange reorganization transactions, provided they satisfy all of the requirements under this exemption (*see* ¶ *5:256 ff.*). [Corps.C. § 25102(f)]

(b) [8:255] **Exemption--"forced sale" exchange where less than 25% of target held by California residents:** By Rule, the Corporations Commissioner has exempted a corporation's issuance of shares in exchange for *all* the outstanding shares (except for directors' qualifying shares) of a target ("acquired") corporation ... *provided all* of the following requirements are met:

1) [8:256] Less than 25% of the shares of the class being exchanged (the target shares) are held by California residents--*excluding* shares held in the names of broker-dealers, and by persons who control 50% or more of the target shares;

2) [8:257] The exchange is subject to approval by *affirmative vote of at least a majority of the target shares* (or greater vote if required by the target corporation's articles, bylaws, or applicable state law), again excluding shares held by anyone owning, directly or beneficially, 50% or more of such shares; *OR*

The exchange is *approved as to fairness* after a hearing by a regulatory agency having powers similar to the Corporations Commissioner ("approval after a hearing as to the fairness of its terms and conditions, by public commission, board or other governmental authority of a state expressly authorized by the law of such state to grant such approval"); *AND*

3) [8:258] Any shareholder of the target corporation dissenting from the exchange is entitled to the "fair value" of his or her shares (presumably in cash). [Corps.Commr.Rule 260.105.15]

[8:258a] **Comment:** Since "share exchange tender offers" do not trigger "dissenters' rights," such transactions cannot satisfy all of the above requirements. Hence, only "exchange reorganizations" can potentially qualify for this exemption.

[8:258.1] *Reserved.*

=> [8:258.2] ***PRACTICE POINTER:*** Even if the exchange is exempt, it may be desirable to obtain qualification upon a "fairness hearing" to exempt the transaction from federal registration under SA § 3(a)(10), ¶ *5:194.1 ff.*

5. [8:259] **Sale-of-Assets Reorganizations:** A "sale-of-assets reorganization" is a sale of corporate assets that has the *effect* of a reorganization, and thus is subject to board and shareholder approval as discussed below. It involves one corporation acquiring all or "substantially all" of the business and assets of another in *exchange*, in whole or part, for the purchaser's (or its parent's) *stock or debt securities*, if such debt securities are not adequately secured and not due for more than 5 years after the sale. [Corps.C. § 181(c)]

[8:260] Such a purchase and sale is treated as a reorganization because the shareholders of the seller corporation end up owning, directly or indirectly, stock or unsecured long-term debt securities of the acquiring corporation. (If the debt *were* adequately secured and due within 5 years, the sale would not be treated as a reorganization, but simply as a sale of assets; *see* ¶ *8:581.*)

• [8:260.1] ***Compare--reorganization with noncorporate entity:*** A "sale-of-assets" reorganization may be effected between a corporation and a noncorporate entity. I.e., a corporation may issue its or its parent's equity or debt securities in exchange for the business and assets of a noncorporate entity (and a noncorporate entity may issue its or its parent's equity or debt securities in exchange for the business and assets of a corporation). Here again, dissenting shareholders have the right to be "cashed out" (¶ *8:292 ff.*). [Corps.C. §§ 168, 181(c)]

However, a sale-of-assets reorganization with a noncorporate entity does *not* qualify as a tax-free "C reorganization" (IRC § 368(a)(1)(C), ¶ *8:276 ff.*). For this reason, the remainder of this discussion focuses on purely corporate sale-of-assets reorganizations.

a. [8:261] **All or "substantially all" assets:** Board and shareholder approval is required as to

transfers involving "all or substantially all" the corporate assets. (Lesser amounts can be disposed of in the ordinary course of business by authorized officers or employees without specific board or shareholder approval.)

Unfortunately, neither the Corporations Code nor case law sheds much light on precisely what amount or percentage of corporate assets constitutes "substantially all" of the total. Arguably, only transfers that would render the corporation unable to continue in business in its usual way should be so treated.

For *tax purposes*, however, the IRS has provided specific guidelines as to what constitutes "substantially all" of a corporation's assets to qualify as a "C reorganization" (*see* ¶ *8:278*).

b. [8:262] **Procedure:** Usually, an agreement for the sale of assets exchange is negotiated by officers of the corporations involved, and then submitted to their respective boards and shareholders for approval.

The agreement normally describes in detail the financial terms, the securities to be issued, the assets to be conveyed, what warranties are made, what liabilities are assumed, etc. If the selling corporation holds a franchise, license or permit for its business, the sale is usually contingent upon obtaining consent to transfer from the appropriate licensing or franchising authority. (See further discussion in "Sale of Assets," ¶ *8:581*.)

(1) [8:263] **Approval by both boards:** A sale of assets reorganization requires approval of the principal terms by the boards of *both* the acquiring corporation (purchaser) and the corporation whose property and assets are being acquired (seller). [Corps.C. § 1200(c)]

(2) [8:264] **Approval by shareholders of both corporations:** The principal terms of the agreement must also be approved by a majority of the outstanding shares of *each class* of *both* corporations or such greater percentage as may be required in their articles. [Corps.C. § 1201(a)]

 (a) [8:264.1] **Measuring shareholder approval:** *See* ¶ *8:173*.
  1) **Foreign corporation shareholder approval:** *See* ¶ *8:177.3*.
 (b) [8:264.2] **Before or after board approval:** *See* ¶ *8:173.1*.
 (c) [8:265] **Exception as to unaffected preferred shareholders:** As with other forms of reorganization, approval by nonvoting preferred shareholders of the *acquiring* corporation is not required if their rights remain unchanged by the reorganization (e.g., as where only junior stock is issued). [Corps.C. § 1201(a), ¶ *8:240*]
  1) **Preferred shares to receive less than required by articles:** *See* ¶ *8:177.2*.
 (d) [8:266] **Exception where limited dilution of voting power:** Nor is shareholder approval required where the sale-of-assets reorganization will result in only a limited dilution of the shareholders' voting power. See the "limited dilution test" *discussed at* ¶ *8:181*. [Corps.C. § 1201(b)]
  [8:267] **Limitations:** However, as discussed earlier, there are some limitations to this exception: I.e., whether or not their voting power is diluted, shareholder approval is required where:
  • [8:268] The reorganization necessitates an *articles amendment* (e.g., to authorize additional shares). [Corps.C. §§ 902(a), 903]
  • [8:269] The reorganization contemplates shareholders of either corporation *surrendering* their shares for other shares having *different* rights than those surrendered, or shares in a foreign corporation. (This might apply where the seller corporation plans to liquidate and distribute the shares being acquired from the purchaser corporation.) [See Corps.C. § 1201(d), ¶ *8:183.2*]
 (e) [8:270] **90% approval required if corporations under common control:** If the purchaser corporation has voting control over the seller (or both are under common control), the sale must be approved by *at least 90%* of the voting shares of the seller corporation, rather than a mere majority. (The purpose, of course, is to prevent the purchaser corporation from taking advantage of minority shareholders in the seller corporation.) [Corps.C. § 1001(d)]
  1) **Exceptions**
   a) [8:271] **Seller given equity in purchaser:** The 90%-approval requirement does not apply if the purchaser pays for the assets with its own or its parent's *nonredeemable common stock* (or *nonredeemable equity securities* where the issuer is a noncorporate entity). Reason: The minority has a *continuing equity interest* in the business. [Corps.C. § 1001(d)]

b) [8:271.1] **Sale approved by Commissioner:** Nor does the 90%-approval requirement apply if the Corporations Commissioner, after a hearing, has approved the "fairness" of the transaction. [Corps.C. § 1001(e)]

2) [8:272] **Compare--alternatives available:** If a parent corporation has 90% or more voting control of a subsidiary, it can "cash out" the minority shareholders at any time: *either* through a "short-form" merger (¶ *8:196*), or through a sale-of-assets reorganization and then liquidating the subsidiary.

With *less* than 90% control, however, no "short-form" merger is possible (*see* ¶ *8:196*). Therefore, a parent corporation must either obtain approval by enough of the minority shareholders to satisfy the 90% approval requirement for a sale-of-assets reorganization, *or* pay for the assets purchased in non-redeemable common shares, *or* seek approval as to the "fairness" of the transaction by the Corporations Commissioner.

(f) [8:273] **Dissenters' rights:** For further discussion of the rights of dissenting shareholders, *see* ¶ *8:292 ff.*

(3) [8:273.1] **Sale-of-assets reorganization proposed by insider:** Where the sale-of-assets reorganization is proposed by an *insider*--i.e., an "interested party" (below)--special requirements are imposed to assure that the shareholders will be treated fairly in the non-arm's-length transaction.

(a) [8:273.2] **Who is an "interested party":** The special requirements apply to sale-of-assets reorganization proposals made to a corporation by anyone who:
- Directly or indirectly *controls* the corporation;
- Is directly or indirectly controlled by any of the corporation's officers or directors; or
- Is an entity in which any of the corporation's directors or "executive officers" (i.e., president, vice-president, or other persons serving similar policymaking functions) holds a *material financial interest*. [Corps.C. § 1203(a)]

1) [8:273.3] **Exception--corporations with fewer than 100 shareholders:** The special requirements do not apply where the proposal is made to a corporation with *fewer than 100* shareholders of record. [Corps.C. § 1203(a)]

2) [8:273.4] **Exception--exchange qualified by permit:** Nor do the special requirements apply to a transaction that has been qualified by permit from the Corporations Commissioner. [Corps.C. § 1203(a)]

(b) [8:273.5] **Independent fairness opinion:** The interested party proposing the sale-of-assets transaction must provide the shareholders with an independent written opinion as to the fairness of the consideration they will receive in the transaction. [Corps.C. § 1203(a)]

1) **Opining person's qualifications:** See ¶ *8:172.10.*
2) **Delivery of opinion:** See ¶ *8:172.11.*

(c) [8:273.6] **Competing offers:** The board of directors must notify the shareholders of any competing offer requiring shareholder acceptance or approval made at least 10 days before the interested party proposal is to be approved, whether a tender offer, a merger offer, a stock-for-stock exchange (¶ *8:235 ff.*), a sale-of-assets reorganization (¶ *8:259 ff.*) or a straight sale-of-assets (¶ *8:581 ff.*). The directors must also forward to the shareholders any written materials provided by the later offeror (at such offeror's expense!). [Corps.C. § 1203(b)(1)]

1) **Insider proposal delayed pending shareholder action on competing offer:** See ¶ *8:172.13.*
2) **Improving insider offer:** See ¶ *8:172.14.*

=> [8:273.7] *PRACTICE POINTER:* When submitting an insider proposal to the shareholders for approval, counsel should disclose that competing offers received 10 days before the proposal is approved will be submitted for shareholder consideration.

(4) [8:274] **Abandonment:** The boards of either corporation have power to call off a sale-of-assets reorganization any time before the sale is consummated. But such abandonment may expose the withdrawing party to contractual liability to the other corporation, and to any third parties who have enforceable rights under such contract. [Corps.C. § 1201(h)]

(5) [8:275] **Documentation:** Bills of sale, deeds to real property, assignment and other documentation will be required to transfer the selling corporation's business and assets.

(See further discussion in "Sale of Assets" at ¶ *8:631*.)

(6) [8:275.1] **Seller corporation's liabilities imposed on acquiring corporation ("de facto mergers"):** Generally, a purchaser of assets does not assume the seller's liabilities. However, a sale that leaves the selling corporation unable to satisfy its creditors has the *same practical result as a merger* and may be treated as a "*de facto merger*"--i.e., the purchaser will be liable for *all* the seller's debts by operation of law, the same as in a merger (¶ *8:193*). (This includes liability for punitive damages claims; *see* ¶ *8:194*.)

A transaction cast as an asset sale has the same effect as a merger and will be treated as a "de facto merger" where:

- The consideration paid for the assets consisted *solely* of the purchaser's (or its parent's) *stock*;
- The purchaser continued the same business after the sale;
- The seller's shareholders became shareholders of the purchaser;
- The seller corporation liquidated; and
- The purchaser assumed those liabilities necessary to carry on the business. [*Marks v. Minnesota Min. & Mfg. Co.* (1986) 187 CA3d 1429, 1436, 232 CR 594, 598; and see *United States v. Oil Resources, Inc.* (9th Cir. 1987) 817 F2d 1429, 1434 & fn. 6; compare *Schwartz v. Pillsbury, Inc.* (9th Cir. 1992) 969 F2d 840, 846--no "de facto merger" in sale of assets for cash]

    (a) [8:275.2] **Compare--product liability claims:** Successor liability for product liability claims may be imposed even where an asset sale is made entirely for cash, if the transaction leads to the seller's liquidation or dissolution (see ¶ *8:663 ff.*).

(7) [8:275.3] **Special employee notice requirements (layoffs, plant closures, relocations):** If the asset sale results in a *mass layoff* or a *plant closure or relocation* affecting at least 50 employees, special notice requirements may need to be satisfied pursuant to the federal Worker Adjustment and Retraining Notification Act ("WARN Act," 29 USC §§ 2101-2109) and its California counterpart (Lab.C. § 1400 et seq.). *See discussion at ¶ 8:1041 ff.*

c. [8:276] **Tax treatment ("C reorganization"):** Ordinarily, a sale of assets is a taxable event; i.e., gain or loss is recognized when the sale occurs (*see* ¶ *8:701*).

But a sale may be a *tax-free exchange* if it qualifies as a "C reorganization" (so-called because it is the third type of reorganization described in IRC § 368(a)(1)). If so qualified, no gain or loss is recognized by the selling corporation (or its shareholders) at the time of sale. Rather, the selling corporation takes a *carryover basis* in the securities received from the purchaser in exchange for the assets sold. Tax is payable only when those securities are ultimately sold. [IRC § 358(a)(1)]

To qualify as a tax-free "C" reorganization, the transaction must satisfy the same "continuity of interest" as required in "A" and "B" reorganizations (¶ *8:215, 8:245*). The following specific requirements must also be met:

(1) [8:277] **Substantially all assets sold:** First of all, the purchaser corporation must acquire "*substantially all* of the properties" of the seller corporation. [IRC § 368(a)(1)(C)]

    (a) [8:278] **IRS guidelines:** For advance ruling purposes, the IRS interprets "substantially all" to require transfer of *both*:
- *At least 90%* of the fair market value of the selling corporation's *net* assets; *and*
- *At least 70%* of the fair market value of its *gross* (total) assets. [Rev.Proc. 77-37, 1977-2 CB 568]

    (b) [8:278.1] **Applies where portion of assets sold for cash:** A transfer of *all* the seller corporation's assets in exchange for voting stock satisfies the "substantially all" requirement, even though the seller sold half or more of its historic business assets to others for cash just before the transfer and transferred the cash to the purchaser corporation. [See Rev.Rul. 88-48, 1988-1 CB 117]

(2) [8:279] **Exchange for purchaser's voting stock:** The assets must be acquired "*solely* in exchange for" *voting stock* (excluding "nonqualified preferred," ¶ *3:340.1 ff.*) in the purchaser corporation or its parent corporation. [IRC § 368(a)(1)(C); see IRC § 354(a)(2)(C)]

Thus, use of debt securities, nonqualified preferred stock or cash to pay for the assets, in whole or in part, renders the *entire* transaction taxable at the time of sale (except as noted below).

[8:280] **Compare:** For *corporate law* purposes, a sale of assets in exchange for the purchaser's long-term debt securities may be treated as a "reorganization," and thus require board and shareholder approvals (see Corps.C. § 181(c), ¶ *8:259*). But, for *tax* purposes, a sale of assets for even long-term debt securities *does not qualify* as a tax-free "reorganization"!

(a) [8:281] **Assumption of liabilities disregarded:** However, the purchaser corporation in a sale-of-assets reorganization *may* assume the seller corporation's debts or liabilities. The fact that the assets purchased are subject to certain liabilities, or that the purchaser has assumed the seller's liabilities, is disregarded in determining whether the transfer is "solely" in exchange for voting stock. [IRC § 368(a)(1)(C)]

(b) [8:281.1] **Asset sale to existing shareholder permitted:** The purchaser corporation's ownership of stock in the seller corporation prior to the asset acquisition (i.e., the seller is a partially-owned subsidiary of the purchaser) does not prevent the transaction from qualifying as a "C reorganization." [Treas.Regs. § 1.368-2(d)(4)]

(c) [8:282] **"Boot" permitted if at least 80% of assets acquired for stock:** One narrow exception allows part payment in "boot" (i.e., cash, debt securities or property other than voting stock) of up to 20% of the fair market value of the transferor corporation's assets. In other words, the acquisition is tax-free if at least 80% of the assets' value is purchased with voting stock. And, for this purpose only, liabilities assumed by the purchaser are treated the same as cash paid for such assets. [IRC § 368(a)(2) (B)]

For example, assume Transferor Corp.'s total assets are worth $100,000, subject to $10,000 liabilities. If Purchaser Corp. pays $10,000 in cash (or other property), assumes the $10,000 liabilities, and issues voting stock for the balance of assets, it will still be treated as a tax-free "C reorganization."

(3) [8:282.1] **Transferor corporation must distribute stock:** The final requirement for a "C reorganization" is that *all* of the transferor corporation's remaining assets (less amounts retained to pay claims)--including the stock and any "boot" (above) received from the purchaser--must be distributed to the transferor corporation's shareholders (or its creditors) pursuant to the plan of liquidation. IRS Regulations may waive this requirement (but none has yet been adopted). [IRC § 368(a)(2)(G)]

(4) [8:282.2] **No gain or loss recognized by corporation:** Generally, the transferor corporation does not recognize either gain or loss *on receipt* of the purchaser corporation's stock or any "boot" (i.e., cash, debt securities or property other than voting stock). [IRC § 361] Nor will it recognize gain or loss on subsequent distribution of such *stock* under the reorganization plan. [IRC § 336(c)]

(a) [8:282.3] **Exception for "boot" and other assets:** But the transferor corporation will recognize *gain* (but not loss) on appreciation in its *remaining assets* (including any "boot" received in the transaction) when it distributes the assets to its shareholders (or creditors). [IRC § 361(c)]

The impact of recognizing gain on the "boot" distributed is mitigated by the fact that the transferor corporation is given a fair market value basis upon receiving it. Thus, any gain would only be from appreciation in value *after* the "boot" was received by the transferor corporation. [IRC § 361(b)(2)]

d. [8:283] **Securities laws considerations:** The purchaser corporation's issuance of securities in exchange for assets is treated as a "sale" of such securities, and hence subject to applicable provisions of federal and California securities laws.

(1) [8:284] **Federal securities laws:** The following provisions of federal law should be considered in connection with any sale-of-assets reorganization:

(a) [8:285] **Proxy rules** of the 1934 Act (SEA § 14(a), Reg. 14A), where shareholder approvals or consents are required (see above) and the corporation is subject to the registration and reporting requirements of the Act.

(b) [8:286] **Registration requirements** and *exemptions* under the 1933 Act. Since the new securities are being issued to only one "purchaser" (the selling corporation), the offer and sale will usually be exempt under the "private offering exemption" (SA § 4 (2)), or under Regulation D; *see* ¶ *5:171.*

Remember, however, that securities issued under these exemptions are *restricted* as to resale or retransfer (under Rule 144, ¶ *5:126 ff.*). Therefore, these exemptions

should not be used where the reorganization plan contemplates that the selling corporation will distribute to its own shareholders the securities received from the purchaser corporation (either as a dividend or in dissolution, or otherwise within 1 year after its shareholders approved the asset sale). In such cases, the issuance should be registered under the 1933 Act. [See SEC Rule 145]

    (c) [8:287] **Antifraud rules** (SEA § 10b and Rule 10b-5) apply to stock-for- assets exchanges since they involve the "purchase" and "sale" of securities. (Dissenting shareholders of the acquiring corporation are treated as "forced" sellers.) The securities need not be registered, but the sale or issuance must satisfy the interstate commerce limitation (*see ¶ 6:362*).

  (2) [8:288] **California Corporate Securities Law:** Negotiations and agreements between the boards of directors of the two corporations involved in stock-for-assets exchange (prior to soliciting shareholder approval) are exempt from qualification. [Corps.C. § 25103(a)] However, once shareholder approval is sought, the "offer" or "sale" of the purchaser corporation's securities is subject to qualification by permit, unless exempt. [Corps.C. §§ 25120, 25121]

    (a) [8:289] **Exemptions:** Most of the reorganization exemptions discussed earlier in connection with recapitalizations, mergers, and stock-for-stock exchanges, *do not apply* in stock-for-assets exchanges. [Corps.C. § 25103, Corps. Commr.Rules 260.103, 260.105.15]

      1) [8:289.1] **"Nonresident shareholders exemption":** However, the *"nonresident shareholders exemption"* (*¶ 8:231*) may be applicable: i.e., if the stock being issued by the purchaser corporation is to be redistributed by the seller corporation to its shareholders, less than 25% of whom reside in California, the exchange is exempt from qualification. [Corps.C. § 25103(c)]

      2) [8:289.2] **"Limited exchange transaction exemption":** Further, the "limited exchange transaction exemption," available for certain mergers, also applies to sales of assets; *see ¶ 8:232.1 ff.* [Corps.C. § 25103(h)]

        [8:289.3] *Reserved.*

        a) [8:289.4] **Compare--less than all (or substantially all) assets exchanged for stock:** If only *some*--i.e., less than all or substantially all--of the seller's assets are being exchanged for stock, the transaction will *not* qualify as a "sale-of-assets reorganization"; instead, it will constitute an ordinary stock issuance for property, as to which the § 25102(f) "limited offering exemption " (rather than the § 25103(h) "exchange transaction exemption") may apply (*see ¶ 5:256 ff.*).

      3) [8:289.5] **Exchanges approved by bankruptcy court:** The exemption for exchanges of securities approved by a bankruptcy court in a *merger* transaction also applies to *asset sales; see ¶ 8:232.10*. [Corps.C. § 25103(i)]

    (b) [8:290] **Caution--§ 25102(n) not applicable:** The § 25102(n) "qualified purchaser" exemption (*¶ 5:304.6 ff.*) *cannot* be utilized here, since exemptive Rule 260.103 does not make § 25102(n) available for this type of exchange.

    (c) [8:291] **Qualification procedure:** If no exemption is available, the purchaser corporation's issuance of securities must be qualified by permit from the Corporations Commissioner. The procedure for obtaining such permit is the same as discussed in connection with recapitalizations and mergers; *see ¶ 8:157*.

6. [8:292] **Dissenters' Rights:** As discussed below, dissenting shareholders have the right to be "cashed out" for the appraised value of their shares following any acquisitive reorganization--i.e., a merger, stock-for-stock exchange or stock-for assets exchange--or a conversion into a noncorporate business entity. (A conversion is deemed a "reorganization" for this purpose; *see ¶ 8:473*.) [Corps.C. §§ 1300-1302, 1313]

(*Compare:* There is *no* provision for dissenters' rights in connection with share exchanges that are *not* "reorganizations" (*see ¶ 8:235.1*). Nor are dissenters' rights available in connection with *recapitalizations*, since they involve "purely internal" reshuffling of the corporation's capital structure (*see ¶ 8:123*).)

The provisions below apply in the absence of contrary provisions in the articles of incorporation. (As a practical matter, the articles rarely spell out the amount to which shareholders of a particular class are entitled to be paid in the event of a reorganization.) [Corps.C. § 1311]

a. [8:293] **Purpose:** Assuring dissenting shareholders the right to be "cashed out" for the fair value of their investments serves two purposes: It protects minority shareholders against being locked by majority fiat into an investment which, as a result of the reorganization, may be substantially different than they originally bargained for.

At the same time, it generally precludes minority shareholders attempting to thwart reorganizations by filing "strike suits" or otherwise challenging the majority's decision. As will be seen, if the reorganization is otherwise duly authorized, the minority shareholders' statutory appraisal rights are virtually their *sole and exclusive remedy*. [Corps.C. § 1312, *see* ¶ 8:358]

b. [8:294] **Shares eligible for appraisal rights:** To be eligible for statutory appraisal rights, the shares must qualify as "dissenting shares." [Corps.C. § 1300(b)]

To qualify as "dissenting shares," such shares must meet the following requirements:

(1) [8:295] **Shares outstanding:** To be eligible for appraisal rights, shares must actually be outstanding and held of record on the record date for determining shareholders entitled to vote on the reorganization (or, in the case of "short-form" mergers, on the effective date of the merger). [Corps.C. § 1300(b)(2)]

(a) [8:296] **Compare--unexercised stock rights:** Thus, stock options, warrants, conversion rights, etc., not yet exercised as of the record date for determining shareholders entitled to vote on the reorganization, are *not* eligible for appraisal rights. It makes no difference that they *could* have been exercised, if in fact they had not been. (The holder may still have the right to exercise such options, warrants, etc., but not the right to have these shares cashed out!)

(2) [8:297] **Shares NOT readily marketable:** To be eligible for appraisal rights, the shares must not be readily salable. The purpose of appraisal rights is to enable a dissenting shareholder to cash out his or her investment for its fair value. Thus, there is no need for such rights where the shares are readily marketable for their fair value. [See Corps.C. § 1300(b)(1)]

(a) [8:298] **Shares deemed readily marketable:** Shares meeting the following descriptions and conditions are deemed readily marketable, and thus *ineligible* for dissenters' appraisal rights:

1) [8:299] **Shares listed on national exchange or NASDAQ/NMS:** Shares listed on a national securities exchange certified by the Corporations Commissioner under Corps.C. § 25100(o) (e.g., the New York and American Stock Exchanges); or shares listed on the National Market System of the NASDAQ stock market (*see* ¶ 8:302.1); and

2) [8:300] **Not restricted as to transferability:** The shares are *not restricted* as to resale, either by the corporation (e.g., buy-sell agreements, etc.) or by any law or regulation (e.g., not "restricted" subject to SEC Rule 144); and

3) [8:301] **Less than 5% dissenting:** Holders of *less than 5%* of the outstanding shares have filed demands for appraisal rights (see below), so presumably they can sell their shares in the market for fair value without driving down the market price; and

4) [8:302] **Holders notified of appraisal rights:** The *notice* of the shareholders' meeting to act on the proposed reorganization (see below) accurately summarized the provisions of §§ 1300-1304, so as to advise all shareholders of the scope of their appraisal rights and the procedures to be followed to exercise them. [Corps.C. § 1300(b)(1)]

[8:302.1] **Comment:** Corps.C. § 1300(b)(1) continues to refer explicitly to the NASDAQ "National Market System," which has been renamed and divided into the NASDAQ Global Market and the NASDAQ Global Select Market.

(3) [8:303] **Shares entitled to vote on reorganization:** Statutory appraisal rights are available only as to shares whose approval of the reorganization is required pursuant to Corps.C. § 1201(a),(b),(e) or (f). [Corps.C. § 1300(a)]

(a) [8:304] **Shares ineligible because not entitled to vote:** Thus (except as noted below), if the transaction does *not* require shareholder approval pursuant to the foregoing sections, objecting shareholders have no right to be cashed out. This applies to:

1) [8:305] **Preferred shares unaffected by reorganization:** Approval by preferred

shareholders of the surviving or acquiring corporation is not required if their rights remain unchanged by the proposed reorganization (Corps.C. § 1201(a); *see* ¶ *8:179*). Thus, such shareholders cannot exercise statutory appraisal rights. [Corps.C. § 1300(a)]

    2) [8:306] **Shares whose voting power not significantly diluted:** Nor is approval required by shareholders of the surviving or acquiring corporation if the proposed reorganization will result in only a limited dilution of their voting power. (See the "limited dilution test" *discussed at* ¶ *8:181*.) It follows that such shareholders have no right to be cashed out as a result of the reorganization. [Corps.C. § 1300(a)]

        a) [8:307] **Exception--dissenters in a statutory close corporation:** Dilution of voting power is irrelevant where the reorganization involves shareholders of a *statutory close corporation* receiving shares in another corporation (which is *not* a statutory close corporation). Such shareholders must approve the reorganization by at least a 2/3 vote (Corps.C. § 1201(e); *see* ¶ *8:176*). And those who dissent are *entitled to be cashed out* even if there is only limited dilution of their voting power. [Corps.C. § 1300(a)]

(b) [8:308] **Compare--short-form mergers:** In short-form mergers, minority shareholder approval is not required for the merger (*see* ¶ *8:205.5*), but they are entitled to be cashed out in any case. [Corps.C. § 1300(a)]

(c) [8:309] **Compare--shareholder approval required under other provisions:** Appraisal rights are provided only where shareholder approval of the reorganization is required under Corps.C. § 1201(a),(b),(e) or (f). [Corps.C. § 1300(a)] Shareholder approval of the transaction may still be required under other subsections (see below). But, those other subsections do not entitle dissenting shareholders to compel the corporation to cash them out.

    1) [8:310] **Example:** Approval by shareholders of the acquiring corporation is not required under § 1201(b) if the reorganization will not result in significant dilution of their voting power (see above).
But their approval may still be required under § 1201(c) if a merger requires an articles amendment (*see* ¶ *8:241.1*); or, under § 1201(d) if it requires them to surrender their shares for others having different rights, preferences, privileges or restrictions (*see* ¶ *8:183.2*).
Even so, there are *no* dissenters' appraisal rights in such cases.

    2) [8:311] **Rationale:** Shareholders have no right to be cashed out simply because they oppose an articles amendment, or a change in the attributes of their shares. There is no reason, therefore, that they should have such right merely because the amendment or change is required in connection with a reorganization.

(4) [8:312] **Shares not voted in favor of reorganization:** Active opposition to the reorganization need not be shown to qualify for dissenters' appraisal rights. In general, it is sufficient that the shares were *not* voted in *favor* of the reorganization; i.e., passive opposition is enough. [Corps.C. § 1300(b)(2)]

(a) [8:313] **Compare--listed shares must be voted against:** The holders of listed shares (i.e., those listed on a national securities exchange or on the National Market System of the NASDAQ stock market, *see* ¶ *8:299*) must *actually vote* such shares *against* the reorganization at any shareholders' meeting called to approve the reorganization. (This requirement does not apply where shareholder approval is by written consent rather than at a meeting.) [Corps.C. § 1300(b)(2)]
**Comment:** Corps.C. § 1300(b) (above) continues to refer explicitly to the NASDAQ "National Market System," which has been renamed and divided into the NASDAQ Global Market and the NASDAQ Global Select Market.

(b) [8:314] **Comment:** This special requirement applies even though such listed shares may become ineligible for dissenters' appraisal rights because holders of less than 5% of the listed shares file demands (*see* ¶ *8:301*). The purpose of the requirement is to enable the corporation to learn if it will be required to repurchase dissenting shares if it proceeds with the reorganization: If the vote *against* the reorganization is less than 5% of the listed shares, the corporation knows no shares of that class can qualify for appraisal rights (*see* ¶ *8:301*). But, if the vote against is more than 5%, the corporation is on notice that it may be required to purchase *for cash* that number of

shares, and can plan accordingly.
- (5) [8:315] **Shares qualified procedurally:** The final requirement for "dissenting shares" status is that the shareholder comply with the procedural requirements for exercising appraisal rights, discussed in the following section. [Corps.C. § 1300(b)(3),(4)]

c. [8:316] **Procedure for exercising appraisal rights:** If shares are eligible for statutory appraisal rights (above), four steps must be taken by the holder to perfect his or her statutory right to be "cashed out" in the reorganization:

- [8:317] First, as discussed above, the shareholder must *refrain* from voting in *favor* of the reorganization; and, in the case of "listed" stock, must affirmatively vote *against* it if the approval is sought at a shareholders' meeting. [Corps.C. § 1300(b)(2), ¶ *8:313*]
- [8:318] Second, the shareholder must make *timely demand* upon the corporation for cash payment. [Corps.C. § 1301, below]
- [8:319] Third, the shareholder must timely *deliver* the share *certificate* to the corporation for "endorsement as dissenting shares." [Corps.C. § 1302, ¶ *8:329-330*]
- [8:320] Fourth, if no agreement is reached with the corporation as to the price to be paid, the shareholder must timely *sue* to have the court fix the fair value of the shares. [Corps.C. § 1304, ¶ *8:334 ff.*]

- (1) [8:321] **Shareholder demand upon corporation:** Shareholders seeking to exercise their right to compel the corporation to purchase their shares on reorganization must make timely written demand on the corporation. [Corps.C. § 1301(b)]

  - (a) [8:322] **Time limit for shareholder demand:** The shareholder's written demand must be *received* by the corporation (or its transfer agent) as follows:
    - [8:323] In the case of "listed" stock (*see* ¶ *8:299*), not later than the date of the *shareholders' meeting* to vote on the proposed reorganization;
    - [8:324] In all other cases (including "listed" shares where shareholder approval is sought by written consent instead of at a meeting), the demand must be received within *30 days after notice* of approval by outstanding shares (see below) has been mailed by the corporation to the shareholders. (In the case of short-form mergers, the demand must be received within 30 days after the corporation mailed notice that the merger was to become effective.) [Corps.C. § 1301(b)]

      - 1) [8:325] **When prior notice required from corporation:** Except for listed stocks (above), the time for demand by dissenting shareholders does not begin to run until the corporation has first mailed notice to the shareholders, alerting them to their statutory appraisal rights.
      - 2) [8:325.1] **Contents of corporation's notice:** The corporation's notice must be mailed to all shareholders of record *within 10 days following shareholder approval* of the reorganization; and must contain the following:
        - Notice that the reorganization has been approved by affirmative vote of a majority of the outstanding voting shares;
        - A copy of Corps.C. §§ 1300-1304 (setting forth dissenting shareholders' rights and the procedure to enforce those rights);
        - A statement of the price determined by the corporation to represent the fair market value of the dissenting shares; and
        - A "brief description" of the procedure to be followed if the shareholder exercises his or her rights as a dissenting shareholder. [Corps.C. § 1301(a)]
      - 3) [8:326] **Notice as irrevocable offer:** The corporation's notice constitutes an *irrevocable* offer by the corporation to purchase any dissenting shares at that price (unless the shares lose their status as such, see ¶ *8:352*). [Corps.C. § 1301(a)]

  - (b) [8:327] **Contents of shareholder demand:** The dissenting shareholder's demand to the corporation must state:
    - The number and class of shares held of record by the shareholder which the shareholder demands the corporation purchase; and
    - The amount the shareholder claims to be the fair market value of those shares as of the day before announcement of the proposed reorganization (or short-form merger). [Corps.C. § 1301(c)]

    **FORM:** Demand for Purchase of Shares (Corps. C. § 1301), see *Cal. Prac. Guide Corps. Form 8:G.*
      - 1) [8:328] **Demand as irrevocable offer:** The dissenting shareholder's demand

constitutes an *irrevocable* offer by such shareholder to sell his or her shares at such price. [Corps.C. § 1301(b),(c)]

Thus, the shareholder may not withdraw such demand (offer) unless the corporation consents. [Corps.C. § 1308]

(2) [8:329] **Delivering certificate for endorsement:** Next, in order to perfect their appraisal rights, the dissenting shareholders must submit their share certificates to the corporation or its transfer agent for endorsement as "dissenting shares." (Exception: If the corporation has adopted uncertificated shares (¶ *5:472*), the shareholder need only deliver a written notice stating the number of shares the shareholder demands that the corporation purchase.) [Corps.C. § 1302]

    (a) [8:330] **Time limit for delivery:** The certificates (or written notice) must be submitted no later than 30 days after the date on which the corporation mailed notice of shareholder approval of the reorganization (above). [Corps.C. § 1302]

    (b) [8:331] **Endorsement by corporation:** The purpose of requiring the shareholders to submit their certificates is to enable the corporation to stamp or endorse thereon a statement that the shares are dissenting shares (or to exchange them for new certificates so stamped or endorsed). [Corps.C. § 1302]

On any subsequent transfer of the shares in question, the new certificates (or "initial transaction statement" if the corporation has adopted uncertificated shares, ¶ *5:472*) must bear a like statement (i.e., that the shares are dissenting shares), together with the name of the original dissenting holder of the shares. [Corps.C. § 1302]

(This prevents a holder in due course from acquiring the certificate, unaware that the shares are being sold to the corporation.)

(3) [8:332] **Obtaining payment where value agreed upon:** If the corporation and shareholder agree that the shares qualify as "dissenting shares" (above), and also agree upon the price of the shares, the only remaining step is to obtain payment from the corporation. Such payment is due within 30 days after the date of such agreement, or after all statutory or contractual conditions to the reorganization have been satisfied, whichever is later. [Corps.C. § 1303(b)]

    (a) [8:333] **Plus interest:** The shareholder is also entitled to interest from the agreement date to the date of actual payment. The interest rate is 10% (the legal rate applicable to judgments). [Corps.C. § 1303(a); CCP § 685.010]

(4) [8:334] **Action to enforce payment where no agreement:** If the corporation denies that the shares qualify as "dissenting shares," or the corporation and shareholder are unable to agree on the price for the shares, legal action is required. Either the shareholder or the corporation may commence the action in the "appropriate" superior court. [Corps.C. § 1304(a)]

    (a) [8:335] **Time limit for commencing action:** Any such action must be commenced within *6 months* after the corporation mailed notice of shareholder approval of the reorganization (¶ *8:325*). [Corps.C. § 1304(a)]

    (b) [8:336] **Joinder and consolidation of actions:** Any two or more dissenting shareholders may join as plaintiffs in such action (or be joined as defendants, if the action is instituted by the corporation). And, if separate actions have been filed by such shareholders, they may be consolidated. [Corps.C. § 1304(a)]

    (c) [8:337] **Issues to be tried:** If the corporation denies that plaintiffs' shares qualify as "dissenting shares," that issue must be tried first. If that is resolved in plaintiffs' favor, the court may then determine the fair market value of such shares. [Corps.C. § 1304(c)]

        1) [8:338] **Valuation date:** The fair market value of dissenting shares is to be determined as of the *day before the first announcement* of the terms of the proposed reorganization or short-form merger--thus excluding any change in value resulting from the proposed action. [Corps.C. § 1300(a)]

[8:339] Appreciation or depreciation in value thereafter is disregarded (except if a stock split, reverse stock split or stock dividend becomes effective after the date of the announcement, the shares' value must be adjusted accordingly). [Corps.C. § 1300(a)]

    (d) [8:340] **Procedure for determining value (appraisal process):** Whenever the fair market value of the shares is in dispute, the court may either determine such value

itself, or appoint one or more impartial appraisers to make such determination. [Corps.C. § 1304(c)]

The court is *not* required to appoint appraisers. Nor, if it does so, is it required to accept their determination of market value. I.e., the judge may make his or her own determination of value, based on whatever evidence is before the court.

1) [8:341] **Report by appraisers:** If the court appoints appraisers, they must proceed "forthwith" to determine the shares' market value (below); and to file a written report of such determination with the court clerk within whatever time is set by the court. [Corps.C. § 1305(a)]

2) [8:342] **Court may accept or reject:** As stated, the report is not conclusive. Rather, on motion of any party, it may be submitted to the court, and considered as *evidence* of value. If the court finds the report reasonable, it may accept such determination as being the value of the shares in question. [Corps.C. § 1305(a)]

   a) [8:342.1] **"Net book value" method may be proper:** The court may accept an appraisal based on the "net book value" method (i.e., the net book value of the corporate assets minus liabilities, divided by the number of outstanding shares) if the corporation has no real earnings or other value based on earnings capacity. [*Meadows v. Bicrodyne Corp.* (9th Cir. 1986) 785 F2d 670, 673]

3) [8:343] **Determination by court:** If the appraisers fail to agree or fail to file a report within 10 days of their appointment (or such time as allowed by the court), or if their determination of value is not accepted by the court, the court will make its own determination of the value of the dissenting shares. [Corps.C. § 1305(b)]

4) [8:344] **Other evidence of value:** Value of the shares is to be determined with reference to a "free" market. Thus, the court may properly consider evidence of the *directors' and officers' misconduct* if it lowered the value of the shares. [*Sturgeon Petroleums, Ltd. v. Merchants Petroleum Co.* (1983) 147 CA3d 134, 141, 195 CR 29, 33]

(e) [8:345] **Judgment:** Upon determining that the shares qualify as "dissenting shares," and their value as of the appropriate valuation date, the court will enter judgment requiring the corporation to purchase the dissenters' shares at such value. The judgment is payable only if the share certificates have been endorsed and delivered to the corporation. (But if the corporation has adopted uncertificated shares (¶ *5:472*), the judgment is payable "forthwith"--i.e., no delivery requirement.) [Corps.C. § 1305 (c),(d)]

1) [8:346] **Interest:** The shareholder is entitled to interest at the legal rate from the date on which judgment is entered. (No prejudgment interest, however, except as provided below.) [Corps.C. § 1305(c)]

2) [8:347] **Costs:** If the value of the shares is determined to be no more than previously offered by the corporation, costs may be awarded or apportioned as the court deems just. [Corps.C. § 1305(e)]

   [8:348] But if the appraised value of the shares is *more* than offered by the corporation, the shareholder is entitled to recover costs, including any appraisers' fees fixed by the court. [Corps.C. § 1305(e)]

   [8:349] Moreover, if the value fixed by the court *exceeds 125%* of the price offered by the corporation, the court has discretion to award the shareholder's *attorney fees* and expert witness fees, *plus interest* at the legal rate on judgments (10%) from the date of the shareholder's demand and submission of shares for endorsement (above). [See Corps.C. § 1305(e)]

d. [8:350] **Effect of lack of lawful source for payment:** The statutory restrictions on a corporation's repurchasing its shares (Corps.C. § 500 et seq.) apply to purchases from dissenting shareholders in reorganizations. Thus, if the corporation lacks retained earnings or other net assets which lawfully can be used for share repurchases (*see* ¶ *7:10 ff.*), the judgment or debt to the dissenting shareholders is not payable until the corporation acquires such funds. [Corps.C. § 1306]

In the meantime, such shareholders become *creditors* of the corporation--but their claims are *subordinate* to the claims of other creditors in the event of liquidation. [Corps.C. § 1306]

e. [8:351] **Effect of dividends paid:** Holders of dissenting shares retain all shareholder rights until determination of the value of their shares (see below). Thus, they are entitled to any

distributions paid by the corporation. However, any *cash* dividends paid by the corporation after shareholder approval of the reorganization are credited against the amount ultimately determined to be due for the dissenting shares. [Corps.C. §§ 1307, 1308]

f. [8:352] **Termination of dissenting share status:** "Dissenting shares" status ends upon occurrence of any of the following events:

- [8:353] The corporation *abandons* the reorganization. [Corps.C. § 1309(a)] (In such event, the corporation must reimburse dissenting shareholders for necessary expenses, including reasonable attorney fees, incurred in any good faith action to determine value, commenced in good faith by such shareholders; see Corps.C. § 1309(a).)

- [8:354] The dissenting shareholder, with the consent of the corporation, *withdraws* the demand that the corporation purchase the shares. [Corps.C. § 1309(d)]

- [8:355] The dissenting shareholder *transfers* the shares (before submitting them to the corporation for endorsement), or exercises conversion rights whereby they are converted to shares of a different class. [Corps.C. § 1309(b)]

- [8:356] The corporation and dissenting shareholder fail to agree on a price for the shares (or whether they qualify as "dissenting shares"), and neither sues within the *6-month limit* permitted for such actions (¶ *8:335*). [Corps.C. § 1309(c)]

- [8:357] The market value of the shares is *agreed upon* or *determined* by the court--at which time, the shareholders lose their status as such and become creditors for the amount due them (see above). [Corps.C. § 1308]

g. [8:358] **Appraisal rights exclusive remedy:** Statutory appraisal rights are designed to be the exclusive remedy available to dissenting shareholders. A shareholder having the right to be "cashed out," as provided above, has no right to attack the validity of a proposed reorganization or short-form merger, or to have it set aside. [Corps.C. § 1312(a); *Steinberg v. Amplica, Inc.* (1986) 42 C3d 1198, 1208-1209, 233 CR 249, 255; *Singhania v. Uttarwar* (2006) 136 CA4th 416, 426, 38 CR3d 861, 868; *Sturgeon Petroleums, Ltd. v. Merchants Petroleum Co.* (1983) 147 CA3d 134, 140, 195 CR 29, 32]

This is true even if the shareholder claims to have been defrauded by management and/or controlling shareholders in connection with the reorganization. [*Sturgeon Petroleums, Ltd. v. Merchants Petroleum Co.*, supra, 147 CA3d at 141, 195 CR at 33; *Steinberg v. Amplica, Inc.*, supra, 42 C3d at 1211-1212, 233 CR at 257 (approving *Sturgeon* where minority shareholder waited to assert previously known claim until after merger consummated; *Singhania v. Uttarwar*, supra, 136 CA4th at 427-433, 38 CR3d at 869-874] (But the court may consider evidence of such fraud in determining the shares' appraisal value; see ¶ *8:344*.)

[8:359-360] *Reserved.*

(1) [8:361] **Exception--action to enforce special articles provision:** If the articles set forth the amount to be paid in respect to any class of shares in the event of a reorganization or short-form merger, such provisions control. A shareholder is entitled to enforce such right by appropriate action, without complying with the requirements for statutory appraisal rights. [Corps.C. §§ 1311, 1312(a)]

   (a) [8:361.1] **Limitation--when merger or sale-of-assets agreement controls:** But the terms of a merger or sale-of-assets reorganization will control over the articles if they are approved by the same percentage of outstanding shares of the affected class (or series) as would be able to *amend* the articles provision to provide for payment of a different amount (see ¶ *8:57 ff.*). [Corps.C. § 1312(a)]

(2) [8:362] **Exception--action to test validity of shareholder approval:** The Code specifically authorizes a dissenting shareholder to bring "an action to test whether the number of shares required to authorize or approve the reorganization or short-form merger were legally voted in favor thereof." [Corps.C. § 1312(a)]

   (a) [8:363] **Application:** An action to test whether the shares were "legally voted" arguably might permit challenges such as whether the meeting was properly called, and proper notice given to all shareholders; whether there were adequate disclosures made in soliciting proxy votes; the validity of proxy votes, the correctness of the vote tallies, etc. [See *Singhania v. Uttarwar*, supra, 136 CA4th at 427, 38 CR3d at 868 (quoting text)]

   However, such an action does *not* extend to such matters as alleged fraud, misrepresentation, forgeries, etc., in connection with obtaining approval of the reorganization. [*Sturgeon Petroleums Ltd. v. Merchants Petroleum Co.*, supra, 147

CA3d at 140, 195 CR at 32]

    (b) **[8:364] Suspends other proceedings:** Such an action may be brought as an alternative to exercise of statutory appraisal rights, and *suspends* all proceedings pending to determine the value of the dissenter's shares. It does not prejudice the shareholder's right to be cashed out if the action fails. [Corps.C. §§ 1310, 1312(a)]

(3) **[8:365] Exception--action to set aside reorganization not at "arms' length":** If one of the corporations in a reorganization or short-form merger is controlled by the other (or both are under common control), there is an increased risk that the terms may be unfair to minority shareholders. Therefore, they are given *alternative* remedies: They may either assert their appraisal rights and be cashed out, *or* may sue to enjoin or set aside the reorganization or short-form merger (on grounds of unfairness, breach of fiduciary duty, etc.). [Corps.C. § 1312(b)]

    (a) **[8:366] Either as bar to other:** The remedies are mutually exclusive: Shareholders cannot sue to enjoin or set aside a reorganization if they have previously demanded payment for their shares. And, conversely, they cannot exercise appraisal rights, after having once filed an action attacking the validity of the reorganization or short-form merger. [Corps.C. § 1312(b)]

    (b) **[8:367] Burden of proof on controlling party:** In an action by a minority shareholder attacking the validity of a reorganization or short-form merger, the burden of proof is on the controlling party (parent corporation) to establish that the terms are "just and reasonable" to the shareholders of the controlled corporation (or of the corporations under common control). [Corps.C. § 1312(c)]

        1) **[8:367.1] Compliance with special procedures for "controlling person" reorganizations:** New procedures governing reorganizations proposed by controlling persons should make it easier to satisfy these requirements. (See Corps.C. § 1203; *discussed at ¶ 8:172.5 ff.*)

    (c) **[8:368] Relief available:** A court may either enjoin a proposed reorganization or short-form merger, or set it aside after it has been consummated. [Corps.C. § 1312 (b)]

But injunctive relief can be granted only after 10 days' prior notice to the corporation (no immediate restraining orders), and only if the court finds that "*clearly no other remedy* will adequately protect the complaining shareholder or the class of which he is a member." [Corps.C. § 1312(b) (emphasis added)]

      • **[8:369] Comment:** The purpose, of course, is to prevent a recalcitrant minority shareholder from holding up the transaction where the amount in dispute is relatively small and a damage award would be a fully adequate remedy.

(4) **[8:370] Compare--action under federal securities laws:** Even when statutory appraisal rights are the exclusive remedy under state law, a dissenting shareholder may be entitled to sue under certain provisions of the federal securities laws. For example:

    (a) **[8:371] Anti-fraud rules:** A dissident shareholder may sue the corporation under Rule 10b-5, for damages *or* injunctive relief, where management has made material misrepresentations or nondisclosures to the shareholders-- notwithstanding the existence of appraisal rights under state law. [*Vine v. Beneficial Fin. Co.* (2nd Cir. 1967) 374 F2d 627, 635]

    (b) **[8:372] Proxy rules:** And, if material misstatements or omissions were made in the proxy solicitations for shareholder approval of the reorganization, an action for damages can be maintained under SEA § 14. A court has power thereunder to award damages, or even *set aside* (unwind) a corporate merger where shareholder approval was obtained by materially false proxy materials. [*J.I. Case v. Borak* (1964) 377 US 426, 430-431, 84 S.Ct. 1555, 1559]

        1) **[8:372.1] Causal nexus required between fraud and injury:** Shareholders suing for a violation of the federal proxy rules must show the violation *caused* their injury. Thus, where a majority shareholder already held sufficient shares to approve a cash-out merger, minority shareholders whose votes were solicited by a misleading proxy statement could not recover under § 14(a) for damages allegedly resulting from the *merger* (i.e., proxy rule violations did not *cause* merger or plaintiff's damages because minority shareholder votes not needed for approval). [*Virginia Bankshares, Inc. v. Sandberg* (1991) 501 US 1083, 1102- 1103, 111 S.Ct.

2749, 2763-2764]

However, the Supreme Court has reserved the question whether a cause of action may be maintained for a deceptive proxy statement that, by inducing shareholders to vote in favor of a merger, deprives those shareholders of their *state dissenters' appraisal rights*. [*Virginia Bankshares, Inc. v. Sandberg*, supra, 501 US at 1108, 111 S.Ct. at 2766, fn. 14] Lower courts have recognized a causal link between the misleading proxy statement and this type of injury, and thus have allowed a cause of action under § 14(a). [See, e.g., *Wilson v. Great American Industries, Inc.* (2nd Cir. 1992) 979 F2d 924, 930-931]

7. **[8:373] Divisive Reorganizations:** Under some circumstances, it may be desirable for a corporation to divide its existing business or assets into two or more separate corporations. Typical reasons: to solve irreconcilable conflicts among the shareholders (as an alternative to dissolution); or to facilitate a sale and divestiture of just part of the business; or to insulate separable business activities from risks likely to be generated by the other (subject to "alter ego" limitations, *see ¶ 2:50 ff.*).

   a. **[8:374] Forms of reorganization:** Dividing the corporation for these or any other reasons may be accomplished in one of three different ways: as a "*spin off*," or as a "*split off*," or as a "*split up*."

   Each of these *may* be tax-free (*see ¶ 8:401*).

    (1) **[8:375] Spin off:** A "spin off" occurs when a parent corporation distributes the stock of a subsidiary to its own shareholders pro rata *as a dividend*. As a result, those shareholders now own stock in two corporations. (The two corporations are now brother-sister, rather than parent-subsidiary.)

     (a) **[8:376] Example:** P Corp. forms S Corp., and transfers part of its assets to S Corp. for all of the S Corp. stock. P Corp. then distributes the S Corp. stock pro rata to the P Corp. shareholders as a dividend, so that they now own all of the stock of both corporations.

     (b) **Procedural considerations**

      1) **[8:377] Formation:** Formation of the subsidiary (S Corp.) involves the same organizational requirements as any new corporation. Ordinarily, the officers of the parent (P Corp.) will act as the incorporators and initial directors.

      2) **[8:378] Distributions limitations:** The dividend-in-kind to P Corp.'s shareholders is subject to the limitations applicable to corporate distributions to shareholders; i.e., P Corp. must have retained earnings or other sufficient net worth against which such a dividend can be charged (Corps.C. §§ 500-503, ¶ 7:10 ff.).

     (c) **[8:379] Securities law considerations:** "Spin offs" are treated differently under federal and California securities laws:

      1) **[8:380] Federal law:** Under federal securities law, a "spin-off" stock dividend is ordinarily treated as a "sale" for value. [See *SEC v. Datronics Engineers, Inc.* (4th Cir. 1973) 490 F2d 250, 253, cert.den. (1974) 416 US 937; see also SEC Release No. 33-4982 (July 2, 1969)]

      The effect is that the original issuance to P Corp. may not qualify for the "private placement" exemption (*see ¶ 5:171*)--because P Corp. did not have the requisite investment intent (i.e., "to hold for its own account and not with view toward further distribution"). P Corp. would thus be viewed as an underwriter engaged in a "sale," thus requiring registration of the spin off (*unless* some other exemption not requiring investment intent is available-- e.g., the "intrastate offering" exemption; *see ¶ 5:81*).

       a) **[8:381] Compare--spin offs not treated as "sales":** But some spin offs may not be treated as "sales for value" by the SEC (and thus would not require registration). Some key factors in determining that a spin off stock dividend is *not* a "sale for value" are the following:

        • Adequate information concerning the corporation whose shares are "spun off" is publicly available (e.g., it is a "reporting company" under the SEA); [*AFK Foods, Inc.*, CCH Fed. Sec.L. Rptr. 79-80, ¶ 82,3771]

        • No new public market is created in the spun off shares; [*Flordina Employees Ins.Co.* CCH Fed.Sec.L.Rptr. 81, ¶ 76,7821]

      => **[8:382] *PRACTICE POINTER:*** If in doubt whether the spin off will be treated

as a "sale," and no exemption is clearly available, you should consider requesting a "No Action" letter from the SEC. This is far less costly than registering the spin off, and far less risky than proceeding without registration!

2) [8:383] **California law:** Under California law, a spin-off distribution by P Corp. to its stockholders is ordinarily *not* treated as a "sale for value" and thus not subject to qualification requirements. [Corps.Commr.Opns. Nos. 76/9, 72/141]

[8:384] On the other hand, the *initial* issuance of S Corp. shares to P Corp. would have to be qualified unless an exemption is available. The "limited offering" exemption (§ 25102(f), ¶ *5:256*) *may* be available here. Arguably, as long as P Corp.'s *shareholders* meet the requirements of § 25102(f), P Corp. should be viewed as a mere conduit, so that its lack of requisite investment intent may be disregarded. [See Corps.Commr. Opn. 83/1C]

(2) [8:385] **Split offs:** A "split off" involves the same steps as a spin off, except that the parent corporation's shareholders do not receive stock in the subsidiary as a dividend. Rather, they are offered such stock in *exchange* for a portion of their existing stock in the parent corporation. The effect is a *redemption* or repurchase of the parent corporation's stock, paid for with the stock of the subsidiary.

(a) [8:386] **Example:** P Corp. forms S Corp. and places part of its assets in S Corp. in return for all of S Corp.'s stock. P Corp. then offers the S Corp. stock to its stockholders in exchange for *some* of their stock in P Corp. After such exchange, there are two groups of stockholders: P stockholders who exchanged their stock for S Corp. stock and those who did not.

(b) [8:387] **Procedural considerations:** The corporate law considerations are much the same as with the "spin off," above. The only difference is that the final step (the exchange of stock in the subsidiary for some of the parent corporation's stock) is treated as a redemption or repurchase (rather than as a dividend-in-kind, in the "spin off").

1) [8:388] **Formation:** If the transfer of assets is to a new (rather than existing) subsidiary, the usual considerations on formation apply.

2) [8:389] **Distributions limitations:** The parent corporation's redemption or repurchase of a portion of its stock, in exchange for stock of its subsidiary, is subject to the same limitations and requirements of any other shareholder distribution (¶ *7:10 ff.*).

(c) [8:390] **Securities law considerations:** A "split off" is treated as an "offer" and "sale" for value under both federal and California securities laws, as it involves a bargained-for exchange of shares. Thus, it is subject to registration and qualification requirements, unless an exemption is available.

1) [8:391] **Federal law:** A split off will ordinarily have to be registered under the SA of 1933. The "private placement" and Reg. D exemptions are probably *not* available for the issuance of the subsidiary's shares to the parent, because the parent (P Corp.) cannot satisfy the investment intent requirement. However, the "intrastate offering" exemption may potentially be available.

2) [8:392] **California law:** If the initial issuance by S Corp. to P Corp., and the later redistribution by P Corp. to its shareholders, are part of the same transaction, P Corp. will be treated as a mere conduit or "underwriter" under Corps.C. § 25022. Thus, the split off will be exempt under the § 25102(f) "limited offering" exemption if P Corp.'s *shareholders* meet its requirements. [See Corps.Commr.Opn. 83/1C]

[8:393] **Comment:** But P Corp. could not be regarded as a mere conduit where S Corp. was formed for some independent business purpose, and P Corp. has held its shares for a protracted period of time. I.e., in such a case, the initial issuance by S Corp. and subsequent split off by P Corp. would be regarded as independent transactions.

(3) [8:394] **Split ups:** A "split up" is similar to the above, but involves *liquidation of the parent* corporation. All of its assets are transferred to two or more subsidiaries in exchange for all of their stock. The parent corporation is then dissolved, and the subsidiaries' stock is distributed to its shareholders as a liquidating dividend.

(a) [8:395] **Example:** P Corp. forms two new subsidiaries, S1 Corp. and S2 Corp. It puts part of its assets in each of the subsidiaries, in return for their stock. P Corp. then

dissolves. The S1 and S2 stock is distributed to the P Corp. shareholders as a liquidation dividend. (Usually, by agreement, some P shareholders get S1 stock and others get S2, so they are free to go their separate ways.) The result is that P Corp. no longer exists, and its assets are now held by two other corporations, owned by separate groups of former P shareholders.

(b) **Procedural considerations**

1) [8:396] **Formation:** If it is necessary to form new subsidiaries, the usual considerations on corporate formation apply. (*See ¶ 4:1 ff.*)

2) [8:397] **Shareholder approval required:** P Corp.'s shareholders must approve the split up--not necessarily because it is a sale-of-assets reorganization (*see ¶ 8:262 ff.*), but rather because it involves *dissolution* and liquidation of P Corp. (See discussion of shareholder approval requirement on dissolution at ¶ *8:758.*)

3) [8:398] **Liquidation distribution:** The distribution of S1's and S2's stock in liquidation of P Corp. must comply with the requirements applicable to corporate liquidation (protection of creditors, etc.); see ¶ *8:901 ff.*

(c) [8:399] **Securities law considerations:** Under either federal or California securities laws, the liquidating (split-up) distribution ordinarily will *not* be considered a "sale for value," and thus it is not subject to registration or qualification requirements. [See *National Petroleum Corp., BRF Resources, Inc.*, CCH Fed.Sec.Law.Rptr. 77-78, ¶ 81,119; and Corps.Commr.Opn. 72/131]

[8:400] However, problems similar to those discussed in connection with spin offs and split offs, above, arise with regard to the initial issuances by S1 and S2 of their stock to P Corp.: I.e., presumably those initial issuances require registration under federal law unless some exemption *not* requiring "investment intent" by P Corp. is available (*see ¶ 8:391*). Under California law, P Corp. would presumably be viewed as a mere conduit so that the § 25102(f) limited offering exemption would be available if P Corp.'s *shareholders* satisfy all of its requirements (*see ¶ 8:392*).

b. [8:401] **Tax treatment ("D reorganization"):** If the spin off, split off or split up meets the requirements below, it will be *tax-free* both to the corporations involved and to their shareholders. [IRC § 355] (A qualifying transaction is referred to as a "D reorganization" because it is described in IRC § 368(a)(1)(D).)

(1) [8:402] **Requirements:** First and foremost, a divisive "D" reorganization (as well as any other reorganization) must have a bona fide *business purpose*. [Treas. Regs. § 1.355-2 (b); *Gregory v. Helvering* (1935) 293 US 465, 469- 470, 55 S.Ct. 266, 267-268; *Commissioner v. Wilson* (9th Cir. 1965) 353 F2d 184, 186; see Rev.Rul. 2003-55, 2003-22 IRB 961]

In addition, it must meet several, complex statutory tests which (at the risk of oversimplification) can be summarized briefly as follows:

(a) [8:403] **"Device" rule:** The transaction must *not* be used "principally as a device" for distribution of earnings and profits of either parent or subsidiary corporations. [IRC § 355(a)(1)(B)]

1) [8:404] **Example:** If the S Corp. shares are *sold* immediately after the reorganization, a court is likely to find that the reorganization was merely a "device" for bailing out P Corp.'s earnings and profits as a capital gain-- particularly if the sale was planned before the reorganization. [See *Gregory v. Helvering*, supra, 293 US at 469-470, 55 S.Ct. at 267-268; *South Tulsa Pathology Lab., Inc. v. Commr.* (2002) 118 TC 84]

(b) [8:405] **Distribution of control:** The parent corporation must have had control of the subsidiary corporation or corporations, and must have distributed such control to its own stockholders. There are two separate requirements:

• [8:406] **Solely stock or securities:** First, P Corp. must be distributing to its shareholders *solely* stock or securities of a *controlled* subsidiary. [IRC § 355(a)(1) (A)] ("Control" is defined in the usual way for tax purposes; i.e., ownership of at least 80% of the voting shares and of each class of nonvoting stock; see IRC § 368 (c) and Rev.Rul. 59-259, 1959-2 CB 115.)

• [8:407] **At least 80%:** Second, P Corp. must distribute all of the subsidiary's stock; or if not, *at least 80%* thereof (i.e., control), and show the IRS a valid business purpose--other than tax avoidance--for retaining the balance. [See IRC § 355(a)(1)

(D)]

(c) [8:408] **Five-year active business:** Except for split ups (where the parent corporation is dissolved), both parent and subsidiary corporations must continue to be engaged in active conduct of a trade or business after the reorganization; *and* those businesses must have been carried on for *at least five years before* the reorganization. [IRC § 355(b)]

    1) [8:409] **"Passive" business distinguished:** The "active business" requirement means what it says: i.e., an active trade or business, as opposed to passive investments. Thus, a reorganization is not tax-free where the assets transferred to a subsidiary are rented out or leased to others on a net rental basis, because rental activity is *not* an "active business." [Treas.Reg. 1.355-3(b)(2)(iv); *Bonsall v. Commr.* (2nd Cir. 1963) 317 F2d 61, 64-65]

    2) [8:409.1] **Spin-off of business acquired during five-year period ("expansion doctrine"):** If a corporation that engaged in the active conduct of a trade or business during the five-year period purchased, created or otherwise acquired another company in the *same line of business*, the acquisition is deemed an *expansion* of the original business, and the entire combined business is treated as having been actively conducted during the five-year period. [Treas.Regs. § 1.355-3 (b)(3)(ii),(c); see ¶ Rev.Rul. 2003-38, 2003-1 CB 811--long-time retailer's spin-off of 2-year-old Internet sales business qualified as tax-free under expansion doctrine; *Athanasios v. Commr.*, TC Memo 1995-72]

(2) [8:410] **Gain or loss computations:** If a spin-off, split off, or split up qualifies as a "D reorganization," no gain or loss is recognized to either corporation or to the shareholders at the time of transaction. [IRC § 355]

(a) [8:411] **Carryover basis:** The assets transferred to the subsidiary corporation retain the same basis as when held by the parent corporation. [IRC § 362(b)] Likewise, the parent corporation's shareholders take the basis of the surrendered shares in the stock they receive. (Where they have stock in both parent and subsidiary corporations, as in a spin off, the basis on the old stock is apportioned in accordance with fair market values; *see* ¶ *7:284*.) [IRC § 358(a)]

(b) [8:412] **Taxability of "boot":** Of course, if cash or property other than securities of the subsidiary is distributed, the subsidiary will recognize gain (but not loss) on the appreciation of such property. [IRC § 361; *see* ¶ *8:282.2*] The distribution will also be taxable to the recipient shareholders. [IRC § 356(a)]

    1) [8:412a] **"Nonqualified preferred stock" as "boot":** Here again, "nonqualified preferred stock" (¶ *3:340.1 ff.*) is treated as "boot" (unless received for other "nonqualified preferred stock"). [IRC §§ 354(a)(2)(C)(i), 356(e)]

(c) [8:412.1] **Exception--corporate gain recognized upon certain stock distributions/sales:** Special rules prevent the corporation from using a "D reorganization" as a vehicle to *sell* a business without recognizing gain. Absent such rules, taxable gain could be avoided where, for example, a parent distributes to its shareholders stock in a subsidiary that has appreciated substantially and the distribution is followed by a prearranged sale of the stock to a third party. Under a complex set of rules, a corporation recognizes gain on distribution of a subsidiary's stock or securities if, immediately after the distribution, a shareholder (or group of related shareholders) holds a 50% or greater interest in either the subsidiary or distributing corporation and such interest is attributable to stock or securities (of either corporation) acquired by *purchase* within a specified period of time (either the preceding five years or, alternatively, the preceding two years or following two years, depending upon the circumstances). In such event, the corporation recognizes gain as if it *sold* the subsidiary's stock at *fair market value*. [See IRC § 355(c),(d), (e); Treas.Temp.Regs. § 1.355-7T]

(d) [8:413] **Compare--nonqualifying transactions:** Of course, if a spin off, split off or split up fails to qualify as a "D reorganization," it will be subject to normal rules governing distributions to shareholders: i.e., a spin off would be taxable as a dividend in kind (¶ *7:178*); a split off would be taxable as a redemption or repurchase of shares (¶ *7:228*); and a split up would be taxable as a distribution in complete liquidation (¶ *8:1152*).

(3) [8:413.1] **California property tax reassessment:** A "D" reorganization may result in a "change of ownership" of the involved corporations' real property, thus triggering reassessment for property tax purposes. [*Pueblos del Rio South v. City of San Diego* (1989) 209 CA3d 893, 899-908, 257 CR 578, 581-588; *see ¶ 8:118.20*]

8. [8:414] **Other Nontaxable Reorganizations:** "A mere change in the identity, form or place of organization of one corporation, however effected" is a tax-free "F" reorganization. [IRC § 368(a)(1)(F)]

[8:415] (For corporate law purposes, however, such changes are *not* treated as "reorganizations" and thus not subject to shareholder approval and other procedural requirements; see Corps.C. § 181.)

[8:416] Changes in a corporation's name, firm or place of organization are tax-free because they do not result in (and usually are not for the purpose of) tax avoidance. [See Rev.Rul. 96-29, 1996-1 CB 50]

For example, a California corporation, wishing to become a Delaware corporation, forms a Delaware subsidiary into which it merges (or to which it transfers all its business and assets in exchange for stock and securities, which it then distributes to its shareholders in liquidation). Such a reorganization would potentially qualify as a tax-free "F reorganization."

[8:417] But a transaction will not be tax-free if it results in a shift in *ownership*. [See *Russell v. Commr.* (6th Cir. 1987) 832 F2d 349, 352-353]

[8:418-450] *Reserved.*

© 1984-1985, 1987-2008 by The Rutter Group, a Division of Thomson/West

(2008)

CACORPS CH. 8-B

END OF DOCUMENT

Adobe Reader is required to view PDF images.



© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.